# In the United States Court of Federal Claims

No. 20-1614
(Filed:  19 March 2021[*])

```
******************************************
AMERICAN K-9 DETECTION              *
SERVICES, LLC,                      *
                                    *
                  Plaintiff,        *
                                    *
v.                                  *
                                    *   Organizational Conflict of Interest;
THE UNITED STATES,                  *   USPS SP&Ps; APA Standard of Review;
                                    *   RCFC 52.2; Remand Without Vacatur
                  Defendant,        *
                                    *
and                                 *
                                    *
MICHAEL STAPLETON                   *
ASSOCIATES, LTD.,                   *
                                    *
                  Defendant-Intervenor.  *
                                    *
******************************************
```

     *Daniel J. Strouse*, of Cordatis LLP, with whom was *Joshua D. Schnell*, all of Arlington, VA, for plaintiff.

     *John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman Jr.*,

---

[*] This Opinion and Order was originally filed under seal on 8 March 2021 pursuant to the protective order in this case.  The Court provided the parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than 15 March 2021 at 12:00 p.m.  The parties filed separate proposed redactions, with the government filing proposed redactions on 12 March 2021 and plaintiff filing its opposition to some of the government's proposed redactions and its own proposed redactions on 15 March 2021.  *See* Def.'s Resp. to March 8, 2021, Order, ECF No. 51; Pl.'s Proposed Redactions to the March 8, 2021, Order and Objs. to Government Proposed Redactions, ECF No. 52, Attachment A.  On 16 March 2021, the Court ordered the parties to file a joint status report on or before 19 March 2021 at 12:00 p.m. with agreed-upon proposed redactions and stating any further disagreement, reminding the parties of the "presumption that judicial records should be available to the public."  Order, ECF No. 53 (quoting *DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.*, No. 2020-1514, 2021 WL 936348, at *3 (Fed. Cir. Mar. 12, 2021)).  The parties filed a joint status report on the morning of 19 March 2021, stating they "have resolved their differences over the proposed redactions."  Joint Status Report at 2, ECF No. 54.  The Court accepts the parties' proposed redactions and reissues the order, with redacted language replaced as follows:  "[XXXXX]."

Director, and *Reginald T. Blades Jr*., Assistant Director, and *Shoshana O. Epstein*, Attorney, Postal Service, all of Washington, DC, for defendant.

    *Ryan C. Bradel*, of Ward & Berry PLLC, with whom was *Stephen G. Darby*, all of Tysons, VA, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

    Plaintiff, American K-9 Detection Services, LLC ("plaintiff" or "AMK9") brings this pre-award bid protest against the United State Postal Service ("USPS" or "the government"), in which the government awarded a contract for canine explosive detection and alarm resolution services to defendant-intervenor Michael Stapleton Associates, LTD. ("defendant-intervenor" or "MSA"), under Solicitation No. 2B-20-A-0087 ("solicitation").  This pre-award protest challenges only the terms of the solicitation before USPS's award of the contract; plaintiff's post-award challenge is pending before USPS, and plaintiff has filed a pre-filing notice in this Court.  Pending before the Court are plaintiff's motion for judgment on the administrative record ("MJAR") and the government's cross-MJAR, as well as plaintiff's motion for preliminary injunction and temporary restraining order ("TRO") and plaintiff's motion for evidentiary hearing and request for status update.  For the following reasons, the Court **STAYS** plaintiff's MJAR, **STAYS** the government's cross-MJAR, **STAYS** plaintiff's motion for preliminary injunction and TRO, **STAYS** plaintiff's motion for evidentiary hearing and request for status update, and **REMANDS** this case to USPS for complete investigation.

## I.  Background

    Following the September 11th attacks, the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission") issued a federal mandate to the Transportation Security Administration ("TSA") requiring "100% screening of all air cargo on passenger planes by 2020."  49 U.S.C. § 44901; Admin. R. ("AR") at 3 (USPS Supply Management Competitive Purchase Plan).  USPS is held to this mandate by TSA regulations under the Aircraft Operator Standard Security Program, which includes mail over sixteen (16) ounces, military mail, and concentration and convoy.  AR at 3.  Currently, mail screening is performed by local law enforcement funded by the TSA.  *Id.* at 4.  Under this scheme, USPS has "little, to no, oversight or ability to manage the screenings or the locations as the program is run directly by TSA."  *Id.*

    To grant USPS control over the package screening process and facilitate development of a program expanding the number of sites with screening capabilities, TSA is currently developing a policy to relieve TSA from package screening and "require the shift of the explosives detection screening to the Postal Service."  *Id.* at 4.  The government refers to this policy as the "Mail Amendment," explaining at MJAR oral argument it is "the procedures by which TSA would permit the screening to be done, locations, security requirements on the ground . . . ."  Transcript of 8 February 2021 Oral Argument on Cross-Motions for Judgment on the Administrative Record ("OA Tr."), ECF No. 44 at 112:15–17.  The government described the Mail Amendment as follows:  "TSA has regulatory authority under 49 CFR [5144] to modify the

procedures for air cargo security.  And using that regulatory authority for the purposes of this new contract, the 3PK9 program, for the Post Office to conduct screening, part of that authority has set up procedures by which it would have the screening be permitted so that it could be part of the same overall screening process that goes onto airlines."  OA Tr. at 111:9–17.  The Mail Amendment is "not published in the Federal Register or CFR," and its contents "were only released to the specific awardee and were designated as sensitive information."  *Id.* at 111:18–21.  Government counsel explained, "USPS asked TSA whether it would permit release of the Mail Amendment to prospective bidders in September of 2020, and TSA denied that authorization to USPS."  *Id.* at 108:23–25.  The Mail Amendment was finalized June 2020.  *Id.* at 108:19–20.

Christopher Shelton is vice president, air cargo, for defendant-intervenor, and he:

"[S]erved as the Supervisory Air Marshal in Charge of the TSA Canine Training Center. He supervised canine team training for the largest explosive detection canine program in DHS and was responsible for training, deploying and evaluating over 1,000 TSA and law enforcement-led canine teams for aviation, multimodal, maritime, mass transit and cargo environments.  Mr. Shelton was instrumental in the development and implementation of the Certified Cargo Security Program – Canine (CCSP-K9), the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments."

AR at 621, n.6 (citing *MSA Leadership Team:  Chris Shelton*, *MSA Sec.*, http://www.msasecurity.net/msa-leadership/msa-leadership-chris-shelton) (plaintiff's business disagreement).  Prior to the release of the solicitation in this case, defendant-intervenor participated in a pilot program administered by USPS.  *See id.* at 816 (USPS Supplier Disagreement Resolution No. SDR-21-CS-001).  In October 2019, Mr. Shelton left TSA and began working for defendant-intervenor.  *Id.* at 621.  Mr. Shelton manages defendant-intervenor's air cargo business line, and while at TSA was closely involved in the development of TSA's canine screening program.  *Id.*

On 14 August 2020, USPS issued a request for information ("RFI") inviting "vendors in the marketplace to register their interest in providing services to the USPS should the USPS decide to develop the [3PK9-C] program."  AR at 24 (RFI).  The RFI was sent to seven potential offerors "from TSA's list of SAFETY Act certified and in-process SAFETY Act certified organizations."  AR at 6–7 (USPS Supply Management Competitive Purchase Plan).  In the RFI, USPS stated it was "peppering the market" regarding ability for suppliers to provide "the canines and program management necessary, should the USPS invest in and develop a 3PK9-C program to screen cargo and mail being transported on domestic and international passenger commercial air carriers on a nationwide basis."  AR at 24 (RFI).  If the 3PK9-C program were to be developed, USPS would need "an Alarm Resolution protocol for instances when a canine alerts to a mail piece," among other detection, analysis, and interpretation technology services.  *Id.* Anticipating its need for alarm resolution services, the RFI asked offerors, "[w]hat are your capabilities around Alarm Resolution and what is your procedure for clearing Alarms?"  *Id.* at 25.

USPS's Competitive Purchase Plan ("CPP") explained its need for mail screening and resolution services. *See* AR at 3–4 (USPS Supply Management Competitive Purchase Plan). Owing to the ongoing COVID-19 pandemic, Air Transportation Operations predicted "a package shift in the global network of air carriers," resulting in "a Peak Season shortfall on the Postal Service's planned capacity with [XXXXXXX] *Id.* at 3. The CPP also described a preference for offerors who "have SAFETY Act certified technology and processes to provide Real-Time X-Ray analysis and interpretation by trained bomb technicians for alarm resolution." *Id.* at 7. The government acknowledged SAFETY Act certification would limit the number of offerors who could submit responsive proposals but found "this will not preclude diversity in the types and sizes of offerors." *Id.* The CPP reiterated a contract "will allow the Postal Service to control the [mail] screening process . . . ." AR at 4.

## A. The Solicitation

On 22 September 2020, USPS issued Solicitation No. 2B-20-A-0087 for "the procurement of Third-Party Canine-Mail Screening with Real-Time X-ray Analysis [and] Interpretation." AR at 118 (solicitation). The solicitation contemplated a four-year base period award with an option to extend for a (1) contract for 3PK9-C services, (2) contract for alarm resources services, or (3) combined contract for both 3PK9-C services and Alarm Resolution single award. *Id.* at 97. USPS specifically sought:

> 1. The services of a TSA-approved Third Party Canine-Cargo (3PK9-C teams) explosive detection canine team offeror to screen Priority Mail and mail weighing 16 ounces or greater transported on domestic and international passenger commercial air carriers on a nationwide basis. The offeror shall have the capability for 3PK9-C teams to respond at the request of a USPIS Postal Inspector on a nationwide basis . . . for investigative and preventative call-outs.

> 2. Alarm Resolution for instances when a canine alerts to a mail piece. The Postal Service requires a combined comprehensive improvised explosive device (IED) screening, detection, analysis and interpretation solution which includes technology used in conjunction with Postal Service or air transportation offerors' (air carriers) owned x-ray screening machines to facilitate remote alarm resolution analysis by FBI Hazardous Device School (HDS) or Naval School Explosive Ordinance Disposal (NAVSCOLEOD) certified bomb technicians.

*Id.* at 97 (solicitation).

Offerors would be evaluated under three factors: (1) capability (explosive detection canines ("EDC") service); (2) capability (alarm resolution); and (3) past performance. AR at 112–13 (solicitation). The government instructed offerors to "respond to the evaluation factors that are only relevant to what they plan on bidding on (Evaluation Factor One or Evaluation Factor Two) in addition to Evaluation Factor Three, which all bidders must respond to." AR at 77 (solicitation). Under the first capability factor, EDC service, an offeror would be evaluated on its "ability to provide canine handler resources," "ability to meet the required or proposed delivery schedules," "management and staffing plan," and its "ability to obtain the necessary

certifications and security badges required at each location" relative to the SAFETY Act and Certificate of Safety Act Designation. *Id.* at 78 (solicitation). The second capability factor, alarm resolution, would consider the "[o]fferor's Alarm Resolution Plan," "[o]fferor's Management and Staffing Plan for K9's [sic] and Handlers," and "[o]fferor's Quality Assurance and Performance Tracking Plans." *Id.* The evaluation of past performance would include, but not be limited to, "[d]emonstrated support for the execution of canine handler teams across the U.S. including the planning and administration of such a national level program"; "[p]roven experience in developing national level canine handler programs"; and "[o]fferor's National Roll-out Canine Support Experience." *Id.*

The intention of the procurement was "to award one or more contracts based on a best value determination." *Id.* at 56 (statement of work ("SOW")), 96 (solicitation). The solicitation noted USPS's "strong preference for awarding one award that will encompass all as [sic] requirements of the SOW," while still "consider[ing] multiple awards, if that were determined to provide best value." AR at 113 (solicitation). First, USPS would "make a preliminary best value decision among offerors who have proposed on the entire scope of work"; then, if satisfied with its first best value determination, USPS would "proceed to award without further best value considerations." *Id.* In making its best value determination, USPS would consider "whether pricing is reasonable compared to internal cost estimates and whether it is satisfied with the overall technical abilities for the proposed awardee of the single award." *Id.*

### B. The Parties' Proposals

Each offeror submitted a proposal for both the government's EDC services and alarm resolution services. AR at 796 (award recommendation).

### C. Plaintiff's Pre-Award Business Disagreement Protest

On 5 October 2020, plaintiff filed a pre-award protest with the contracting officer ("CO"), which USPS refers to as a "business disagreement," challenging the terms of the solicitation and arguing it was prejudiced by those terms. AR at 616 (plaintiff's business disagreement). Plaintiff protested on three grounds: (1) "[t]he Solicitation improperly bundles requirements for 3PK9-C services with alarm resolution services, unduly restricting competition"; (2) "the requirements have been written around a single offeror's product, removing the adequate competition requirement"; and (3) "the Solicitation includes unreasonable evaluation methods, contains ambiguous and incomplete provisions, and implicates TSA regulations that are known only to one offeror." *Id.*

Regarding plaintiff's argument concerning restriction of competition, plaintiff stated "there are many offerors capable of providing 3PK9-C services, and many offerors capable of providing Alarm Resolution, real-time x-ray analysis and interpretation," yet "MSA is the only offeror currently providing 3PK9-C and Alarm Resolution services." *Id.* at 622. Plaintiff described the government's preference for bundling of services as a "subjective and self-serving determination that a single contract for both services provides the 'best value.'" *Id.*

Plaintiff also argued the evaluation methodology unreasonably favored the award of a single contract, noting language from the solicitation:  "The Postal Service will first make a preliminary best value decision among offerors who have proposed on the entire scope of work.  Should the Postal Service be satisfied with that best value determination, it will proceed to award without further best value consideration."  *Id.* at 623 (citing solicitation).  Plaintiff understood this language to mean "if there is an offer that can meet the requirements to provide both 3PK9-C and Alarm Resolution services, the agency will not even consider the comparative value of 3PK9-C services from other offerors who cannot meet or choose not to bid on the Alarm Services requirement."  *Id.*

Plaintiff also observed the government admitted the requirement for alarm resolution services constituted a "novel process."  *Id.*  Plaintiff then noted the solicitation was amended eight days after publication, "to increase the value of Alarm resolution experience."  AR at 624.  Plaintiff challenged the logic of increasing the significance of past performance "given that the agency admits the services constitute a 'novel process.'"  *Id.*  The solicitation also stated, "USPS reserves the right to contact some, all, or none of the Offerors for clarifications or additional explanations concerning their respective proposals."  *Id.* (citing solicitation).  Plaintiff argued this language granted the government a patently unfair, arbitrary, and capricious process to give certain offerors opportunity to clarify or explain their proposal, without affording other offerors the same opportunity.  *Id.*

Plaintiff's final ground for protest argued the solicitation wrongly excluded the Mail Amendment and MSA had an organizational conflict of interest ("OCI").  *Id.* at 625.  Offerors were to be compliant with TSA standard certifications for 3PK9-C mail screening, as prescribed in the Mail Amendment; however, "neither the agency nor TSA are making the Mail Amendment available until after award."  *Id.*  Plaintiff stated only one offeror, defendant-intervenor, "has some insight into the provisions of the Mail Amendment" because its vice president of air cargo business line, Mr. Shelton, "previously worked for TSA and helped to develop the 3PK9 mail screening program."  AR at 625.  Plaintiff asserted this means "MSA has an organizational conflict of interest [OCI] to the extent Mr. Shelton has knowledge about the Mail Amendment that no other offeror has."  *Id.*  Defendant-intervenor also garnered nonpublic information, according to plaintiff, when it participated in the pilot program for 3PK9 mail screening.  *Id.*  Plaintiff concluded the "requirements of Section 3.2.1 of the SOW are in direct conflict with the agency's answers to questions, creating a patent ambiguity."  *Id.*  Plaintiff requested the government sustain its protest and recommended a reissue of the solicitation to procure 3PK9-C services separately from alarm resolution services.  *Id.* at 626.

In support of this OCI challenge, plaintiff cited defendant-intervenor's public website, which provides the following biography for Mr. Shelton and lists him as "Vice President, Air Cargo":

> Mr. Shelton is a 17-year veteran with the Federal Air Marshal Service (FAMS), a United States federal law enforcement agency under the supervision of the Transportation Security Administration (TSA) of the United States Department of Homeland Security (DHS).  During his tenure with FAMS, Mr. Shelton served as the Supervisory Air Marshal in Charge of the TSA Canine Training Center.  He

supervised canine team training for the largest explosive detection canine program in DHS and was responsible for training, deploying and evaluating over 1,000 TSA and law enforcement-led canine teams for aviation, multimodal, maritime, mass transit and cargo environments.  Mr. Shelton was instrumental in the development and implementation of the Certified Cargo Security Program – Canine (CCSP-K9), the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments. With a long-time passion for security and explosive detection canines, Mr. Shelton began his career with a decade of service as a municipal law enforcement officer.

AR at 621, n.6 (citing *MSA Leadership Team:  Chris Shelton*, *MSA Sec.*, http://www.msasecurity.net/msa-leadership/msa-leadership-chris-shelton).  Plaintiff also cited another public website's announcement of Mr. Shelton joining defendant-intervenor, which stated:

Shelton joins MSA following 17 years with the TSA's Federal Air Marshal Service, where he most recently served as the Supervisory Air Marshal in Charge of the TSA Canine Training Center, overseeing canine team training for the largest explosive detection canine program in the Department of Homeland Security.  He was responsible for training, deploying, and evaluating over 1,000 TSA and law enforcement-led canine teams for aviation, multimodal, maritime, mass transit and cargo environments.  Over the past several years, Shelton was instrumental in the development of the Certified Cargo Security Program – Canine (CCSP-K9), the TSA program regulating the use of third-party canines for explosive detection screening in regulated air cargo environments.

*Id.* at 621 n.7 (citing *TSA Canine Training Specialist Joins MSA Security*, *Homeland Sec. Today* (Oct. 8, 2019), https://www.hstoday.us/industry/tsa-canine-training-specialist-chris-joins-msa-security/).  Additionally, plaintiff noted defendant-intervenor "has developed a 'Patented Advanced Alarm Resolution (AAR) process' specifically 'for the Air Cargo Industry . . . to address the Alarm Resolution process that will be included in the expected implementation of the TSA 3rd Party Canine Program, set for release in early fall.'  Notwithstanding MSA's expectations that TSA would implement Alarm Resolution into the 3PK9 program, to date no such program exists." *Id.* (emphasis omitted).

### i.   USPS's Pre-Award Investigation of Defendant-Intervenor's Potential OCI

On 8 October 2020, a USPS CO contacted MSA to request a response concerning whether an OCI may exist, noting Mr. Shelton, one of MSA's key personnel, "was a TSA employee who had a supervisory role at the TSA Canine Training Center and was involved in the USPS canine screening pilot program, both from the perspective of TSA rules and regulations and approvals of USPS processes in the pilot program."  AR at 614 (email from CO Jeremy Baker, USPS, to Gerald Goss, MSA).  Less than an hour later, an executive at MSA replied:

> Regarding the matter of potential OCI, MSA gave that topic thoughtful consideration and determined it not to be an issue based on the following; [sic]

> Mr. Shelton was not in Phoenix and didn't witness or plan the pilot testing. While he was at the TSA, he was responsible for training. TSA personnel at the pilot were focused on regulatory and compliance, functions that did not report to Mr. Shelton.

> Mr. Shelton conferred with TSA attorneys upon exiting the Agency and no restrictions were placed upon him in coming to MSA.

*Id.* at 613 (email from Gerald Goss, MSA, to CO Jeremy Baker, USPS). Defendant-intervenor also noted, "Mr. Shelton conferred with TSA attorneys upon his exiting the Agency and no restrictions were placed upon him in coming to MSA." *Id.* USPS concluded a "medium" level of conflict of interest may exist: "Medium—The contracting officer contacted MSA on the employment history concerning one of its employees. MSA provided a response which addressed the matter. The contracting officer does not view there is [sic] a conflict of interest." *Id.* at 798 (award recommendation). The Court later discovered Mr. Shelton also "received an exit letter when he left TSA with respect to whether there were conflicts," which was the product of "an investigation by or at least a review by TSA officials, including their ethics office." *See infra* discussion regarding 16 February 2021 Status Conference. 16 February 2021 Status Conference Transcript ("SC Tr."), ECF No. 47 at 13:16–20. The government stated it is not "aware of" any prohibition on the CO requesting an exit letter from TSA. *Id.* at 14:21–25.

## D. CO's Resolution of Plaintiff's Pre-Award Business Disagreement

On 15 October 2020, the CO denied plaintiff's business disagreement in its entirety. AR at 627 (CO's resolution of plaintiff's business disagreement). The CO defended the government's stated preference for one supplier over two because the services "are interdependent pieces of the two step screening process. Effective and efficient interoperability between the K9 detection and technological alarm resolution services both to support airline safety and law enforcement efforts the Inspection Service may need to undertake in relation to suspect pieces." *Id.* at 627–28. The CO further justified the single supplier preference as stemming "from inefficient and inconsistent results with respect to alarm clearing under the current screening methods . . . . A single integrated solution is most likely to ensure smooth program administration." *Id.* at 628.

In response to plaintiff's argument only one offeror could satisfy the government's single-supplier preference, the CO clarified it received "numerous responses to its Solicitation, in which a fully integrated solution to the entire Statement of Work was offered." *Id.* The CO also explained USPS modified the past performance factor because the government mistakenly removed the alarm clearing portion of the SOW as an element for past performance consideration; the government wanted to ensure receipt of past performance data from offerors for both portions of the SOW, not just one. *Id.* at 629. Responding to plaintiff's final evaluation method argument, the CO noted while "clarifications may occur when necessary," such clarifications do "not indicate that unfair treatment will occur during the evaluation process." *Id.*

Regarding plaintiff's argument USPS's alarm resolution solicitation was duplicative of existing airline processes, the CO explained, "airlines are not present at all of our locations where mail will be screened." AR. at 628. The CO responded to plaintiff's argument USPS's withholding of the Mail Amendment created unfair competition by explaining USPS did not have authority to release TSA's Mail Amendment nor did TSA provide USPS with authorization to release the Mail Amendment. *Id.* at 630. Relatedly, regarding the OCI issue, the CO stated Mr. Shelton "had no role in the TSA regulatory and compliance function, which would have been involved in Mail Amendments." *Id.*

### E. Plaintiff's Request for Final Resolution and the Government's Decision

If USPS does not resolve a business disagreement to a supplier's satisfaction, the supplier may appeal to a higher official, the Supplier Disagreement Resolution Official ("SDRO"), for "final resolution of the matter." 39 C.F.R. § 601.108. On 23 October 2020, plaintiff requested final resolution of its business disagreement challenging the terms of the solicitation. AR at 632 (Request for Final Resolution). Plaintiff set forth the same grounds it did in its initial business disagreement with the CO: the solicitation is unduly restrictive, the solicitation prescribes an unreasonable evaluation method, and the solicitation contains incomplete provisions. *Id.* at 638–41. On 27 November 2020, the USPS SRDO informed plaintiff it "reviewed the matter and conclude[d] that AMK9 has not raised any valid challenges to the Solicitation" and "decid[ed] to deny AMK9's business disagreement." AR at 816 (SDRO decision).

The SDRO found plaintiff offered little support beyond "conclusory allegations that the bundling was either improper or unfairly restricted competition." *Id.* at 813. The SDRO also found the government's preference for a single supplier to be appropriate because no law or regulation limits USPS COs from including two interdependent services under one contract; further, "[a]ll offerors were permitted to subcontract any portion of the work they could not self-perform." *Id.* at 814. The SRDO also confirmed the CO's explanation regarding the Mail Amendment, stating plaintiff's argument "assumes that the Postal Service had the ability to disclose the Mail Amendment to offerors, a false assumption." *Id.* at 816. According to the SDRO, because no offeror had access to the Mail Amendment, plaintiff could not have suffered prejudice from the nondisclosure. *Id.* The SRDO also dismissed plaintiff's allegations regarding defendant-intervenor's acquisition of nonpublic information and OCI: "the Mail Amendment was not finalized until after the conclusion of MSA's pilot program with the Postal Service, and AMK9 offers no support for its allegation that Mr. Shelton had access to the Mail Amendment while employed with TSA." *Id.* For the above reasons, the SRDO denied plaintiff's business disagreement. *Id.*

### F. Technical Evaluation Team Findings

On 6 November 2020, the Technical Evaluation Team's ("TET") award recommendation presented defendant-intervenor's proposal to be the absolute best value, with plaintiff's proposal ranking fourth. AR at 780 (award recommendation). Defendant-intervenor's technical evaluation consensus was rated [XXXXXXXXXXXX] and its past performance rated [XXXXX XXXXXXX] *Id.* In comparison, plaintiff's technical evaluation consensus was rated [XXXXX

-9-

XXX] and its past performance rated [XXXXXXX] *Id.* Defendant-intervenor was rated [XXXX XXXXXXX] under the first factor, EDC service capability. *Id.* Plaintiff's first factor rating was [XXXXXXX] *Id.* To provide EDC service, plaintiff would need to [XXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] *Id.* at 785. Under the second factor, alarm resolution services, defendant-intervenor was rated [XXXXXXXXXXXX] AR at 780. Plaintiff's second factor proposal [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] *Id.* at 787. For the past performance factor, defendant-intervenor was the only offeror to be rated [XXXXXXXXXXXX] *Id.* at 780. Plaintiff's past performance was rated [XXXXXX] as it demonstrated [XXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] *Id.* at 788. The TET, however, found no clear explanation of [XXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] nor [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] *Id.*

### G. Contract Award

Each of the seven offerors submitted a proposal for a combined effort, but defendant-intervenor was recommended for the award as it "provide[d] the best tradeoff between technical, risk, and price." AR at 805 (award recommendation). On 9 November 2020, USPS informed plaintiff it awarded the contract to defendant-intervenor. Am. Compl., Ex. 1, at 4.

### II.    Procedural History Before This Court

On 18 November 2020, plaintiff filed its pre-award complaint in this bid protest, its motion to seal the complaint, and a proposed redacted complaint. *See* Compl., ECF No. 1; Mot. for Leave to File Under Seal, ECF No. 2; Proposed Redacted Compl., ECF No. 3. On 20 November 2020, the government filed a status report. *See* Def.'s Initial Status Report, ECF No. 9. Also on 20 November 2020, defendant-intervenor filed a motion to intervene. *See* Mot. by Michael Stapleton Associates, Ltd. Intervene as Def., ECF No. 10. On 22 November 2020, plaintiff filed a status report. *See* Pl.'s Initial Status Report, ECF No. 11. The Court held an initial telephonic scheduling conference on 23 November 2020, and on the same day the Court filed an order granting defendant-intervenor's motion to intervene, granting plaintiff's motion for leave to file the complaint under seal, and ordering the government to file a status report updating the Court on the SDRO's decision on plaintiff's pre-award appeal within USPS. Order, ECF No. 13. On 24 November 2020, plaintiff filed a motion for protective order, which the Court granted on the same day. *See* Def.-Intervenor's Mot. for Protective Order, ECF No. 14; Order, ECF No. 15. The government filed a status report on 27 November 2020 to report the SDRO issued a decision on the same day. Def.'s Status Report, ECF No. 16.

On 1 December 2020, plaintiff filed a joint status report with separate proposed schedules for proceedings, noting it "intends to file a request for a temporary restraining order and a

preliminary injunction."  Joint Status Rep. at 3, ECF No. 18.  On 2 December 2020, the Court issued a scheduling order.  *See* Order, ECF No. 19.  On 3 December 2020, plaintiff separately filed an amended complaint and a motion for TRO and preliminary injunction.  *See* Pl.'s Am. Compl., ECF No. 20; Pl.'s Mot. for TRO and Prelim. Injunction, ECF No. 21.  The Court held a status conference on plaintiff's motion for TRO and preliminary injunction on 4 December 2020. On 7 December 2020, the Court issued a scheduling order maintaining the previously agreed deadline for the government to file the administrative record, noting "plaintiff agreed for its motion for TRO and PI to be construed only as a motion for PI," and the parties agreed to meet and confer to discuss the need for and details of a preliminary injunction hearing and propose an MJAR briefing schedule.  Order, ECF No. 22 at 1.  On 8 December 2020, the government filed the administrative record.  *See* AR, ECF No. 23.  On 9 December 2020, the Court stayed plaintiff's motions for preliminary injunction and TRO and set the schedule for MJAR proceedings.  *See* Order, ECF No. 25.  On 21 December 2020, plaintiff filed its MJAR.  *See* Pl.'s Mot. for J. on Admin. R., ECF No. 27 ("Pl.'s MJAR").  On 22 December 2020, plaintiff filed a redacted MJAR.  *See* Pl.'s Redacted MJAR, ECF No. 28.

On 8 January 2021, the government filed its cross-MJAR and response to plaintiff's MJAR.  *See* Def.'s Cross-Mot. for J. on Admin. R., & Resp. to Pl.'s MJAR, ECF No. 30 ("Def.'s Resp. and Cross-MJAR").  On the same day, defendant-intervenor filed its sealed response to the plaintiff's MJAR.  *See* Def.-Intervenor's Resp. to Def.'s MJAR ("Def.-Intervenor's Resp."), ECF No. 31.  On 11 January 2021, plaintiff filed its motion to amend the schedule.  *See* Pl.'s Mot. to Revise Scheduling Order, ECF No. 32.  On 12 January 2021, plaintiff filed a motion to withdraw its 11 January 2021 motion to amend the schedule.  *See* Withdrawal of Mot. to Revise Scheduling Order, ECF No. 33.

On 14 January 2021, the government filed a motion to remove highly sensitive documents ("HSDs") from the Court's electronic filing system, which the Court granted on the same day, removing the government's cross-MJAR and response from CM/ECF.  *See* Def.'s Mot. to Remove HSD, ECF No. 34; Order, ECF No. 35.  On 15 January 2021, the government filed a sealed cross-MJAR and response, redacting HSDs from what was ECF No. 30.  *See* Def.'s Resp. & Cross-MJAR, ECF No. 36.[1]  On the same day, plaintiff filed a sealed reply and response to the government's cross-motion and response, redacted for HSDs.  *See* Pl.'s Redacted Resp. & Reply to Def.'s Cross-Mot. and Resp. ("Pl.'s Resp. & Reply"), ECF No. 37.  On 22 January 2021, the government filed a joint motion for extension of time to file unredacted versions of highly sensitive documents, which the Court granted on the same day.  *See* Joint Mot. for Extension of Time to File Unredacted Version of Highly Sensitive Documents, ECF No. 38; Order, ECF No. 40.  Also on 22 January 2021, the government filed a sealed reply to plaintiff's response, redacted for HSDs, and defendant-intervenor filed a sealed reply to plaintiff's response.  *See* Def.'s Reply, ECF No. 39; Def.-Intervenor's Reply, ECF No. 41.

On 26 January 2021, plaintiff filed an unredacted version of its reply and response containing HSDs, to be maintained outside the Court's electronic filing system, and on 27

---

[1] Subsequent citations of and all quotations from Def.'s Resp. & Cross-MJAR refer only to ECF No. 36, the HSD-removed version, rather than the original, which the Court determined to be an HSD in its 14 January 2021 Order, ECF No. 35.

January 2021 the government filed an unredacted version of its reply and response containing HSDs, to be maintained outside the Court's electronic filing system.

On 8 February 2021, the Court held sealed oral argument via Zoom on the cross-MJARs, and a sealed transcript was released on 9 February 2021. *See* OA Tr. On 16 February 2021, the Court held a sealed in-person status conference to discuss HSDs, where the Court ordered the government to file a joint status report on or before 22 February 2021 at 5:00 p.m. *See* Order, ECF No. 45. On 17 February 2021, the sealed transcript was made available to the parties. On 22 February 2021 after 5:00 p.m., the government filed a joint status report containing HSDs ("22 February 2021 JSR"). On 23 February 2021, plaintiff filed a pre-filing notice for a potential post-award bid protest related to this pre-award bid protest. On 2 March 2021, plaintiff filed a sealed motion for evidentiary hearing and request for status update on administrative matters, including a request the Court issue an order requiring the government to show cause for why it "has not yet filed a redacted transcript of the February 16, 2021" status conference. Mot. for Evidentiary Hearing and Request for Status Update on Admin. Matters ("Mot. for Evidentiary Hearing"), ECF No. 46 at 1–2. On 5 March, the Court ordered the government to file sealed HSD-removed versions of the 16 February 2021 status conference transcript and the 22 February 2021 JSR. *See* Order, ECF No. 48. Also on 5 March 2021, the government filed a sealed proposed redacted status conference transcript and a sealed proposed redacted JSR. *See* SC Tr.; 22 February 2021 JSR, ECF No. 49.

## III.    Plaintiff's MJAR Arguments with Focus Now on OCI Issues

The parties dispute the following: whether USPS failed to recognize or mitigate defendant-intervenor's OCI; whether USPS required both canine detection and alarm resolution services under one procurement; whether bundling the two services under one procurement was necessary to meet USPS's minimum needs; and whether the evaluation methodology effectively established a procurement for a single award. *See* Pl.'s MJAR. Following MJAR oral argument via Zoom and the subsequent 16 February 2021 in-person status conference, the Court determined, based on the available evidence in the administrative record, plaintiff's OCI claim may raise the most pressing and substantive issues in this bid protest. The Court therefore addresses the OCI issue before it considers the remainder of plaintiff's arguments.

Plaintiff argues "USPS failed to recognize or mitigate MSA's organizational conflict of interest . . . ." Pl.'s MJAR at 26. Plaintiff explained, "Mr. Shelton, through his training, would be intimately familiar with the regulations associated with the needs of the 3PK9 program and the Mail Amendment," and "the contracting officer did not consider that the statement MSA provided him deviated materially from MSA's own website, which explains that Mr. Shelton 'was instrumental in the development and implementation of the Certified Cargo Security Program[,] . . . the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments.'" *Id.* at 29. Plaintiff's MJAR asserts the following, all in support of its argument "the Solicitation extended beyond USPS' minimum needs": "[t]he administrative record shows that USPS did not require both services under one procurement"; "TSA's screening policies confirm what USPS has already conceded; that the bundling of these services under one procurement was not necessary to meet USPS' minimum

needs"; "[t]he evaluation methodology effectively established a procurement for a single award"; "USPS crafted the Solicitation in a manner that favored MSA." *Id.* at 14, 15, 17, 19, 22.

The government argues "USPS's solicitation had a rational basis" because: "USPS did not fail to recognize or to mitigate an organizational conflict of interest for MSA"; "the solicitation did not improperly bundle canine detection and alarm resolution services"; "USPS did not prepare the solicitation to favor MSA." Def.'s Resp. and Cross-MJAR at 22, 28, 30. The government also argues plaintiff's claim for injunctive relief should be denied even if the Court rules for plaintiff on the merits because "the harm to the United States from an injunction would be substantial and virtually immediate" and "[a]n injunction also would not serve the public interest." *Id.* at 33.

Defendant-intervenor argues "USPS recognized MSA's potential organizational conflict of interest and were [sic] satisfied by MSA's mitigation and consideration of the potential OCI" and "the procurement process conducted by the USPS was in accord with applicable law and otherwise reasonable." Def.-Intervenor's Resp. at 12, 22. Additionally, defendant-intervenor states, "[e]ven if the substantive claims had merit, Plaintiff would still not be entitled to a permanent injunction because Plaintiff will not suffer irreparable harm absent an injunction" and "because the balance of hardships and the public interest do[] not favor an injunction." *Id.* at 27, 29.

## IV.    Whether the Court's Jurisdiction to Analyze the OCI Question in This Case Is Under the Tucker Act or the APA

Plaintiff argues "[t]he Court has jurisdiction over this bid protest consistent with the Tucker Act." Pl.'s MJAR at 11 (citing 28 U.S.C. § 1491(b)(1)). The government agrees "[t]his Court has jurisdiction over USPS bid protests pursuant to 28 U.S.C. § 1491(b)." Def.'s Cross-MJAR at 18 (citing *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001)). The government explains the Federal Circuit in *Emery* "appl[ied] the Administrative Dispute Resolution Act of 1996 ('ADRA') to USPS." *Id.* Defendant-intervenor acknowledged the Court has jurisdiction in this case but did not state a ground for jurisdiction. Def.-Intervenor's Resp. at 9; Def.-Intervenor's Reply at 4 ("[T]he Federal Circuit has held that the Court of Federal Claims has jurisdiction over procurements involving the USPS . . . .") (citing *Emery*, 264 F.3d at 1085).[2]

---

[2] Plaintiff recently requested "that the Court order USPS to submit a status report explaining why it cannot issue a decision on [plaintiff's] post-award protests [sic] before March 22, 2021." 22 February 2021 JSR at 11–12. In response, the government argues plaintiff's "request is improper because the SDRO administrative appeal for AMK9's post-award protest before USPS is not before the Court in this lawsuit, which concerns AMK9's pre-award protest." *Id.* at 6 (citing 39 C.F.R. § 601.108(h)). While the Court observes plaintiff's post-award protest is not yet before the Court, the Court notes the government previously argued USPS regulations should create an exemption from the Tucker Act in determining the Court's jurisdiction. *See* Def.'s Initial Status Report at 2 (quoting 39 C.F.R. § 601.108(h) ("The party lodging the disagreement may seek review of the Postal Service's final contract award only after the mandatory administrative remedies provided under § 601.107 and § 601.108 have been exhausted.")). As the government did not cite case law on this issue, the Court welcomes briefing should plaintiff wish to argue for constructive denial when filing its post-award protest. The Court also notes the government's jurisdictional argument presents a possible *Blue & Gold* issue insofar as the government seeks to argue plaintiff waived certain OCI arguments. In *Blue & Gold Fleet, L.P. v. United States*, the Federal Circuit held, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the

At oral argument, plaintiff and the government agreed the Court has jurisdiction under the Tucker Act, while defendant-intervenor argued the Court has jurisdiction under the Administrative Procedure Act according to *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970).  *See* OA Tr. at 14:24–16:25.[3]  The government stated at oral argument it "disagree[s] with the statement that the Court is sitting in jurisdiction pursuant to *Scanwell* review as opposed to the Tucker Act," and plaintiff "agree[s] with the Government."  *Id.* at 16:12–25.

The Federal Circuit in *Emery* discussed the history of federal courts' jurisdiction over USPS bid protests, including APA-based *Scanwell* jurisdiction and the enactment of the Administrative Dispute Resolution Act of 1996 ("ADRA").  *Emery Worldwide Airlines*, 264 F.3d 1078–79 (Fed. Cir. 2001).  The Federal Circuit concluded:  "[T]here is no longer . . . APA-based jurisdiction for the district courts in government bid protest cases; rather Congress effectively subsumed APA jurisdiction of the district courts into the more specific jurisdictional language of the ADRA," thus "the Court of Federal Claims was to gain traditional *Scanwell* jurisdiction."  *Id.* at 1080, 1083 (quoting *Novell, Inc. v. United States,* 109 F.Supp.2d 22, 24–25 (D.D.C. 2000)).  According to the Federal Circuit, this means "the Court of Federal Claims has jurisdiction over all government procurement protest cases, including those involving the USPS."  *Id.* at 1083.  The Federal Circuit affirmed this holding in *Banknote*:  "In *Emery,* we held that the Court of Federal Claims possesses jurisdiction over bid protest actions involving the USPS."  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).  Defendant-intervenor's appeal to *Scanwell* jurisdiction appears to ignore the ADRA, as the ADRA channeled *Scanwell* jurisdiction into the Court of Federal Claims.  *Emery*, 264 F.3d at 1080.  To assert this Court has *Scanwell* jurisdiction is, in fact, to assert this Court has jurisdiction under the ADRA, which presumably means defendant-intervenor should not be understood to dispute the other parties' view the Court has jurisdiction under the Tucker Act and ADRA.  The Court therefore finds it has jurisdiction in this USPS bid protest pursuant to the Tucker Act as amended by the ADRA, which "subsumed" *Scanwell* APA jurisdiction.  28 U.S.C. § 1491(b)(1); *Emery*, 264 F.3d at 1080, 1083; *Banknote*, 365 F.3d at 1351.

---

close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  492 F.3d 1308, 1313 (Fed. Cir. 2007).  The Federal Circuit has since held this reasoning "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."  *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).  The Federal Circuit recently held "[t]he Court of Federal Claims has correctly applied this rule in organizational-conflict-of-interest cases, including cases dealing with the disclosure of pricing information during debriefing."  *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020).  The Court notes presenting the issue in an agency protest prior to the award may preserve the issue.  *See DGR Assocs., Inc. v. United States*, 690 F.3d 1335, 1338–39, 1343 (Fed. Cir. 2012) (recognizing that a challenge to a solicitation term, in a post-award bid protest filed in the Court of Federal Claims, was preserved by the filing of a formal, agency-level protest before the proposal submission deadline).

[3] THE COURT:  [Y]our argument . . . seems to assume that this Court is hearing the case under the APA according to *Scanwell* jurisdiction rather than according to the Tucker Act.  Is it your argument, then, that this is a *Scanwell* case rather than a Tucker Act case?

DEFENDANT-INTERVENOR:  Yes, it is, Your Honor.

OA Tr. at 14:24–15:6.

## V.     Plaintiff's OCI Argument

Following MJAR oral argument via Zoom and the subsequent 16 February 2021 in-person status conference, the Court now determines based on all the arguments and evidence available in the administrative record that plaintiff's OCI claim raises the most pressing issue in this bid protest.  For reasons explained *infra*, the Court addresses the OCI issue before it considers the remainder of plaintiff's arguments.

### A.  Legal Standard

#### 1.   Whether the Court Should Apply the APA Standard of Review for USPS OCI Issues

The Federal Circuit has not ruled directly on the applicable legal standard for review of USPS bid protest cases.  *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).  Plaintiff asserts the Court should review this USPS bid protest according to the Court's typical application of the APA standard of "determin[ing] whether the government's procurement actions are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law."  Pl.'s MJAR at 11–12 (citing 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4); *Banknote*, 365 F.3d at 1350–51).  The government agrees with plaintiff, stating "[t]he applicable standard of review under the ADRA is derived from the Administrative Procedure Act . . . ."  Def.'s Response and Cross-MJAR at 18–19.

Defendant-intervenor proposed in its briefing, "[t]he *ultra vires* standard of review applies because the APA standard of review does not apply in cases involving USPS procurements."  Def.-Intervenor's Resp. at 9.  Defendant-intervenor potentially contradicted its briefing at oral argument by asserting the Court hears this case under the APA according to *Scanwell*.  OA Tr. at 14:24–15:6; *see Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970).[4]  The Court will proceed with applying the APA standard as the Federal Circuit outlined in *Domenico Garufi*:  "[u]nder the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either:  (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed. Cir. 2001).  "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir.

---

[4] The Federal Circuit considered a version of defendant-intervenor's argument in *Emery*, when the government argued the Postal Reorganization Act created an exception from this Court's jurisdiction under the Tucker Act, holding, "[w]ithout express statutory language from Congress or clear legislative history for support, we refuse to twist 39 U.S.C. § 410(a) and 28 U.S.C. § 1491(b)—statutes originally enacted twenty-six years apart—to find that no judicial body possesses jurisdiction to judicially review pre-award protests involving the USPS."  264 F.3d 1071, 1083–84 (Fed. Cir. 2001).  Defendant-intervenor here asks the Court to "twist 39 U.S.C. § 410(a) and 28 U.S.C. § 1491(b)," but this time "to find that no judicial body" can effectively review USPS's procurements even after establishing jurisdiction.  *Id.*

2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### 2. The Court's Review of the Weight of the SP&Ps in OCI Review

Plaintiff asserts, "[w]hile the Competition in Contracting Act (CICA) does not apply to USPS procurements, the competition requirements of CICA are not meaningfully distinguishable from USPS' policy"; therefore, according to plaintiff, USPS's Supplying Principles and Practices ("SP&Ps") are binding on the agency. Pl.'s MJAR at 14. The government argues the SP&Ps "are not regulations of the Postal Service, but rather are internal guidelines." Def.'s Resp. and Cross-MJAR at 22 (citing 39 C.F.R. § 211.2(a)).[5] Defendant-intervenor argues the SP&Ps "are merely guidelines and are not binding in any manner unless specifically incorporated into the Solicitation." Def.-Intervenor's Resp. at 13.

Plaintiff explained at oral argument it understands the SP&Ps to be "a regulation," which "the Government must comply with . . . ." OA Tr. at 22:12–14. The government clarified at oral argument: "the Court can look to [the SP&Ps] for determining whether there was a rational basis" for the action of a USPS employee, but the SP&Ps are not "treated as a regulation or procedure that a deviation from would automatically constitute a failure under" the APA review standard of "violation of regulation or procedures." *Id.* at 25:21–26:13. Plaintiff and the government generally disagree how the standard of review stated in *Domenico Garufi* applies in this case. *See* 238 F.3d at 1332. Plaintiff believes its assertion the SP&Ps are binding regulations would require the Court to rule on USPS's actions according to both aspects of the *Domenico Garufi* standard, analyzing not only whether the USPS CO's "decision lacked a rational basis," but also whether the USPS CO's "procurement procedure involved a violation of regulation or procedure" as contemplated in the SP&Ps. *Id.* The government, on the other hand, proposes the Court only determine whether the USPS CO's "decision lacked a rational basis" according to guidance from the SP&Ps, rather than treating the SP&Ps as binding. *Id.* at 25:12–26:20.[6]

---

[5] The government quotes the introduction to the SP&Ps from USPS's website: "In order to institutionalize supply chain management (SCM) throughout the Postal Service™, these SPs and Ps were developed to replace the interim *Internal Purchasing Guidelines*. These guidelines are intended for internal use only to assist the Postal Service in obtaining best value and to efficiently conduct its SCM functions. They are advisory and illustrative of approaches that may generally be used by Postal Service employees to conduct SCM activities, but are intended to provide for flexibility and discretion in their application to specific business situations. They are designed to supplement the Postal Service's purchasing regulations contained in 39 CFR Part 601." Def.'s Resp. and Cross-MJAR at 22 (citing Introduction to SP&Ps).

[6] In light of defendant-intervenor's argument the SP&Ps "are not binding in any manner unless specifically incorporated into the Solicitation," the Court observes the solicitation does contain an OCI contract provision from the SP&Ps, which states: "The supplier warrants and represents that, to the best of its knowledge and belief, it does not presently have organizational conflicts of interest that . . . might result in an unfair competitive advantage, except for advantages flowing from the normal benefits of performing this agreement." Def.-Intervenor's Resp. at 13; AR at 136 (solicitation, Clause 1-7 Organizational Conflicts of Interest (March 2006)). The SP&Ps state this clause "should be included in all contracts when the contracting officer determines that a real or potential organizational conflict of interest exists." U.S. Postal Serv., Supplying Principles and Practices 7-15.3, Clause. USPS's inclusion of this language is not evidence the government believed defendant-intervenor had a real or potential OCI, since the language was included in the solicitation pre-award. The provision is evidence, however, of the government's intent to signal to offerors they could rely on the government to follow the SP&Ps related to OCI.

The text of the SP&Ps is clear they only provide guidance and are not binding regulations:

> These guidelines are intended for internal use only to assist the Postal Service in obtaining best value and to efficiently conduct its SCM functions. They are advisory and illustrative of approaches that may generally be used by Postal Service employees to conduct SCM activities, but are intended to provide for flexibility and discretion in their application to specific business situations. They are designed to supplement the Postal Service's purchasing regulations contained in 39 CFR Part 601.

Def.'s Resp. and Cross-MJAR at 22 (citing Introduction to SP&Ps). Even assuming *arguendo* the SP&Ps are binding, the SP&Ps related to OCI are not binding, as the Federal Circuit is clear even the OCI provisions of the FAR, a binding regulation, are to be treated under *Domenico Garufi*'s first "arbitrary and capricious" or "rational basis" standard, rather than its second "violation of regulation or procedure" ground, owing to "the discretion given to COs" and the Federal Circuit's wish for this Court avoid "trigger[ing] de novo review." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381–82 (Fed. Cir. 2009).[7] Therefore, the Court will review whether the USPS CO's "decision lacked a rational basis" according to guidance from the SP&Ps, rather than treating the SP&Ps as binding. *Domenico Garufi*, 238 F.3d at 1332; OA Tr. at 25:12–26:20.

The Post Office's SP&Ps define an OCI as follows:

> An organizational conflict of interest exists when the nature of the work to be performed under a contract may give an offeror or supplier an unfair competitive

---

This contract provision provides an additional grounding for using the SP&P 7-15.2 and 7-15.2.1 to determine whether the government acted rationally in investigation of potential OCI. *See Domenico Garufi*, 238 F.3d at 1332.
[7] Even assuming *arguendo* plaintiff is correct the SP&Ps are generally binding regulations under the *Hamlet* test, plaintiff's proposed legal standard as applied to the OCI SP&Ps fails in light of *Axiom*'s holding that even the otherwise-binding FAR, in the context of its OCI provisions, is applied according to a "rational basis" standard, rather on a "violation of regulation or procedure" ground. *See Axiom Res. Mgmt., Inc.*, 564 F.3d at 1381–82; Pl.'s Resp. & Reply at 6 ("[E]ven if USPS had not expressly incorporated the SPP into its regulations, the SPP are binding under the Federal Circuit's *Hamlet* test.") (citing *Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995)). The Federal Circuit in *Axiom* held, "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion," so CO decisions on OCI issues, even under binding FAR regulations, must be evaluated according to *Domenico Garufi*'s first "arbitrary and capricious" or "rational basis" standard, rather than its second "violation of regulation or procedure" ground. *Id.* at 1381–82 (citing *Domenico Garufi*, 238 F.3d at 1332). The *Hamlet* test states: "regardless of whether a provision of an agency's personnel manual or handbook was published or promulgated under the standards set out in the APA, such provision is a regulation entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute." *Hamlet*, 63 F.3d at 1105. The Court takes no position on plaintiff's argument applying the *Hamlet* test, since *Axiom* controls here.

advantage and when an offeror or supplier has other interests that may impair its objectivity or ability to render impartial assistance or advice or to provide objectivity in performing the contract work.

U.S. Postal Serv., Supplying Principles and Practices 7-15.2, Organizational Conflicts of Interest (emphasis added).  The SP&Ps further advise:

> As part of purchase planning (see 2-1, Develop Purchase Plan), contracting officers, with the assistance of the purchase/SCM team, must attempt to identify organizational conflicts of interest so that they may be avoided, neutralized or mitigated (when purchases will be made noncompetitively, certain disclosures must be made – see 2-10, Determine Extent of Competition).  When a potential organizational conflict is foreseeable, *the contracting officer should consult with assigned counsel and obtain the assistance of appropriate technical specialists to consider the potential to avoid, neutralize or mitigate the organizational conflict of interest*.  Mitigation actions may include, but are not limited to (a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair a competition as possible.  Any limit on future contracts must be for a reasonable period sufficient to avoid unfair competitive advantage or potential bias.

> *If it becomes apparent when proposals are received that participation by a particular offeror could lead to an organizational conflict of interest and unfair competition, the offeror may be disqualified and its proposal rejected.  The contracting officer may take actions necessary and in the interest of the Postal Service and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest.*

> If the contracting officer decides to neutralize *or mitigate a potential or apparent organizational conflict of interest, he or she should include a written analysis of the decision and the chosen course of action in the contract file.  The analysis should include a consideration of the potential benefits and detriments to the Postal Service* (including consideration of the overall business and competitive interests of the Postal Service and how the appearance of an organizational conflict of interest may affect them) and the offerors, and may consider information provided by offerors in response to the solicitation, or obtained during discussions and negotiations.

U.S. Postal Serv., Supplying Principles and Practices 7-15.2.1, Avoiding Real or Apparent Organizational Conflicts of Interest (emphasis added).

> The solicitation also contains an OCI contract provision, which states:

> The supplier warrants and represents that, to the best of its knowledge and belief, it does not presently have organizational conflicts of interest that would diminish its capacity to provide impartial, technically sound, objective research assistance or advice, or would result in a biased work product, or might result in an unfair competitive advantage, except for advantages flowing from the normal benefits of performing this agreement.

AR at 136 (solicitation, Clause 1-7 Organizational Conflicts of Interest (March 2006)); U.S. Postal Serv., Supplying Principles and Practices 7-15.3, Clause.

### B. Whether the Government Failed to Recognize or Mitigate Defendant-Intervenor's Organizational Conflict of Interest

Plaintiff argues "USPS failed to recognize or mitigate" defendant-intervenor's OCI because defendant-intervenor "gain[ed] an unfair advantage arising from previous work." Pl.'s MJAR at 26 (citing SP&P § 7-15.2). Plaintiff argues defendant-intervenor "gained insight into the Mail Amendment and other 3PK9 requirements" "through its work on the pilot program and its hiring of Chris Shelton . . . ." *Id.* Specifically, plaintiff alleges the government was arbitrary and capricious in identifying a "medium" level of risk of OCI related to Mr. Shelton and then closing the investigation after "one exchange" over email with defendant-intervenor "and no substantive analysis." *Id.* at 27. Plaintiff notes, "[t]he record does not indicate how this summary statement satisfied USPS' concerns about a conflict of interest." *Id.* at 28. Plaintiff also argues, "Mr. Shelton, through his training, would be intimately familiar with the regulations associated with the needs of the 3PK9 program and the Mail Amendment." *Id.* at 29. According to plaintiff, defendant-intervenor "did not deny that it gained a competitive advantage or learned of non-public information from the hiring of Mr. Shelton" and "did not provide insight into what . . . knowledge (or lack of knowledge) Mr. Shelton had (or shared) about the Mail Amendment or other requirements . . . ." *Id.* at 29–30. Plaintiff asserts the CO acted arbitrarily and capriciously in concluding there was not a conflict of interest "based on this brief (and non-committal) statement from" defendant-intervenor. *Id.* at 30.

The government asserts plaintiff merely argues "Mr. Shelton likely would have had access to the Mail Amendment as a consequence of his role in developing the CCSP-K9 program" but notes plaintiff "identifies no evidence in the record, or otherwise, that Mr. Shelton or MSA actually received the Mail Amendment or details of the program." Def.'s Resp. and Cross-MJAR at 31. The government notes the SDRO considered plaintiff's arguments on this issue and "recognized that the Mail Amendment was not finalized until after the conclusion of MSA's pilot program with the USPS." *Id.* at 32. The government adds the SDRO "found no evidence that USPS used the Mail Amendment to evaluate AMK9 or any other offeror," so "unequal access to the Mail Amendment, if any, could not have provided MSA with an unfair advantage." *Id.* The government characterizes plaintiff's position as "disagreement with the substance of USPS's decision," which "does not equate to a failure to investigate." Def.'s Reply at 13. The government explains the CO's decision as such: "USPS concluded that Mr. Shelton's role posed a medium risk of an OCI but did not require further action, citing the contracting officer's conclusion that he did not view there to be a conflict of interest." *Id.* at 14.

Defendant-intervenor argues, "[n]one of USPS's regulations restrict an organizational conflict of interest" and asserts plaintiff relies on USPS's SP&Ps, rather than what defendant-intervenor understands to be binding law, for legal restrictions on any organizational conflicts of interest. Def.-Intervenor's Resp. at 22–23. In the alternative, defendant-intervenor argues it did not obtain an "unfair competitive advantage" under SP&P § 7-15.2 for two reasons: (1) defendant-intervenor's "simple performance of the pilot program is not an unfair advantage nor does it give MSA access to unequal information, particularly because the Mail Amendments were not completed nor issued prior to the termination of the pilot program"; and (2) "Mr. Shelton . . . 'had no role in the TSA regulatory or compliance function, which would have been involved in the Mail Amendments' and, in any event, the Mail Amendments were not finalized until eight months after his departure from TSA." *Id.* at 23–26 (quoting AR at 630 (CO's resolution of plaintiff's business disagreement)).

At oral argument, plaintiff noted the AR shows the CO "asked a single question with two parts" to defendant-intervenor about the potential OCI. OA Tr. at 105:11–13. Plaintiff notes "[t]he first part related to Mr. Shelton's employment with a supervisory role at the TSA K-9 training center," and defendant-intervenor "never responded" to this question. OA Tr. at 105:13–16. The second part of the question, according to plaintiff, related to "the Agency's recollection that Mr. Shelton was involved with the USPS K-9 screening pilot program from the perspective of TSA rules and regulations and approvals of USPS processes in the pilot program. There MSA gave a fairly nonresponsive response where they say that Mr. Shelton wasn't in Phoenix and didn't witness or plan the pilot testing and their personnel did not report to Mr. Shelton for regulatory or compliance." *Id.* at 105:17–25. Plaintiff explained "[t]here's nothing else in the record," and "[t]he Agency concluded that there was a medium chance . . . of an OCI and then somehow concluded with no discussion that no OCI existed." *Id.* at 106:3–9. Plaintiff summarized the government's position as being: "because they asked a single question and got a response that doesn't answer the question, that was sufficient to find no OCI existed," and concluded by arguing holding the government to a standard of "rational basis would require a significant investigation into an OCI." *Id.* at 106:10–15.

The government stated at oral argument "the Postal Service did investigate the question of whether Mr. Shelton had an OCI and reached out to MSA to get clarification on his role. . . . And ultimately, the contracting officer who did the investigation concluded that the OCI was not present or a reason to contest that." OA Tr. at 107:19–25 (citing AR at 613–14). The government notes the CO explains "why he concluded that Mr. Shelton's previous employment at TSA was not disqualifying to MSA, particularly that Mr. Shelton did not have access to this Mail Amendment or the conditions under which USPS would allow screening by a customer because it had not been created at the time he left TSA." *Id.* at 108:1–10 (citing AR at 630). The government explained "Mr. Shelton was involved with a pilot program" and states "[w]e were informed that the pilot program basically involved handling—you know, whether the dogs could be used for the mail screening but was not directly involved in the drafting, and the regulatory compliance functions, did not report to him on the creation of Mail Amendment." *Id.* at 108:11–17. The government also noted "it's simply speculation for Plaintiffs to argue that because Mr. Shelton was a previous TSA employee that he would have had inside knowledge of the contents of the Mail Amendment that wasn't completed until eight months after he left TSA's employ." *Id.* at 109:1–5. Defendant-intervenor observed at oral argument "that it doesn't seem that the

-20-

Plaintiff has alleged any specific information that MSA allegedly had unequal access to other than perhaps the Mail Amendment. . . . [W]ith the exception of the Mail Amendment, there is really no specific allegation of what unequal access MSA had by virtue of employing Mr. Shelton." OA Tr. at 110:6–13.

The Court asked the government at oral argument: "you do agree that this is a situation where an employee at the TSA, having knowledge of what the TSA was handing off or the goal of what the USPS as an agency was going to do, could have definitely had advantage related to timing associated with unequal access to information from the TSA?" OA Tr. at 120:9–15. The government responded: "Theoretically, but we don't see evidence based on the record that that's what occurred here." *Id.* at 120:16–18.

The government clarified the standard under which it believes the Court should review the OCI issue: "the Court is reviewing the procurement as a whole for rational basis, and we believe the CO's decision that no OCI existed would also be subject to a rational basis determination." *Id.* at 120:25–121:4. Without any clarity on how the SP&P steps apply to the facts here, the government also noted the "language [of the SP&Ps] says that the Postal Service should investigate and determine whether there is an OCI," and "the processes that the contracting officer was following were those in the SP&P. So the contracting officer was following those procedures as per U.S. Postal Service guidance." *Id.* at 124:3–16.

Plaintiff argued at oral argument, "the Government never conducted an investigation into this beyond a cursory one e-mail," so "[w]e are stuck with a cursory investigation that reveals a one-liner from the Government's conclusion . . . ." *Id.* at 129:8–21. In response, the government states, "the record contains the investigation that the Postal Service did"; thus, plaintiff is "second-guessing an investigation that was done by the Postal Service but does not point to any evidence that there actually was any unequal active information as a consequence." *Id.* at 132:14–16, 133:21–25.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("*Chenery I*"). The CO "must attempt to identify organizational conflicts of interest so that they may be avoided, neutralized or mitigated . . . ." U.S. Postal Serv., Supplying Principles and Practices 7-15.2.1, Avoiding Real or Apparent Organizational Conflicts of Interest. "When a potential organizational conflict is foreseeable, the contracting officer should consult with assigned counsel and obtain the assistance of appropriate technical specialists to consider the potential to avoid, neutralize or mitigate the organizational conflict of interest." *Id.*

"To prevail on an OCI claim of 'unequal access to information,' it is axiomatic that the government contractor must have access to 'the kind of specific, sensitive information that would create an OCI.'" *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 688 (2008); *rev'd on other grounds*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) ("We have considered [plaintiff's] arguments regarding alleged organizational conflicts of interest . . . and we concur with the trial court's decision . . . ."). "Thus, for a bid protester to succeed on an 'unequal access to information' OCI claim, it must demonstrate 'the awardee was in the unique position of [] having access to information to which no other offeror had access.'" *Id.* (internal quotation

marks omitted) (quoting *Johnson Controls World Servs., Inc.*, B–286714.2, 2001 WL 122352, at *5 (G.A.O. Feb. 13, 2001) (finding an "unequal access to information" OCI existed when the incumbent had access to a database that provided more detailed information about the procurement than was available in the public domain)).

"[G]overnment officials are presumed to do their duty, and one who contends they have not done so must establish that defect by clear evidence." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1384 (Fed. Cir. 2009) (quoting *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345, 1350 (Fed. Cir. 2005)) (internal quotation marks omitted). "To demonstrate that [a CO's] determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough." *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (quoting *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed. Cir. 1983)). On the other hand, "'hard facts' do not need to show an actual conflict—a potential conflict can be sufficient." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1387 (Fed. Cir. 2011).

The Court acknowledges the deferential standard it owes the CO when considering allegations of OCI and understands its responsibility to avoid conducting de novo review. The parties' MJAR briefings and the oral argument, however, left the Court with follow-up questions related to a number of items concerning Mr. Shelton's work as a TSA employee, the minimal CO investigation, the Mail Amendment details Mr. Shelton may have known, and TSA's relationship with the USPS's solicitation and contract. At oral argument, the Court observed the government and defendant-intervenor failed to adequately account for the rationality of the CO's decision according to the SP&Ps as that decision was reported in the record. After a discussion between the Court and counsel for the government regarding how USPS's OCI investigation tracked the SP&Ps, the Court noted "it seems like the Government's review here happens to be fairly cursory, and I'm somewhat at a loss as to if it fits the guidance of the SP&P. The Government seems to merely have asked Intervenor about the apparent conflict, taken Intervenor at its word, not followed up with the TSA and then lists medium but no conflict." OA Tr. at 144:14–149:5; 149:6–14. Following the oral argument conducted via Zoom, the Court held a status conference to discuss the OCI issue further. The proceeding was held in person to facilitate open discussion of HSDs the government previously filed related to plaintiff's request for injunctive relief and to ask additional questions potentially related to the HSDs in light of issues raised at oral argument.

## C. Further Discussion of OCI Issue at Follow-Up In-Person Status Conference After Oral Argument

At the 16 February 2021 in-person status conference, the Court explored further the OCI investigation, unequal access, the role of the TSA, and details surrounding the Mail Amendment. *See* SC Tr. at 7:9–17. The government was more forthcoming at the 16 February status conference with information related to these matters and highlighted a number of areas related to the OCI investigation where it speculated the administrative record could be incomplete.

The government informed the Court for the first time Mr. Shelton "received an exit letter when he left TSA with respect to whether there were conflicts," which was the product of "an investigation by or at least a review by TSA officials, including their ethics office . . . ." *Id.* at 13:16–20. The government explained TSA is "not at liberty to release" the details of the

investigation "absent some order from the Court," but the government has "established contact if the Court orders some relief in that regard for us to follow up with TSA . . . ." *Id.* at 13:21–14:1. The government added, "if the Court believes it sheds light on the broader issue" to obtain information on TSA's review, the government "would follow up with TSA on that issue." *Id.* at 14:6–8. The government stated it was not aware of the CO or SDRO performing any additional research on Shelton or any contact with TSA not contained in the record, but noted "[i]f the Court orders a remand for purposes of clarification of both what investigation was done at the time of the contract award and at this point for any kind of retroactive relief, we will certainly do so." *Id.* at 12:25–13:9. The government also noted, "[w]hat we don't know is what, if any, file there was leading up to the issuance of the letter, the exit letter for Mr. Shelton. So whether there was an—whether there were interviews or documents or things of that nature, we don't know what's in the file since we haven't been shown it." *Id.* at 43:3–8.

Counsel for the government explained he also does not "know of a reason why the CO couldn't have sent" TSA a request for information about Mr. Shelton. SC Tr. at 15:2–4. Counsel for defendant-intervenor explained it did not send the TSA exit letter to the CO following his email investigation because "my client didn't believe it necessary"; counsel for defendant-intervenor also noted only Mr. Shelton was in possession of the exit letter, not defendant-intervenor. *Id.* at 15:12–23. Counsel for defendant-intervenor emphasized "there's absolutely no reason why either my client or Mr. Shelton would object to the release of the letter." *Id.* at 16:1–2.

The government noted: "TSA anticipated that they would have no problem with releasing the Mail Amendment to the Court to review in camera, for it to be distributed as an HSD for Plaintiff's counsel to review as well. . . . They said there was an additional procedure that they would need to follow to do that, which may require a court order as well." *Id.* at 17:11–18. USPS counsel stated, "the provisions of the Mail Amendment necessary for bidding are part of the statement of work" in the solicitation. *Id.* at 20:1–3. Counsel for USPS also clarified the Mail Amendment is "11 pages and not very long," and "is about that second level of screening." *Id.* at 22:3; 24:11–13. USPS counsel did not "believe [the Mail Amendment] was shared by Mr. Shelton, but that can be figured out. There's going to be a timeline of when [Mr. Shelton] left and when [the Mail Amendment] was issued, and [she] believe[d] it was issued after he left." *Id.* at 22:21–24. Nor did USPS counsel believe the CO "had any access" to the Mail Amendment. *Id.* at 25:4–5.

The government explained it asked TSA "what, if any, procedures TSA followed with respect to Mr. Shelton's exit arrangements," and noted "our Administrative Record was the Postal Service's Administrative record. It's not TSA's." *Id.* at 10:9–20. The government said there was no additional communication between USPS and the TSA about the Mail Amendment "produced to us by the Post Office." *Id.* at 10:21–11:9. The government offered: "If the Court orders further remedy, we can, of course, conduct a further investigation to see if there were any such communications at the time. Or if any further investigation is ordered by the Court by the CO or other individuals with the Postal Service with respect to that topic, we will follow up on that as ordered by the Court." *Id.* at 11:9–15. Defendant-intervenor also noted Mr. Shelton is "more than willing to provide the Court with whatever the Court is interested in, in terms of his participation in the TSA's processes related to this procurement." *Id.* at 11:25–12:3.

The government also noted it cannot "foreclose the possibility that there was some [OCI investigation] that was not discussed . . . ." *Id.* at 30:17–19. The government stated, "[i]n terms of what remand scope would be appropriate from the perspective of the Government, first I think it would be certification of whether there were any other investigations done by the CO that may or may not have been reflected in the documents. If the Court wishes to supplement the record with any further clarifications from the CO as to what, if any, investigation was done or with what from the TSA with respect to what, if any, investigation TSA performed, . . . it would be, I guess, reasonable for the Court to request that we get what, if any, records TSA had with respect to what investigation was done with that insofar as that was relied upon by the CO in making his decision that there was no OCI." *Id.* at 34:16–35:11. The government is "open" to a remand because of "the lack of previous record on" details of "what investigation was done by the CO." *Id.* at 37:1–5.

Given the in-person format of the status conference, the government was able to elaborate on the HSD security details related to its need for contract performance to continue before a 30 June 2021 deadline. The Court will not address the concerns and arguments related to the government's need for contract performance in this order, however, to guard against the release of information related to the HSDs. At the non-HSD MJAR oral argument, the government asserted: "the international screening is not currently required to be done and is not part of TSA legacy program. Therefore, for international airmail, the current contract would be the vehicle by which the Postal Service would accomplish that, because pursuant to the Chicago Convention, there was an agreement to have the international airmail being screened prior to June 30th of 2021." OA Tr. at 134:4–11. At the 16 February status conference, plaintiff offered a different understanding of the requirements of the Chicago Convention's 30 June 2021 deadline, noting the Federal Register states: "U.S. requirements consistent with the Chicago Convention are already in place for cargo transported by aircraft operators and foreign air carriers engaged in commercial passenger transportation." SC Tr. at 45:12–18 (quoting 85 Fed. Reg. 20236). Plaintiff contends this shows security measures are already in place, and the government merely "wants to do it a different way." *Id.* at 45:19–20.

Counsel for USPS explained regarding the deadline plaintiff discussed: "that mandate came out through the Chicago Convention," and "[t]here are a lot of moving parts to the Postal Service. There may be an international mandate." *Id.* at 48:13–25. Counsel for USPS also explained there are "exceptions" to the Federal Register, and noted, "I don't think they make [the Federal Register] so transparent perhaps on purpose." *Id.* at 53:6–10. Following this discussion, and in agreement certain timelines on the implementation of the contract may very well need to go forward, plaintiff stated, "I'm not in a position as a human being, an American citizen to say if there's a deadline that we need to meet that we shouldn't meet it." *Id.* at 60:11–13.

**D. Conclusion Regarding Rationality of USPS's Investigation for OCI**

The CO's OCI report did not review Mr. Shelton's TSA exit letter or include any other communication with TSA regarding defendant-intervenor's potential OCI, but instead took the

party being investigated at its word that there was no OCI.[8]  The TSA exit letter was in the hands of the government (at least the TSA) and the 16 February 2021 status conference discussion demonstrates the TSA performed something akin to an OCI review in preparing the TSA exit letter for Mr. Shelton.  SC Tr. at 13:16–20; 14:2–20.  The CO did not report requesting or receiving any TSA input and instead took defendant-intervenor's conclusory email denying any OCI at face value.  AR at 630.  The Court therefore finds the CO's OCI investigation process, and the SDRO's affirmation of the OCI decision detailing a lack of proper OCI investigation, to lack a rational basis—the OCI investigation was arbitrary and capricious for conducting such a limited OCI review and reaching a premature conclusion of no OCI risk.  *See* AR at 630, 798, 815–16; *Alabama Aircraft Indus.*, 586 F.3d at 1375; U.S. Postal Serv., Supplying Principles and Practices 7-15.2.1, Avoiding Real or Apparent Organizational Conflicts of Interest; *PAI Corp.*, 614 F.3d at 1352; *Turner Const. Co.*, 645 F.3d at 1387.  *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (finding the agency did not "provide a reasonable explanation for its decision," remanding for further consideration, and "further decid[ing] that the [agency action] will remain in effect during the [remand].").  It further does not appear the CO tracked the process outlined in the SP&P procedures as was required to guide the OCI review process:  insofar as the SP&Ps provide a guidance to follow, the CO's decision not to follow the SP&Ps after identifying a potential OCI—without providing any explanation for the decision to divert from the guidelines—further "lack[s] a rational basis." *See Domenico Garufi*, 238 F.3d at 1332; OA Tr. at 25:12–26:20 (Government counsel noting the CO decision must withstand rational basis scrutiny insofar as it was to be guided by an SP&P OCI investigation process).[9]

---

[8] *See* SC Tr. at 43:3–8 ("What we don't know is what, if any, [TSA] file there was leading up to the issuance of the letter, the exit letter for Mr. Shelton.  So whether there was an—whether there were interviews or documents or things of that nature, we don't know what's in the file since we haven't been shown it."); OA Tr. at 139:15–19 ("[T]he discussion particularly at [AR] page 630 would give the best summary of what analysis the contracting officer did of the issue.") (citing AR at 630 (CO's resolution of plaintiff's business disagreement) ("[W]e understand that Mr. Shelton had no role in the TSA regulatory and compliance function, which would have been involved in Mail Amendments.")); AR at 613–614 (email exchange between CO Jeremy Baker, USPS, to Gerald Goss, MSA).

[9] The SP&Ps state the CO "must attempt to identify organizational conflicts of interest so that they may be avoided, neutralized or mitigated . . . ."  U.S. Postal Serv., Supplying Principles and Practices 7-15.2.1, Avoiding Real or Apparent Organizational Conflicts of Interest ("SP&P 7-15.2.1").  At the MJAR oral argument, the government verified the extent of the record relating to OCI analysis consists of:  the CO's email exchange with defendant-intervenor, the CO's resolution of plaintiff's business disagreement, the award recommendation, and the SDRO's supplier disagreement resolution.  OA Tr. at 136:22–24 ("The only places we are aware of are pages 613 and 614, page 630, page 798 and pages 815 and 816.").  The CO here began to "attempt to identify" an OCI by emailing defendant-intervenor about the CO's "concerns regarding whether an organizational conflict of interest (OCI) may exist," and requested defendant-intervenor "explain[] whether MSA believes there are any OCI concerns, and if not, please explain why not."  AR at 614 (email from CO Jeremy Baker, USPS, to Gerald Goss, MSA).  Defendant-intervenor's reply was nonresponsive to this inquiry, but the record does not demonstrate the CO investigated further.  *Id.* at 613 (email from Gerald Goss, MSA, to CO Jeremy Baker, USPS).  The SP&Ps then state:  "When a potential organizational conflict is foreseeable, the contracting officer should consult with assigned counsel and obtain the assistance of appropriate technical specialists to consider the potential to avoid, neutralize or mitigate the organizational conflict of interest."  SP&P 7-15.2.1.  The record provides no indication the CO either "consult[ed] with assigned counsel" or "obtain[ed] the assistance of appropriate technical specialists," nor does the record establish the CO made any other effort to "avoid, neutralize or mitigate" the OCI.  *Id.*  The Court notes counsel for the government stated at oral argument regarding the CO's investigation, "there was consultation with other personnel," and there "was an attorney cc'd" on the CO's email to defendant-intervenor.  OA Tr. at 144:14–145:19.  Counsel for the government also asserted "there was further communication with respect to the OCI"

## VI.    Remand

### A.  Summary of Positions Regarding Remand in the Parties' 22 February 2021 JSR

At the close of the status conference, the Court issued an oral order requesting a JSR based on the parties "confer[ring] after this proceeding and also discuss[ing] with the TSA and perhaps Intervenor regarding the recommended extent, timeline, procedures for the remand and investigation should the Court deem that necessary and each prong of [RCFC] 52.2."  SC Tr. at 65:13–66:24.  The government states in the 22 February 2021 JSR it understands the purpose of remand inquiry to be:  "reconsider and conduct additional investigation of the organizational conflict of interest (OCI) allegation . . . ."  22 February 2021 JSR at 1.  The government believes "such a remand is unnecessary," and notes plaintiff believes the government "should conduct a reasonable OCI investigation and investigate whether MSA had an unequal access OCI because it employed Mr. Shelton but did not provide further specific questions."  *Id.* at 2.  Defendant-intervenor asserts, "the proposed remand is unnecessary and [] the USPS's initial OCI investigation during the procurement rationally determined that no OCI was created by virtue of MSA's employment of Mr. Chris Shelton."  *Id.* at 12.

The government also outlined "the scope of remand proceedings and anticipated time required for the remand proceedings" pursuant to the Court "requesting that USPS reexamine

---

between the CO and the technical evaluation team, although there is no "memo from the CO in the record saying at the time prior to the decision here is why I concluded that there was no OCI."  *Id.* at 145:18–25.  At the follow-up status conference, however, counsel for the government clarified he is not "aware of" any "further action beyond what was in the record."  SC Tr. at 9:13–10:1.  Mitigation actions contemplated by the SP&Ps "may include, but are not limited to (a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair a competition as possible.  Any limit on future contracts must be for a reasonable period sufficient to avoid unfair competitive advantage or potential bias."  SP&P 7-15.2.1.  The solicitation did include a clause from the SP&Ps related to OCIs, but the CO did not engage with the clause.  AR at 136 (solicitation, Clause 1-7 Organizational Conflicts of Interest (March 2006)).  The SP&Ps further guide:  "If it becomes apparent when proposals are received that participation by a particular offeror could lead to an organizational conflict of interest and unfair competition, the offeror may be disqualified and its proposal rejected.  The contracting officer may take actions necessary and in the interest of the Postal Service and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest."  SP&P 7-15.2.1.  As demonstrated by the CO's email to defendant-intervenor, it was "apparent when proposals [were] received that participation by a particular offeror could lead to an organizational conflict of interest and unfair competition," but the record does not show the CO even considered disqualifying the offeror or taking any other actions to "avoid, neutralize or mitigate the potential or apparent conflict of interest."  *Id.*; *see* AR at 614.  The CO did not "decide[] to neutralize or mitigate a potential or apparent" OCI; therefore, there was apparently no "written analysis of the decision and the chosen course of action" in the record.  SP&P 7-15.2.1; *id.* at 798 (After checking the box "medium" to "indicate what level of conflict of interest may exist," the award recommendation explained:  "The contracting officer contacted MSA on the employment history concerning one of its employees.  MSA provided a response which addressed the matter.  The contracting officer does not view there is [sic] a conflict of interest.").  Additionally, the CO and SDRO did not address plaintiff's argument citing various pages of defendant-intervenor's website and a press release about Mr. Shelton's hiring, which plaintiff argued was further evidence of a potential OCI because, according to plaintiff, the website citations indicate defendant-intervenor possessed advanced knowledge of the details of the solicitation.  *See* AR at 621 (plaintiff's business disagreement); 630 (CO's resolution of plaintiff's business disagreement); 637–38 (CO's resolution of plaintiff's business disagreement); 815–16 (SDRO decision).

any information it had when it initially considered the OCI issue that AMK9 raised with respect to Mr. Shelton and also to conduct further investigation concerning the scope of Mr. Shelton's job duties and knowledge of any matters relating to this procurement while at TSA." *Id.* at 2. The government understands the Court to request "that the Government inquire with Mr. Shelton as to any knowledge he had from his employment at TSA that was pertinent to the matter of this procurement and to determine whether TSA had any records relating to any investigation of possible conflicts of interest that it performed relating to Mr. Shelton prior to Mr. Shelton leaving TSA." *Id.* at 2–3.

The government reports the TSA "contracting officer replied that the length of such an investigation would depend on what information was received but he anticipated that such a review could be completed within 28 days after the remand order," and the government also notes, "AMK9's counsel stated that AMK9 should be amenable to the 28-day timeframe for such remand proceedings." *Id.* at 3. The government also spoke to TSA counsel "and requested that TSA provide any records that it possessed relating to any investigation of potential conflicts of interest for Mr. Shelton prior to his leaving TSA." *Id.* The government "confirmed with counsel for MSA that he would request that Mr. Shelton provide any documents that he received from TSA concerning any conflict of interest investigation prior to his leaving TSA and make himself available for an interview with the contracting officer as part of any remand proceedings." *Id.* Defendant-intervenor states it "and Mr. Shelton will provide full cooperation with the OCI investigation and are in the process of collecting relevant documents." *Id.* at 13.

Plaintiff argues: "the Court should enjoin contract performance during the OCI investigation because the United States is already in compliance with the Chicago Convention." *Id.* at 7. Plaintiff alternatively "respectfully requests an evidentiary hearing" if "the Court finds that the government's arguments related to the Chicago Convention may justify denying an injunction . . . ." *Id.* at 9. The Court recognizes the arguments noted here, and the reasons to support the arguments, are limited due to HSD-related redactions to the 16 February 2021 status conference transcript and 22 February JSR.

## B.  Whether the Court Should Remand to USPS for a Complete OCI Investigation

The Tucker Act states:  "In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2). "[O]nce jurisdiction attaches, the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). "The court has the authority to grant a remand of a case to another body at the request of a party or on its own motion." *Emerald Coast Finest Produce Co. v. United States*, 75 Fed. Cl. 549, 553 (2007) (Lettow, J.). "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("*Chenery I*"). If the limited record before the court precludes a determination as to whether "the procurement official's decision lacked a rational basis . . . or . . . the procurement procedure involved a violation of regulation or procedure," a court's decision to remand the matter to the agency appropriately avoids invading the province of the agency and substituting the court's judgment for that of the agency. *See Impresa Construzioni Geom. Domenico Garufi*

*v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *Rollock Co. v. United States*, 115 Fed. Cl. 317, 334 (2014) (Lettow, J.) ("When the factual record before the court is incomplete or additional agency proceedings or action are necessary, a remand may be appropriate."); *Knowledge Connections, Inc. v. United States*, 76 Fed. Cl. 6, 21 (2007); *Diversified Maint. Sys., Inc. v. United States*, 74 Fed. Cl. 122, 126–27 (2006).

The Federal Circuit holds, "[t]he focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Accordingly, this Court should only allow the parties to supplement the administrative record if the Court has "determined whether supplementation of the record was necessary in order not 'to frustrate effective judicial review.'" *Id.* (quoting *Camp v. Pitts,* 411 U.S. 138, 142–43 (1973)). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44 (1985). The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review." *Murakami v. United States,* 46 Fed. Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed. Cir. 2005). Thus, supplementation of the record should be limited to cases in which "the omission of extra-record evidence precludes effective judicial review." *Id.; see also Axiom Res. Mgmt.*, 564 F.3d at 1379–81. When supplementing the record, the Court of Federal Claims is "required to explain why the evidence omitted from the record frustrated judicial review . . . ." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018).

The Court observes that, on a number of occasions during the 16 February 2021 status conference, the government acknowledged it did not know whether the record provided complete detail of the CO's OCI investigation and discussed a variety of additional documents related to the OCI investigation not in the record. *See supra* at V.C. The government stated at the 16 February 2021 status conference it is "open" to a remand because "the lack of previous record on" details of "what investigation was done by the CO," and defendant-intervenor stated Mr. Shelton is "more than willing to provide the Court with whatever the Court is interested in, in terms of his participation in the TSA's processes related to this procurement." SC Tr. at 11:25–12:3; 37:1–5. In light of information the government provided at the in-person status conference regarding the possibility USPS conducted further investigation not contained in the record, along with USPS's insufficient OCI review pursuant to SP&P guidance, the Court finds: (1) "the existing record is insufficient to permit meaningful review consistent with the APA," and (2) the government was unable to confirm USPS is not responsible for "omission of extra-record evidence preclud[ing] effective judicial review." *See supra* at V.C.; *Axiom Res. Mgmt.*, 564 F.3d at 1379–81.

The Court's finding the USPS CO's investigation to be arbitrary and capricious for failing to consider all information related to the potential OCI in this case, *supra* V.D., means the CO, the SDRO, and the Court are not in a position to determine whether defendant-intervenor has an OCI. *Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) ("It may be that the agency can provide a reasonable explanation for its decision[,] . . . [b]ut it has not yet

done so."). The Court hereby orders this case to be remanded to USPS for the CO to provide a complete account of the OCI investigation consistent with the guidance in USPS's SP&Ps. 28 U.S.C. § 1491(b)(1); RCFC 52.2(a); *Turner*, 645 F.3d at 1388; *see Tikigaq Constr., LLC v. United States*, No. 16-708C, 2016 WL 6080803, at *8 (Fed. Cl. Oct. 6, 2016) ("[T]he administrative record in this matter clearly demonstrates that the [agency's action] in this case is not supported, or even explained, by the current record evidence. Given this, the Court cannot ascertain a rational basis for the agency's . . . action. And so, a remand of this matter to the [agency] is warranted."). At a minimum, it would be prudent for the CO on remand to: (1) consider whether the CO already possessed Mr. Shelton's TSA exit letter and to analyze the exit letter for OCI according to the guidance of USPS's OCI SP&Ps; and (2) interview Mr. Shelton regarding the potential OCI as the government suggested in the 22 February 2021 JSR and as counsel for defendant-intervenor suggested at the 16 February 2021 status conference. *See* 22 February 2021 JSR at 3; SC Tr. at 12:1–3.

### C. Whether the Court Should Remand Without Vacatur

Plaintiff "assert[s] that the Court should enjoin contract performance during the OCI investigation because the United States is already in compliance with the Chicago Convention" and "[a]ny potential harm to the government is outweighed by the harm AMK9 will suffer if MSA is allowed to expand into additional airports despite USPS's unreasonable OCI investigation." 22 February 2021 JSR at 7, 9. On 2 March 2021, plaintiff moved to "request[] that the Court conduct an evidentiary hearing for the reasons set forth in AMK9's portion of the February 22, 2021, Joint Status report [sic]." Mot. for Evidentiary Hearing at 1. Plaintiff noted defendant-intervenor "opposes AMK9's request for an evidentiary hearing." *Id.*

In addition to a number of HSD-related arguments provided during the 16 February 2021 status conference the Court will not cite here, the government argues "the Court should not vacate the contract during any remand proceedings" because doing so [XXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXX] "that could be avoided by allowing the contract to continue during remand proceedings." 22 February 2021 JSR at 3–4. The government also notes "[t]he Court did not enter a preliminary injunction prior to briefing." *Id.* At the 16 February 2021 status conference, the government argued, "if the Court were to order a remand for the purposes of further investigation beyond clarifying whether there was any record of any additional investigation which was previously performed, . . . we think that the appropriate outcome would be for the contract not to be vacated as part of that due to the security and all the other reasons that were discussed in the declaration in terms of disruption of operations." SC Tr. at 37:20–38:4. The parties stated they were not aware of any case law "where this Court has remanded a pre-award bid protest where the contract has already been awarded and is in progress and the contract is not stayed." *Id.* at 38:14–24.

Defendant-intervenor notes, should the Court vacate the contract, "in all likelihood the United States would have to enter into a bridge contract to ensure continuity of service and in all likelihood that bridge contract would go to the incumbent MSA. Thus, plaintiff's concerns about ongoing performance by MSA would not be solved by vacating the current contract. Rather vacating the current contract would only enact a meaningless administrative burden on both the

United States and MSA." 22 February 2021 JSR at 13.  Defendant-intervenor also argues, "a remand for a 28-day timeframe without vacating the contract would enable the Court to evaluate all of the merits at once, including the appropriateness of injunctive relief . . . ." *Id.*

"The Tucker Act . . . empowers the court to 'award *any relief* that the court considers proper, including declaratory and injunctive relief . . . .' Thus, once jurisdiction attaches, the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy." *Turner Const. Co.*, 645 F.3d at 1388 (internal citation omitted) (emphasis in original).  The Federal Circuit allows for remand without vacatur when "[i]t may be that the agency can provide a reasonable explanation for its decision[,] . . . [b]ut it has not yet done so." *Nat'l Org. of Veterans' Advocates*, 260 F.3d at 1380.  The Federal Circuit allows for the practice of remand without vacatur because "[a]n inadequately supported rule . . . need not necessarily be vacated." *Id.* (quoting *Allied-Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150, 151 (D.C. Cir. 1993) (remanding without vacatur for the agency "to develop a reasoned" explanation for its action)).  "Since 'courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review,' reviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision." *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994) (separate opinion of Silberman, J.) (quoting *Chenery I*, 318 U.S. at 94) (internal citations omitted).  In *Knowledge Connections*, Judge Lettow found "[o]n the facts of this case, it would be inappropriate to order a form of relief traditionally employed in bid protest cases, *viz.*, vacating the award of a contract." 76 Fed. Cl. at 21.  This was because "the administrative record contains insufficient evidence for the court" to make a final determination of the issues. *Id.* at 22.

According to the Tucker Act, "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3).  The Court appreciates the national security and public safety concerns the government discussed in its HSD filings and at the 16 February 2021 status conference, and notes plaintiff's counsel agreed at the 16 February status conference with the validity of these concerns. SC Tr. at 60:11–15.  Plaintiff's request for an evidentiary hearing "[i]f the Court finds that the government's arguments . . . may justify denying an injunction," 22 February 2021 JSR at 9, is not yet properly before the Court, as the "the administrative record contains insufficient evidence" for the Court to decide the merits of plaintiffs' claims or rule on any injunctive relief until after remand to USPS. *Knowledge Connections*, 76 Fed. Cl. at 22; *see also Nat'l Org. of Veterans' Advocates*, 260 F.3d at 1380.  By remanding for further USPS OCI review, the Court withholds a decision on the merits of the parties' respective MJARs and does not rule on any request for remedy. *See PlanetSpace, Inc. v. U.S.*, 92 Fed. Cl. 520, 549 (2010) ("Because the court does not reach the merits . . . in this opinion, it need not address plaintiff's motion for a permanent injunction at this time.").  For all these reasons, the Court remands without vacatur and stays plaintiff's MJAR, the government's cross-MJAR, plaintiff's motion for preliminary injunction and TRO, and plaintiff's motion requesting an evidentiary hearing related to possible injunctive relief.  As proposed by the

government and not opposed by plaintiff, the remand shall terminate after 28 days.[10]  *See* 22 February 2021 JSR at 3.

As enumerated in detail *infra*, the process for review could include avenues the government and defendant-intervenor suggested at the 16 February 2021 status conference and in the 22 February 2021 JSR to be reviewed, such as USPS interviewing Mr. Shelton regarding the TSA exit letter.  *See* SC Tr. at 12:1–3 (Defendant-intervenor reports Mr. Shelton is "more than willing to provide the Court with whatever the Court is interested in, in terms of his participation in the TSA's processes related to this procurement."); 22 February 2021 JSR at 3 ("[C]ounsel for the Government also confirmed with counsel for MSA that he would request that Mr. Shelton provide any documents that he received from TSA concerning any conflict of interest investigation prior to his leaving TSA and make himself available for an interview with the contracting officer as part of any remand proceedings.").  Remand could also include review of: the product of the TSA's investigation behind Mr. Shelton's exit letter; analysis of the MSA website description of Mr. Shelton's TSA work experience; and any communications within USPS or between USPS and TSA related to defendant-intervenor's potential OCI.  *See* SC Tr. at 16:1–3 (Defendant-intervenor stated "there's absolutely no reason why either my client or Mr. Shelton would object to the release of the [TSA exit] letter."); 14:2–8 (The government's "understanding was TSA did do some kind of review prior to the issuance of [Mr. Shelton's TSA exit] letter prior to Mr. Shelton leaving TSA's employment in roughly October of 2019, . . . if the Court believes it sheds light on the broader issue, we would follow up with TSA on that issue."); 15:2–11 (Government counsel explained:  "I'm not aware at this time of whether there was a reason the CO couldn't have reached out to TSA.  I'm also not aware of any indication that either he did and got an answer that wasn't reflected in the record or anything else of that nature."); 64:3–4 (Plaintiff "do[es]n't have any objection to in-camera review [of the Mail Amendment].").[11]

---

[10] A range of leading administrative law remedies scholars support deadlines when remanding without vacatur.  A middle ground between remanding with vacatur and remanding without vacatur "is for courts to simply impose deadlines when they remand without vacatur.  Deadlines in this context offer a gentle counterbalance to a deferential remedy, thus contributing to the meaningful equilibrium that should mark the relationship between judicial and administrative power."  Emily Hammond Meazell, *Deference and Dialogue in Administrative Law*, 111 COLUM. L. REV. 1722, 1786–87 (2011).  "[T]he ABA resolution recognizes that the remedy of remand without vacation reduces an agency's incentive to cure its error expeditiously during the ensuing proceedings.  Accordingly, it provides that the court may wish to specify a time frame within which it expects the agency to comply with the terms of the remand order."  Ronald M. Levin, *"Vacation" at Sea:  Judicial Remedies and Equitable Discretion in Administrative Law*, 53 DUKE L.J. 291, 384 (2003); *see id.* at 384 n.421 (citing *Nat'l Org. of Veterans' Advocates*, 260 F.3d at 1381).  "Setting a deadline for the response on remand . . . is perhaps the most direct way to expedite the remand process, speed up the dialogue, and in the process alleviate Article III fears based on undue delay. . . .  Deadlines are not only a 'gentle counterbalance' to the ordinary remand rule, but they are also a meaningful way of enhancing court–agency dialogue by signaling a strong interest in a continuing dialogue and by speeding up that conversation."  Christopher J. Walker, *The Ordinary Remand Rule and the Judicial Toolbox for Agency Dialogue*, 82 GEO. WASH. L. REV. 1553, 1594 (2014) (citing Hammond, *Deference and Dialogue*, 111 COLUM. L. REV. at 1786–87; Levin, *"Vacation" at Sea*, 53 DUKE L.J. at 384).

[11] Plaintiff additionally argued the Mail Amendment could have provided defendant-intervenor with insight on specific airport locations for the contract ahead of other offerors.  Pl.'s MJAR at 28 ("[B]etween August 14, 2020 (when the RFI was released) and October 5, 2020 (when proposals were due), MSA was able to recruit and hire staff (for a contract it had not yet won) with 100% alignment and in a manner consistent with the roll-out schedule.  If Mr. Shelton, despite only being involved in 'training,' understood the roll-out schedule prior to the release of the

Plaintiff's 2 March 2021 motion also requested "that the Court issue an order requiring the government to show cause as to why (1) the SDR Official cannot (or will not) issue a decision on AMK9's appeal of its November 27, 2020 post-award protest before USPS and (2) the government has not yet filed a redacted transcript of the February 16, 2021, hearing."  Mot. for Evidentiary Hearing at 1–2.  The government argues plaintiff's first "request is improper because the SDRO administrative appeal for AMK9's post-award protest before USPS is not before the Court in this lawsuit, which concerns AMK9's pre-award protest."  22 February 2021 JSR at 6 (citing 39 C.F.R. § 601.108(h)).  The Court notes plaintiff cites no procedural grounds for the request for show cause order related to the post-award SDRO decision, and the request will be mooted when plaintiff files its post-award bid protest.  *See generally* Mot. for Evidentiary Hearing.  The Court's 5 March 2021 Order renders moot plaintiff's request for show cause order related to transcript redactions.  *See* Order, ECF No. 48.  The Court has received plaintiff's prefiling notice of its post-award bid protest and notes a stay of the current proceedings is not to be read as staying any of the proceedings in a post-award protest filed in the future.[12]

### D.  Details Regarding Remand of Case to USPS

For the foregoing reasons, the Court **REMANDS** this case to USPS.  Pursuant to RCFC 52.2(b) and the parties' positions expressed at the 16 February 2021 status conference and in the 22 February 2021 joint status report, the Court provides the following instructions for remand:

(1)  The remand period shall terminate after twenty-eight (28) days, on Monday, 5 April 2021, and all proceedings in this case are **STAYED** until then.  If USPS does not respond on or before Monday, 5 April 2021, the parties shall follow the procedures set forth in RCFC 52.2(c).

(2)  USPS shall reopen the OCI investigation into defendant-intervenor and Mr. Shelton according to guidelines provided by the SP&Ps and reassess a complete and documented review of the OCI in light of:  (1) the government's assertions at the 16 February 2021 status conference regarding the possibility of the record being an incomplete representation of the CO's actual 2020 investigation; (2) TSA or defendant-intervenor's production of Mr. Shelton's TSA exit letter; (3) the possibility of investigation or communication within USPS, or between USPS and TSA, related to defendant-intervenor's potential OCI not currently reported in the record; (4) the MSA website detail regarding Mr. Shelton's experience from working with TSA; and (5) any other

---

RFI—as a result of his employment with TSA—Mr. Shelton could have provided MSA with a competitive advantage in staffing its team for the imminent proposal.").

[12] The Federal Circuit has established different standards for pre-award and post-award bid protest standing under the Tucker Act.  A pre-award bid protest plaintiff must establish it has suffered or will suffer a "non-trivial competitive injury which can be addressed by judicial relief."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009).  "[T]he 'non-trivial competitive injury' standard [is] applicable to 'a *pre-award* protest.'  That standard does not apply . . . [to a] post-award protest."  *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 n.7 (Fed. Cir. 2012) (internal citation omitted).  "The question whether a [post-award] protester 'ha[s] a substantial chance of securing the award,' turns on whether the protester would have had a substantial chance if not for the alleged errors."  *Id.* at 1383 (internal citation omitted).

evidence USPS reflects as necessary to consider regarding defendant-intervenor's potential OCI.

(3) The administrative record of remand proceedings shall include, as suggested by the government at the 16 February 2021 status conference:  (1) *in camera* review of the Mail Amendment as agreed by the parties; (2) a copy of Mr. Shelton's TSA exit letter as defendant-intervenor agreed Mr. Shelton would submit; (3) the product of TSA investigation behind Mr. Shelton's exit letter; (4) any communications within USPS or between USPS and TSA related to defendant-intervenor's potential OCI; and (5) summary report of additional review USPS conducts or action USPS decides to take regarding defendant-intervenor's potential OCI, including a complete OCI decision based on all additional information.

(4) When proceedings before USPS conclude, the government shall file with the Clerk's office, pursuant to RCFC 52.2(d):  (1) a joint status report proposing a procedure for *in camera* review of the Mail Amendment; (2) a copy of Mr. Shelton's TSA exit letter; (3) the product of the TSA's investigation behind Mr. Shelton's exit letter; (4) any communications within USPS or between USPS and TSA related to defendant-intervenor's potential OCI; (5) any additional review USPS conducts regarding defendant-intervenor's potential OCI; and (6) two copies of USPS's administrative record of remand proceedings and any action taken, including a complete OCI decision based on all additional information.  Within seven (7) days of the filing of USPS's remand record and any action taken, the parties shall file a joint status report proposing future proceedings, on or before 12 April 2021, pursuant to RCFC 52.2(e)(1).

(5) As plaintiff has already alerted the Court to its pre-filing notice of a post-award bid protest related to this pre-award bid protest and solicitation, the Court notes the stay of these proceedings and issues is not to be read as staying any of the proceedings in a post-award protest filed in the future.

The Clerk's office is directed to serve a certified copy of this opinion and order on USPS CO Jeremiah D. Baker via mail at:  USPS EFTS CMC, 3300 S Parker Road, Suite 601, Aurora, CO 80014-3500.  The Clerk's office shall send a courtesy copy via email to: jeremiah.d.baker@usps.gov.

## VII.   Conclusion

For the reasons discussed *supra*, the Court **STAYS** plaintiff's MJAR, **STAYS** the government's cross-MJAR, **STAYS** plaintiff's motion for preliminary injunction and TRO, **STAYS** plaintiff's motion for evidentiary hearing and request for status update,[13] and **REMANDS** this case to USPS for complete investigation.

**IT IS SO ORDERED.**

---

[13] The Court's 5 March 2021 Order renders moot plaintiff's request for show cause order related to transcript redactions.  *See* Order, ECF No. 48; Mot. for Evidentiary Hearing.

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge