# In the United States Court of Federal Claims

Nos. 20-1614; 21-1165
(Filed:  16 August 2021[*])

```
*****************************************
AMERICAN K-9 DETECTION              *
SERVICES, LLC,                      *
                                    *
            Plaintiff,              *
                                    *
v.                                  *
                                    *   Organizational Conflict of Interest;
THE UNITED STATES,                  *   Unequal Access to Information OCI;
                                    *   Biased Ground Rules OCI; USPS SP&Ps;
            Defendant,              *   RCFC 52.2; Remand Without Vacatur;
                                    *   Bias Allegation; Technical Evaluation
and                                 *   Factors; Best-Value Tradeoff
                                    *
MICHAEL STAPLETON                   *
ASSOCIATES, LTD.,                   *
                                    *
            Defendant-Intervenor.   *
                                    *
*****************************************

*****************************************
GLOBAL K9 PROTECTION GROUP, LLC,    *
                                    *
            Plaintiff,              *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant,              *
```

---

[*] This Opinion and Order was originally filed under seal on 4 August 2021 pursuant to the protective order in this case.  The Court provided the parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than 13 August 2021 at 12:00 p.m.  The parties filed joint proposed redactions.  *See* Joint Notice of Proposed Redactions to the Court's Opinion and Order, ECF No. 111-1.  The Court accepts the parties' proposed redactions and reissues the order with a few minor, non-substantive corrections and redacted language replaced as follows:  "[xxxxx]."

```
                                            *
and                                         *
                                            *
MICHAEL STAPLETON                           *
ASSOCIATES, LTD.,                           *
                                            *
                    Defendant-Intervenor.   *
                                            *
*****************************************
```

     *Daniel J. Strouse*, of Cordatis LLP, with whom was *Joshua D. Schnell*, all of Arlington, VA, for plaintiff American K-9 Detection Services, LLC.

     *W. Brad English*, of Maynard, Cooper & Gale, PC, with whom were *Jon D. Levin*, *Emily J. Chancey*, *J. Dale Gipson*, and *Nicholas P. Greer*, all of Huntsville, AL, for plaintiff Global K9 Protection Group, LLC.

     *John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman Jr.*, Director, *Martin F. Hockey Jr.*, Acting Director, and *Reginald T. Blades Jr.*, Assistant Director, all of Washington, DC, and *Shoshana O. Epstein*, Attorney, Postal Service, for defendant.

     *Ryan C. Bradel*, of Ward & Berry PLLC, with whom were *P. Tyson Marx* and *Stephen G. Darby*, all of Tysons, VA, for defendant-intervenor.

## OPINION AND ORDER

**HOLTE, Judge.**

     This Opinion rules on two consolidated bid protests against the United States Postal Service ("USPS," "the agency," or "the government"), in which the government awarded a contract for canine explosive detection and alarm resolution services to defendant-intervenor Michael Stapleton Associates, LTD ("MSA" or "defendant-intervenor"), under Solicitation No. 2B-20-A-0087 ("solicitation"). American K-9 Detection Services, LLC ("AMK9") brought a pre-award bid protest and, because the government continued with award and performance of the contract, later amended its complaint to include a post-award protest. Global K9 Protection Group, LLC ("GK9") additionally brought a post-award bid protest. Pending before the Court now are plaintiff AMK9's pre-award and post-award motions for judgment on the administrative record ("MJARs"), plaintiff GK9's MJAR, the government's pre-award and post-award cross-MJARs, MSA's cross-MJAR, and GK9's motion to supplement the administrative record. For the following reasons, the Court **DENIES IN PART AND STAYS IN PART** AMK9's pre-award and post-award MJARs, **DENIES IN PART AND STAYS IN PART** GK9'S MJAR, **GRANTS IN PART AND STAYS IN PART** the government's pre-award and post-award cross-MJARs, **GRANTS IN PART AND STAYS IN PART** MSA's cross-MJAR, and **REMANDS** this case to USPS for complete investigation. While this Opinion fully considers

and denies most of plaintiffs' claims, it remands for the second time consideration of plaintiffs' organizational conflict of interest ("OCI") allegations given the continued lack of full investigation from the contracting officer leading to several unresolved issues.

## I.    Background

Following the September 11th attacks, the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission") issued a federal mandate to the Transportation Security Administration ("TSA") requiring "100% screening of all air cargo on passenger planes by 2020."  Admin. R., ECF No. 23-2 ("AR") at 3 (USPS Supply Management Competitive Purchase Plan); *see also* 49 U.S.C. § 44901 ("The Administrator of the [TSA] shall provide for the screening of all passengers and property, including United States mail, . . . that will be carried aboard a passenger aircraft . . . .").  USPS is held to this mandate by TSA regulations under the Aircraft Operator Standard Security Program, which includes mail over sixteen (16) ounces, military mail, and registered mail.  AR at 3.  Currently, local law enforcement, funded by the TSA, provides screening of mail delivered on airplanes.  *Id.* at 4.  Under this system, USPS has "little, to no, oversight or ability to manage the screenings or the locations as the program is run directly by TSA."  *Id.*

To grant USPS control over the package screening process and facilitate development of a program expanding the number of sites with screening capabilities, TSA is currently developing a policy to relieve TSA from package screening and "require the shift of the explosives detection screening to the Postal Service."  *Id.*  The government explained at the pre-award MJAR oral argument this policy, called the "Mail Amendment," is "the procedures by which TSA would permit the screening to be done, locations, security requirements on the ground . . . ."  Transcript of 8 February 2021 Oral Argument on Cross-Motions for Judgment on the Administrative Record ("Pre-Award OA Tr."), ECF No. 44 at 112:15–17.  The government further described the mail amendment as follows:

> TSA has regulatory authority under 49 CFR [5144] . . . to modify the procedures for air cargo security.  And using that regulatory authority for the purposes of this new contract, the 3PK9 program, for the [P]ost [O]ffice to conduct screening, part of that authority has set up procedures by which it would have the screening be permitted so that it could be part of the same overall screening process that goes onto airlines.

*Id.* at 111:9–17.  The mail amendment is "not published in the Federal Register or CFR," and its contents "were only released to the specific awardee and were designated as sensitive information."  *Id.* at 111:18–21.  Counsel for the government explained, "USPS asked TSA whether it would permit release of the Mail Amendment to prospective bidders in September of 2020, and TSA denied that authorization to USPS."  *Id.* at 108:23–25.  The mail amendment was finalized June 2020.  *Id.* at 108:19–20.

Christopher Shelton is vice president of air cargo for MSA, and he:

[S]erved as the Supervisory Air Marshal in Charge of the TSA Canine Training Center. He supervised canine team training for the largest explosive detection canine program in DHS and was responsible for training, deploying and evaluating over 1,000 TSA and law enforcement-led canine teams for aviation, multimodal, maritime, mass transit and cargo environments. Mr. Shelton was instrumental in the development and implementation of the Certified Cargo Security Program – Canine (CCSP-K9), the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments.

AR at 621, n.6 (citing *MSA Leadership Team: Chris Shelton*, *MSA Sec.*, http://www.msasecurity.net/msa-leadership/msa-leadership-chris-shelton) (AMK9 Business Disagreement). Prior to the release of the solicitation in this case, defendant-intervenor participated in a pilot program administered by USPS. *See id.* at 816 (USPS Supplier Disagreement Resolution No. SDR-21-CS-001). In October 2019, Mr. Shelton left TSA and began working for defendant-intervenor. *Id.* at 621. Mr. Shelton manages defendant-intervenor's air cargo business line and, while at TSA, was closely involved in the development of TSA's canine screening program. *Id.*

On 14 August 2020, USPS issued a request for information ("RFI") inviting "vendors in the marketplace to register their interest in providing services to the USPS should the USPS decide to develop the [3PK9-C] program." AR at 24 (USPS RFI). The RFI was sent to seven potential offerors "from TSA's list of SAFETY Act certified and in-process SAFETY Act certified organizations." *Id.* at 6–7 (USPS Supply Management Competitive Purchase Plan). In the RFI, USPS stated it was "peppering the market" regarding the "potential and ability" for suppliers to "provide the USPS with the canines and program management necessary, should the USPS invest in and develop a 3PK9-C program to screen cargo and mail being transported on domestic and international passenger commercial air carriers on a nationwide basis." *Id.* at 24 (RFI). If the 3PK9-C program were to be developed, the RFI stated USPS would need "an Alarm Resolution protocol for instances when a canine alerts to a mail piece," among other detection, analysis, and interpretation technology services. *Id.* Anticipating its need for alarm resolution services, the RFI inquired about offerors' "capabilities around Alarm Resolution" and "procedure for clearing Alarms." *Id.* at 25.

USPS's Competitive Purchase Plan ("CPP") explained its need for mail screening and resolution services. *See* AR at 3–4 (USPS Supply Management Competitive Purchase Plan). Owing to the ongoing COVID-19 pandemic, Air Transportation Operations predicted "a package shift in the global network of air carriers," resulting in "a Peak Season shortfall on the Postal Service's planned capacity with FedEx." *Id.* at 3. The CPP described a preference for offerors who "have SAFETY Act certified technology and processes to provide Real-Time X-Ray analysis and interpretation by trained bomb technicians for alarm resolution." *Id.* at 7. The government acknowledged requiring SAFETY Act certification would limit the number of offerors who could submit responsive proposals but determined "this will not preclude diversity in the types and sizes of offerors." *Id.* The CPP reiterated such a contract "will allow the Postal Service to control the [mail] screening process." *Id.* at 4.

## A. The Solicitation

-4-

On 22 September 2020, USPS issued Solicitation No. 2B-20-A-0087 for "the procurement of Third-Party Canine-Mail Screening with Real-Time X-ray Analysis [and] Interpretation."  AR at 118 (Solicitation).  The solicitation contemplated a four-year base period award with two two-year renewal options.  *Id.* at 97.  The pricing method for the contract contemplated:  (1) a contract for 3PK9-C services, (2) a contract for alarm resources services, or (3) a combined contract for both 3PK9-C services and Alarm Resolution single award.  *Id.* USPS specifically sought service contracts which included:

> 1.  The services of a TSA-approved Third Party Canine-Cargo (3PK9-C teams) explosive detection canine team offeror to screen Priority Mail and mail weighing 16 ounces or greater transported on domestic and international passenger commercial air carriers on a nationwide basis.  The offeror shall have the capability for 3PK9-C teams to respond at the request of a USPIS Postal Inspector on a nationwide basis . . . for investigative and preventative call-outs.

> 2.  Alarm Resolution protocols for instances when a canine alerts to a mail piece. The Postal Service requires a combined comprehensive improvised explosive device (IED) screening, detection, analysis and interpretation solution which includes technology used in conjunction with Postal Service or air transportation offerors' (air carriers) owned x-ray screening machines to facilitate remote alarm resolution analysis by FBI Hazardous Device School (HDS) or Naval School Explosive Ordinance Disposal (NAVSCOLEOD) certified bomb technicians.

*Id.* at 96–97.

Offerors would be evaluated under three factors:  (1) capability (explosive detection canines ("EDC") service); (2) capability (alarm resolution); and (3) past performance.  AR at 112–13.  The government instructed offerors to "respond to the evaluation factors that are only relevant to what they plan on bidding on (Evaluation Factor One or Evaluation Factor Two) in addition to Evaluation Factor Three, which all bidders must respond to."  *Id.* at 77 (Solicitation). Under the first capability factor, EDC service, an offeror would be evaluated on its "ability to provide canine handler resources," "ability to meet the required or proposed delivery schedules," "management and staffing plan," and its "ability to obtain the necessary certifications and security badges required at each location" relative to the SAFETY Act and Certificate of SAFETY Act Designation.  *Id.* at 78 (Solicitation).  The second capability factor, alarm resolution, would consider the "[o]fferor's Alarm Resolution Plan," the "[o]fferor's Management and Staffing Plan for K9's [sic] and Handlers," and the "[o]fferor's Quality Assurance and Performance Tracking Plans."  *Id.*  The evaluation of past performance would include, but would not be limited to, "[d]emonstrated support for the execution of canine handler teams across the U.S.[,] including the planning and administration of such a national level program"; "[p]roven experience in developing national level canine handler programs"; and "[o]fferor's National Roll-out Canine Support Experience."  *Id.*

The intention of the procurement was "to award one or more contracts based on a best value determination."  AR at 56 (Statement of Work ("SOW")), 96 (Solicitation).  The

solicitation noted USPS's "strong preference for awarding one award that will encompass all as [sic] requirements of the SOW," although the USPS was "willing to consider multiple awards, if that were determined to provide best value." *Id*. at 113. First, USPS would "make a preliminary best value decision among offerors who have proposed on the entire scope of work"; then, if satisfied with its first best value determination, USPS would "proceed to award without further best value considerations." *Id.* In making its best value determination, USPS would consider "whether pricing is reasonable compared to internal cost estimates and whether it is satisfied with the overall technical abilities for the proposed awardee of the single award." *Id.*

### B. The Parties' Proposals

Each offeror submitted a proposal for a "combined effort" of both the government's EDC services and alarm resolution services. AR at 796 (Award Recommendation). AMK9's final negotiated price for the contract was $[xxxxxxxxxxxxx], MSA's price was $[xxxxxxxxxxxxx], and GK9's was $[xxxxxxxxxxxxx]. *Id*. at 794–95.

### C. AMK9's Pre-Award Business Disagreement Protest

On 5 October 2020, AMK9 filed a pre-award protest with the contracting officer ("CO"), which USPS refers to as a "business disagreement," challenging the terms of the solicitation and arguing it was prejudiced by those terms. AR at 616 (AMK9 Business Disagreement). AMK9 protested on three grounds: (1) "[t]he Solicitation improperly bundles requirements for 3PK9-C services with alarm resolution services, unduly restricting competition"; (2) "the requirements have been written around a single offeror's product, removing the adequate competition requirement"; and (3) "the Solicitation includes unreasonable evaluation methods, contains ambiguous and incomplete provisions, and implicates TSA regulations that are known only to one offeror." *Id.*

Regarding AMK9's argument concerning the restriction of competition, AMK9 stated "there are many offerors capable of providing 3PK9-C services, and many offerors capable of providing Alarm Resolution, real-time x-ray analysis and interpretation," yet "MSA is the only offeror currently providing 3PK9-C and Alarm Resolution services." *Id*. at 622. AMK9 described the government's preference for bundling of services as a "subjective and self-serving determination that a single contract for both services provides the 'best value.'" *Id.*

AMK9 also argued the evaluation methodology unreasonably favored the award of a single contract, noting language from the solicitation: "The Postal Service will first make a preliminary best value decision among offerors who have proposed on the entire scope of work. Should the Postal Service be satisfied with that best value determination, it will proceed to award without further best value consideration." *Id.* at 623 (citing Solicitation) (emphasis omitted). AMK9 understood this language to mean "if there is an offer that can meet the requirements to provide both 3PK9-C and Alarm Resolution services, the agency will not even consider the comparative value of 3PK9-C services from other offerors who cannot meet or choose not to bid on the Alarm Services requirement." *Id.*

AMK9 also observed the government admitted the requirement for alarm resolution services constituted a "novel process." AR at 623.  AMK9 then noted the solicitation was amended eight days after publication, "to increase the value of Alarm resolution experience." *Id.* at 624.  AMK9 challenged the logic of increasing the significance of past performance providing alarm resolution services "given that the agency admits the services constitute a 'novel process.'" *Id.*  The solicitation also provided, "USPS reserves the right to contact some, all, or none of the Offerors for clarifications or additional explanations concerning their respective proposals." *Id.* (citing Solicitation).  AMK9 argued this language granted the government a patently unfair, arbitrary, and capricious process to "give certain offerors opportunity to clarify or explain [their] proposal, . . . without affording all offerors the same opportunity." *Id.*

AMK9's final ground for protest argued both the solicitation wrongly excluded the mail amendment and MSA had an OCI.  *Id.* at 625.  According to the solicitation offerors were to be compliant with TSA standard certifications for 3PK9-C mail screening, as prescribed in the mail amendment; however, "neither the agency nor TSA are making the Mail Amendment available until after award." *Id.*  AMK9 stated only one offeror, defendant-intervenor, "has some insight into the provisions of the Mail Amendment" because its vice president of air cargo, Mr. Shelton, "previously worked for TSA and helped to develop the 3PK9 mail screening program." *Id.*  AMK9 asserted this meant "MSA has an organizational conflict of interest to the extent Mr. Shelton has knowledge about the Mail Amendment that no other offeror has." *Id.*  Defendant-intervenor also obtained nonpublic information, according to AMK9, when it participated in the pilot program for 3PK9 mail screening.  *Id.*  AMK9 concluded the "requirements of Section 3.2.1 of the SOW are in direct conflict with the agency's answers to questions, creating a patent ambiguity." *Id.*  AMK9 requested the government sustain its protest and recommended a reissue of the solicitation to procure 3PK9-C services separately from alarm resolution services and provide all offerors with the mail amendment.  *Id.* at 626.

In support of this OCI challenge, AMK9 cited defendant-intervenor's public website, which provides the following biography for Mr. Shelton and lists him as "Vice President, Air Cargo":

> Mr. Shelton is a 17-year veteran with the Federal Air Marshal Service (FAMS), a United States federal law enforcement agency under the supervision of the Transportation Security Administration (TSA) of the United States Department of Homeland Security (DHS).  During his tenure with FAMS, Mr. Shelton served as the Supervisory Air Marshal in Charge of the TSA Canine Training Center.  He supervised canine team training for the largest explosive detection canine program in DHS and was responsible for training, deploying and evaluating over 1,000 TSA and law enforcement-led canine teams for aviation, multimodal, maritime, mass transit and cargo environments.  Mr. Shelton was instrumental in the development and implementation of the Certified Cargo Security Program – Canine (CCSP-K9), the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments.  With a long-time passion for security and explosive detection canines, Mr. Shelton began his career with a decade of service as a municipal law enforcement officer.

AR at 621, n.6 (citing *MSA Leadership Team:  Chris Shelton*, *MSA Sec.*, http://www.msasecurity.net/msa-leadership/msa-leadership-chris-shelton).  AMK9 also cited another public website's announcement of Mr. Shelton joining defendant-intervenor, which stated:

> Shelton joins MSA following 17 years with the TSA's Federal Air Marshal Service, where he most recently served as the Supervisory Air Marshal in Charge of the TSA Canine Training Center, overseeing canine team training for the largest explosive detection canine program in the Department of Homeland Security.  He was responsible for training, deploying, and evaluating over 1,000 TSA and law enforcement-led canine teams for aviation, multimodal, maritime, mass transit and cargo environments.  Over the past several years, Shelton was instrumental in the development of the Certified Cargo Security Program – Canine (CCSP-K9), the TSA program regulating the use of third-party canines for explosive detection screening in regulated air cargo environments.

*Id.* at 621 n.7 (citing *TSA Canine Training Specialist Joins MSA Security*, *Homeland Sec. Today* (Oct. 8, 2019), https://www.hstoday.us/industry/tsa-canine-training-specialist-chris-joins-msa-security/).  Additionally, AMK9 noted defendant-intervenor "has developed a 'Patented Advanced Alarm Resolution (AAR) process' specifically 'for the Air Cargo Industry . . . to address the Alarm Resolution process that will be included in the expected implementation of the TSA 3rd Party Canine Program, set for release in early fall.'  Notwithstanding MSA's expectations that TSA would implement Alarm Resolution into the 3PK9 program, to date no such program exists." *Id.* (emphasis and internal citations omitted).

### D. USPS's Pre-Award Investigation of Defendant-Intervenor's Potential OCI

On 8 October 2020, a USPS CO contacted MSA to request a response concerning whether an OCI existed, noting Mr. Shelton, one of MSA's "[xxxxxxxxxxxxxxxxxxxxxx], . . . was a TSA employee who had a supervisory role at the TSA Canine Training Center and was involved in the USPS canine screening pilot program, both from the perspective of TSA rules and regulations and approvals of USPS processes in the pilot program."  AR at 614 (Email from CO Jeremy Baker, USPS, to Gerald Goss, MSA).  Less than an hour later, an executive at MSA replied:

> Regarding the matter of potential OCI, MSA gave that topic thoughtful consideration and determined it not to be an issue based on the following; [sic]

> Mr. Shelton was not in Phoenix and didn't witness or plan the pilot testing.  While he was at the TSA, he was responsible for training.  TSA personnel at the pilot were focused on regulatory and compliance, functions that did not report to Mr. Shelton.

> Mr. Shelton conferred with TSA attorneys upon exiting the Agency and no restrictions were placed upon him in coming to MSA.

*Id*. at 613 (Email from Gerald Goss, MSA, to CO Jeremy Baker, USPS).  USPS concluded a "medium" level of conflict of interest may exist for MSA, stating:  "Medium—The contracting officer contacted MSA on the employment history concerning one of its employees.  MSA provided a response which addressed the matter.  The contracting officer does not view there is [sic] a conflict of interest."  *Id.* at 798 (Award Recommendation).  The Court later discovered during a status conference Mr. Shelton also "received an exit letter when he left TSA with respect to whether there were conflicts," which the government reports to be the product of "an investigation by or at least a review by TSA officials, including their ethics office."  *See infra* discussion regarding 16 February 2021 Status Conference.  16 February 2021 Status Conference Transcript ("SC Tr."), ECF No. 47 at 13:16–20.  The government stated it is not "aware of" any prohibition on the CO requesting an exit letter from TSA.  *Id.* at 14:21–25.

### E.  CO's Resolution of AMK9's Pre-Award Business Disagreement

On 15 October 2020, the CO denied AMK9's business disagreement in its entirety.  AR at 627 (CO Resolution of AMK9's Pre-Award Business Disagreement).  The CO defended the government's stated preference for one supplier over two because the services "are interdependent pieces of the two step screening process.  Effective and efficient interoperability between the K9 detection and technological alarm resolution serves both to support airline safety and law enforcement efforts the Inspection Service may need to undertake in relation to suspect pieces."  *Id.* at 627–28.  The CO further justified the single supplier preference as stemming "from inefficient and inconsistent results with respect to alarm clearing under the current screening methods . . . .  A single integrated solution is most likely to ensure smooth program administration . . . ."  *Id.* at 628.

In response to AMK9's argument only one offeror could satisfy the government's single-supplier preference, the CO clarified USPS received "numerous responses to its Solicitation, in which a fully integrated solution to the entire Statement of Work was offered."  *Id.*  The CO also explained USPS modified the past performance factor because the government mistakenly removed the alarm clearing portion of the SOW as an element for past performance consideration; the government wanted to ensure receipt of past performance data from offerors for both portions of the SOW, not just one.  *Id.* at 629.  Responding to AMK9's final evaluation method argument, the CO noted while "clarifications may occur when necessary," such clarifications "[do] not indicate that unfair treatment will occur during the evaluation process."  *Id.*

Regarding AMK9's argument USPS's alarm resolution solicitation was duplicative of existing airline processes, the CO explained, "airlines are not present at all of our locations where mail will be screened."  *Id.* at 628.  The CO responded to AMK9's argument USPS's withholding of the mail amendment created unfair competition by explaining USPS did not have the authority to release TSA's mail amendment, nor did TSA provide USPS with authorization to release the mail amendment when USPS sought such authorization.  *Id.* at 630.  Relatedly, regarding the OCI issue, the CO stated Mr. Shelton "had no role in the TSA regulatory and compliance function, which would have been involved in Mail Amendments."  *Id.*

### F.  AMK9's Request for Final Resolution and the Government's Decision

If USPS does not resolve a business disagreement to a supplier's satisfaction, the supplier may appeal to a higher official, the Supplier Disagreement Resolution Official ("SDRO"), for "final resolution of the matter." 39 C.F.R. § 601.108(a). On 23 October 2020, AMK9 requested final resolution of its pre-award business disagreement challenging the terms of the solicitation. AR at 632 (Request for Final Resolution). AMK9 set forth the same grounds in its request for final resolution as it did in its initial business disagreement with the CO: "[t]he solicitation is unduly restrictive"; "[t]he solicitation prescribes an unreasonable evaluation method"; and "[t]he solicitation contains incomplete provisions." *Id.* at 638–41. On 27 November 2020, the USPS SDRO informed AMK9 they "reviewed the matter and conclude[d] that AMK9 has not raised any valid challenges to the Solicitation" and therefore "decid[ed] to deny AMK9's business disagreement." AR at 816 (AMK9 Pre-Award SDRO decision).

The SDRO found AMK9 offered little support beyond "conclusory allegations that the bundling was either improper or unfairly restricted competition." *Id.* at 813. The SDRO also found the government's preference for a single supplier to be appropriate because no law or regulation limits USPS COs from including two interdependent services under one contract; further, "[a]ll offerors were permitted to subcontract any portion of the work they could not self-perform." *Id.* at 814. The SDRO also confirmed the CO's explanation regarding the mail amendment, stating AMK9's argument "assumes that the Postal Service had the ability to disclose the Mail Amendment to offerors, a false assumption that the CO already corrected." *Id.* at 816. According to the SDRO, because no offeror had access to the mail amendment, AMK9 could not have suffered prejudice from the nondisclosure. *Id.* The SDRO also dismissed AMK9's allegations regarding defendant-intervenor's acquisition of nonpublic information and any OCI: "the Mail Amendment was not finalized until after the conclusion of MSA's pilot program with the Postal Service, and AMK9 offers no support for its allegation that Mr. Shelton had access to the Mail Amendment while employed with TSA." *Id.* For the above reasons, the SDRO denied AMK9's pre-award business disagreement. *Id.*

### G. Technical Evaluation Team Findings

On 6 November 2020, the Technical Evaluation Team's ("TET") award recommendation presented MSA's proposal to be the absolute best value. AR at 796 (Award Recommendation). AMK9's proposal ranked fourth and GK9's proposal ranked second. *Id.* MSA's technical evaluation consensus was rated "Excellent," and its past performance rated "Very Good." *Id.* at 780. In comparison, AMK9's technical evaluation consensus was rated "Fair," and its past performance rated "Good." *Id.* GK9's technical evaluation consensus and past performance rated "Good." *Id.* MSA was rated "Excellent" under the first factor, EDC service capability, while AMK9's first factor rating was "Fair" and GK9's was rated "Good." *Id.* To provide EDC service, AMK9 would need to recruit handlers and acquire SIDA [Security Identification Display Area] badging to allow those handlers on airport grounds, and "[r]ecruitment deficiencies raise the risk of a delay in meeting the roll-out schedule." *Id.* at 785. Under the second factor, alarm resolution services, MSA was rated "Excellent." AR at 780. AMK9's second factor proposal was rated only "Fair," in part because it did not illustrate "the usage of [AMK9's] alarm resolution technology that meets the requirements of the SOW." *Id.* at 787. GK9 rated "Fair" on the second factor because evaluators viewed GK9's technology as possibly unreliable and easily

distorted. AR at 786–87. For the past performance factor, MSA was the only offeror to be rated "Very Good." *Id.* at 780. AMK9's past performance was rated "Good" as it demonstrated "its proven experience in national screening, national level Alarm Resolution, and national level roll-out support." *Id.* at 788. The TET, however, found no clear explanation of how AMK9 previously provided alarm resolution technology nationwide nor how it implemented alarm resolution services. *Id.* GK9's past performance was rated "Good" for GK9's demonstrated history of operations at 33 airports, although GK9 did not provide an explanation of its past experience in national alarm resolution technology roll-outs. *Id.*

### H.  Contract Award

Each of the seven offerors submitted a proposal for combined 3PK9-C services and alarm resolution services, but MSA was recommended for the award as the CO determined MSA "provide[d] the best tradeoff between technical, risk, and price." AR at 805 (Award Recommendation). On 9 November 2020, USPS informed AMK9 and GK9 it awarded the contract to MSA. *See* AMK9 Am. Compl., Ex. 1, ECF No. 20-1 at 2 (Attachments to AMK9 Amended Complaint); GK9 Am. and Restated Compl., ECF No. 82 at 5 (GK9 Amended Complaint).

### I.  AMK9's Post-Award Administrative Dispute and Appeal

AMK9 filed a post-award business disagreement with USPS on 27 November 2020, challenging the award of the contract to defendant-intervenor. AR at 1976–90. AMK9 alleged an "unreasonable and inconsistent" evaluation of its proposal and "clear Organizational Conflicts of Interest that should have warranted MSA's removal from consideration for award." *Id.* at 1976. AMK9 further alleged USPS used an "unstated evaluation factor" to evaluate AMK9's proposal, assigned "unreasonable" weakness to AMK9's proposal, "ignored portions of AMK9's proposal," conducted an unreasonable tradeoff analysis, and "failed to consider the Organizational Conflict of Interest." *Id.* at 1976–90. The CO denied AMK9's post-award business disagreement on 7 December 2020. *Id.* at 1991–97. On 17 December 2020, AMK9 appealed to the SDRO, who denied the appeal on 21 April 2021. *Id.* at 1999, 2017–26.

### J.  GK9's Administrative Dispute and Appeal

On 30 November 2020, GK9 filed a post-award business disagreement with USPS. AR at 1937–45. GK9 disputed USPS's effective identification, and resolution, of an "obvious" OCI involving MSA. *Id.* at 1942–44. GK9 further alleged USPS improperly evaluated technical aspects of its proposal, including aspects related to x-ray technology, the number of command center locations, past rollouts, and projected staffing to meet the rollout schedule. *Id.* at 1944. The USPS CO denied GK9's post-award business disagreement on 10 December 2020. *Id.* at 1946–51. On 17 December 2020, GK9 appealed the CO's denial to the USPS SDRO. *Id.* at 1952–63. On 13 April 2021, the SDRO denied GK9's appeal. *Id.* at 1964–72.

## II.  Procedural History Before This Court

### A.  Pre-Remand

-11-

On 18 November 2020, AMK9 filed its pre-award complaint in this bid protest, its motion to seal the complaint, and a proposed redacted complaint. *See* AMK9 Pre-Award Compl., ECF No. 1; Mot. for Leave to File Under Seal, ECF No. 2; AMK9 Pre-Award Proposed Redacted Compl., ECF No. 3. On 20 November 2020, MSA filed a motion to intervene. *See* Mot. by Michael Stapleton Associates, Ltd. to Intervene as Def., ECF No. 10. The Court held an initial telephonic scheduling conference on 23 November 2020, and, on the same day, the Court filed an order granting MSA's motion to intervene, granting AMK9's motion for leave to file the complaint under seal, and ordering the government to file a status report updating the Court on the SDRO's then-pending decision on AMK9's pre-award appeal within USPS. Order, ECF No. 13. On 24 November 2020, AMK9 filed a motion for protective order, which the Court granted on the same day. *See* Unopposed Mot. for Protective Order, ECF No. 14; Order, ECF No. 15. The government filed a status report on 27 November 2020 reporting the SDRO issued a decision on the same day. *See* Def.'s Status Report, ECF No. 16.

On 1 December 2020, AMK9 and the government filed a joint status report with separate proposed schedules for further proceedings, with AMK9 noting it "intends to file a request for a temporary restraining order and a preliminary injunction." Joint Status Report ECF No. 18 at 4. The Court issued a scheduling order on 2 December 2020. *See* Order, ECF No. 19. On 3 December 2020, AMK9 filed an amended complaint and a motion for TRO and preliminary injunction. *See* AMK9 Am. Compl., ECF No. 20; Pl.'s Mot. for a TRO and Prelim. Injunction, ECF No. 21. The Court held a status conference on AMK9's motion for TRO and preliminary injunction on 4 December 2020. *See* Order, ECF No. 19. On 7 December 2020, the Court issued a scheduling order maintaining the previously agreed deadline for the government to file the administrative record and noting both "AMK9 agreed [at the 4 December status conference] for its motion for TRO and PI to be construed only as a motion for PI" and the parties agreed to meet and confer to discuss the need for, and details of, a preliminary injunction hearing and to propose an MJAR briefing schedule. Order, ECF No. 22 at 1. On 9 December 2020, the Court stayed AMK9's motion for preliminary injunction and TRO and set the schedule for MJAR proceedings. *See* Order, ECF No. 25. On 21 December 2020, AMK9 filed its pre-award MJAR. *See* Pl.'s Mot. for J. on the Admin. Record, ECF No. 27 ("AMK9 Pre-Award MJAR"). MSA filed a response to AMK9's MJAR on 8 January 2021. *See* Def.-Intervenor MSA's Resp. to Pl.'s Mot. for J. on the Admin. Record, ECF No. 31 ("MSA Pre-Award Resp."). The government filed an HSD-redacted response to AMK9's pre-award MJAR and cross-MJAR on 15 January 2021. *See* Def.'s Resp. to Pl.'s Mot. for J. on the Admin. Record and Cross-Mot. for J. on the Admin. Record, ECF No. 36 ("Gov't Pre-Award Cross-MJAR"). On 15 January 2021, AMK9 filed its response to the government's cross-MJAR and reply in support of its MJAR. *See* Pl.'s Resp. to the Cross-Mot. for J. on the Admin. Record and Reply in Supp. of Pl.'s Mot. for J. on the Admin. Record, ECF No. 37 ("AMK9 Pre-Award Resp."). On 22 January 2021, the government filed a reply in support of its cross-MJAR. *See* Def.'s Reply in Supp. of its Cross-Mot. for J. on the Admin. Record, ECF No. 39 ("Gov't Pre-Award Reply").

On 8 February 2021, the Court held a sealed oral argument via Zoom on the parties' pre-award cross-MJARs. *See* Order, ECF No. 29. On 16 February 2021, the Court held a sealed in-person status conference to discuss HSDs, during which the Court ordered the government to file a joint status report on or before 22 February 2021. *See* Order, ECF No. 45. On 23 February

2021, AMK9 filed a pre-filing notice for a potential post-award bid protest related to its pre-award protest. On 2 March 2021, AMK9 filed a sealed motion for evidentiary hearing and request for status update on administrative matters, which included in part a request the Court issue an order requiring the government to show cause for why it "has not yet filed a redacted transcript of the February 16, 2021" status conference. Mot. for Evidentiary Hearing and Request for Status Update on Admin. Matters ("Mot. for Evidentiary Hearing"), ECF No. 46 at 1–2. On 5 March 2021, the Court ordered the government to file sealed HSD-removed versions of the 16 February 2021 status conference transcript and the 22 February 2021 joint status report ("JSR"). *See* Order, ECF No. 48. Later the same day, the government filed a sealed proposed redacted status conference transcript and a sealed proposed redacted JSR. *See* SC Tr.; Joint Status Report, ECF No. 49. On 8 March 2021, the Court remanded this case with instructions for the CO to review specific items related to the OCI investigation into defendant-intervenor and Mr. Shelton. *See* Opinion and Order, ECF No. 55 ("Remand Order"). On 1 April 2021, GK9 submitted pre-filing notice of its post-award bid protest.

### B. Post-Remand

On 2 April 2021, the CO issued his post-remand review, entitled "Contracting Officer Organizational Conflict of Interest (OCI) Review Pursuant to Court of Federal Claims Remand." AR at 1862–69. On 14 May 2021, GK9 and the government filed a joint motion to consolidate the hearing on GK9's motion for preliminary injunction with the Court's consideration of the merits of AMK9's bid protest, which the Court granted on the same day. *See* Joint Mot. to Consolidate Hearing on Mot. for Prelim. Inj. with the Court's Consideration of the merits, ECF No. 79; Order, ECF No. 80. On 19 May 2021, GK9 filed an amended complaint and a post-award MJAR. *See* Am. and Restated Compl., ECF No. 82; Global K9 Protection Group, LLC's Mot. for J. on the Administrative R. and Incorporated Br., ECF No. 83 ("GK9 MJAR"). AMK9 filed a post-award MJAR on the same day. *See* Plaintiff's[sic] Mot. for J. on the Administrative R., ECF No. 84 ("AMK9 Post-Award MJAR"). On 20 May 2021, the government filed a sealed motion to strike GK9's amended complaint and post-award MJAR and AMK9's post-award MJAR. *See* Def.'s Mot. to Strike Am. Compl. and Mots. for J. on the Administrative R., ECF No. 85. The Court denied the government's motion to strike on 28 May 2021. *See* Order, ECF No. 92.

On 1 June 2021, the government filed its response to AMK9 and GK9's motions for judgment on the administrative record and cross-motion for judgment on the administrative record. *See* Def.'s Resp. to Pls.' Mots. for J. on the Admin. Record and Cross-Mot. for J. on the Admin. Record, ECF No. 93 ("Gov't Post-Award Cross-MJAR"). Also on 1 June 2021, MSA filed a response to AMK9 and GK9's motions for judgment on the administrative record and cross-motion for judgment on the administrative record. *See* Def.-Intervenor's Cross-Mot. for J. on the Admin. Record, ECF No. 94 ("MSA Post-Award Cross-MJAR"). GK9 filed its response to MSA and the government's cross-MJARs and its reply in support of its MJAR on 5 June 2021. See Global K9 Protection Group, LLC's Reply and Resp. to Defs.' Mots. for J. on the Admin. Record, ECF No. 96 ("GK9 Resp."). Also on 5 June 2021, AMK9 filed its response to MSA and the government's cross-MJARs and its reply in support of its MJAR. See Pls. AMk9's Resp. to the Cross-Mots. for J. on the Admin. Record and Reply in Supp. of its Mot. for J. on the Admin. Record, ECF No. 97 ("AMK9 Post-Award Resp."). The government filed a reply in

support of its cross-MJAR on 10 June 2021.  *See* Def.'s Reply in Supp. of its Cross-Mot. for J. on the Admin. Record, ECF No. 100.  MSA also filed a reply in support of its cross-MJAR on 10 June 2021.  *See* Def.-Intervenor MSA's Reply for J. on the Admin. Record, ECF No. 101.  On 22 June 2021 the Court held in-person oral argument on the post-award cross-MJARs.  *See* Order, ECF No. 102.

## III.   USPS Remand OCI Investigation

On 8 March 2021, the Court remanded the case to USPS and directed the CO to "reopen the OCI investigation into defendant-intervenor and Mr. Shelton according to guidelines provided by the SP&Ps and reassess a complete and documented review of the OCI."  *See* Remand Order at 32.  The Court instructed the CO to reexamine the case to consider records he previously did not fully investigate, including Mr. Shelton's TSA exit letter, communications between USPS and TSA, and any other additional evidence viewed as necessary to determining MSA's potential OCI.  *See id.*[1]

Following remand, the CO noted in his remand investigation analysis that he conducted "a much more thorough review of the potential OCI."  AR at 1869.  As part of the remand investigation, the CO reviewed Mr. Shelton's TSA exit clearance memorandum, reviewed the record of communications between USPS and TSA, and questioned MSA about the website's description of Mr. Shelton's experience.  *Id.* at 1863–69 (USPS CO's OCI Review Following Remand).  The CO acknowledged Mr. Shelton may have been involved in drafting the mail amendment throughout "TSA's policy development process," but stated Mr. Shelton was "not directly involved in creating the mail amendment or other TSA regulations relating to mail."  *Id.* at 1865–66, 1869.  The CO also determined, "[w]ith respect to Mr. Shelton's post-employment ethics advice received from TSA, Mr. Shelton and TSA had different recollections."  *Id.* at 1866.  The CO nonetheless stated the TSA and Mr. Shelton are "essentially in agreement regarding Mr. Shelton's work at TSA."  *Id.* at 1864.  The CO concluded, although MSA was issued a mail amendment, the mail amendment did not create an unfair competitive advantage for MSA, there was no evidence Mr. Shelton committed an ethics violation, and there was no evidence offerors were prejudiced by not having access to the mail amendment.  *Id.* at 1869.

## IV.   Legal Standards

### A.  Bid Protest Jurisdiction & APA Standard of Review

The Tucker Act provides this Court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  To be an interested party, a protestor must show that it is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award or failure to award the contract."  *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1356 (Fed. Cir. 2018) (internal quotation marks and citations omitted).

---

[1] The Court discusses its Remand Order in greater detail in the OCI section, VIII. B. *infra.*

In rendering such judgment, this Court "review[s] the agency's decision pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act ("APA"). *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing 28 U.S.C. § 1491(b)(4)) (internal quotation marks omitted). "Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. §706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). Under this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "The arbitrary and capricious standard . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

MSA previously argued the Court has jurisdiction under the APA according to *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970). *See* Pre-Award OA Tr. at 14:24–16:25.[2] All parties now agree this Court has jurisdiction pursuant to the Tucker Act. *See* AMK9 Post-Award MJAR at 14; GK9 MJAR at 11; Gov't Post-Award Cross-MJAR at 17; MSA Post-Award Cross-MJAR at 13; Transcript of 22 June 2021 Oral Argument on Cross-Motions for Judgment on the Administrative Record, ECF No. 104 ("Post-Award OA Tr.") at 81:15–17 (Counsel for MSA agreeing MSA "no longer suggests the *Scanwell* jurisdiction."). As stated in the Remand Order, "jurisdiction in this USPS bid protest [is] pursuant to the Tucker Act as amended by the ADRA, which 'subsumed' *Scanwell* APA jurisdiction." Remand Order at 14 (citing 28 U.S.C. § 1491(b)(1)).

### B. USPS SP&Ps

As the Court previously concluded, "[t]he text of the SP&Ps is clear they only provide guidance and are not binding regulations." Remand Order at 17. This Court stated:

> Even assuming *arguendo* the SP&Ps are binding, the SP&Ps related to OCI are not binding, as the Federal Circuit is clear even the OCI provisions of the FAR, a binding regulation, are to be treated under *Domencio Garufi's* first "arbitrary and

---

[2] THE COURT: [Y]our argument . . . seems to assume that this Court is hearing the case under the APA according to *Scanwell* jurisdiction rather than according to the Tucker Act. Is it your argument, then, that this is a *Scanwell* case rather than a Tucker Act case?

DEFENDANT-INTERVENOR: Yes, it is, Your Honor.

Pre-Award OA Tr. at 14:24–15:6.

capricious" or "rational basis" standard, rather than its second "violation of regulation or procedure" ground, owing to "the discretion given to COs" and the Federal Circuit's wish for this Court [to] avoid "trigger[ing] de novo review." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374,1381–82 (Fed. Cir. 2009).

*Id.* The Court reviews whether the USPS CO's "decision lacked a rational basis" according to guidance from the SP&Ps, rather than treating the SP&Ps as binding regulations. *Domenico Garufi*, 238 F.3d at 1332; *see also* Pre-Award OA Tr. at 25:12–26:20 (Government counsel arguing: "The Court is always engaging in a rational basis of review. We do not believe that the specific language of the SP&Ps is binding such that the SP&Ps are treated as a regulation or procedure that a deviation from would automatically constitute a failure under an APA review.").

### C. Judgment on the Administrative Record in a Bid Protest

RCFC 52.1(c) "provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011). Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

This Court may set aside a contract award if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. In pre-award protests, a plaintiff must demonstrate "that it suffered a 'non-trivial competitive injury which can be addressed by judicial relief.'" *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009)). A post-award bid protest plaintiff must establish "errors in the procurement process significantly prejudiced [the plaintiff]" by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum, Inc.*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

"Contracting officers are not obligated by the APA to provide written explanations for their actions," and agency decisions are "entitled to a presumption of regularity." *Domenico Garufi*, 238 F.3d at 1337–38. There is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Savantage Fin. Servs., Inc. v. United States*, 86 Fed. Cl. 700, 703 (2009), *aff'd*, 595 F.3d 1282 (Fed. Cir. 2010). "Given the presumption of regularity and good faith, a heavy burden rests upon [a plaintiff] to demonstrate that [an] absence of documentation reflects a failure to perform the organizational conflict of interest review." *Beta Analytics Int'l, Inc. v. U.S.*, 61 Fed. Cl. 223, 228 (2004) (citing *Domenico Garufi*, 238 F.3d at 1338).

"Hard facts" and "concreteness" are necessary to show a contracting officer's OCI determination lacked a rational basis under the APA's arbitrary and capricious standard; "sufficient alignment of interests," "vague allegations," "mere suspicion and innuendo" are not enough. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1385 (Fed. Cir. 2011) (internal quotation marks omitted). "'[H]ard facts' do not need to show an actual conflict—a potential conflict can be sufficient." *Id.* at 1387. "An 'unequal access to information' conflict occurs

when a government contractor has access to non-public information in connection with performance of a government contract that may afford a competitive advantage in subsequent competition for a government contract." *Axiom Res. Mgmt.*, 564 F.3d at 1377 n.1.

For a plaintiff alleging bias "to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." *Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citing *Info. Tech. Applications*, 316 F.3d at 1323 n.2). "Almost irrefragable proof" amounts to "clear and convincing evidence." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002) ("[W]e must determine if a reasonable fact finder could find, by clear and convincing evidence, that the CO did not act in good faith."). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Galen*, 369 F.3d at 1330 (citing *Torncello v. United States*, 231 Ct. Cl. 20, 45 (1982)).

### D. Relief

Mitigation actions contemplated by the SP&Ps "may include, but are not limited to":

(a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair a competition as possible. Any limit on future contracts must be for a reasonable period sufficient to avoid unfair competitive advantage or potential bias.

SP&P 7-15.2.1. The SP&Ps further guide: "If it becomes apparent when proposals are received that participation by a particular offeror could lead to an organizational conflict of interest and unfair competition, the offeror may be disqualified and its proposal rejected. The contracting officer may take actions necessary and in the interest of the Postal Service and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest." *Id*.

When deciding whether a permanent injunction is warranted, a court considers:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

## V.   USPS's Allegations of Special Treatment Within Government Contracting

Amongst other arguments, the government asserts USPS reserves the discretion to waive "minor informalities" in keeping with its "business-oriented procurement process." Post-Award

OA Tr. at 20:1–13; *see also* Gov't Post-Award Cross-MJAR at 8.  The government claims special treatment status for the Postal Service on the basis of the Postal Reorganization Act and internal guidance, arguing USPS is a more "businesslike" organization and that its procurement process, separate and distinct from the Federal Acquisitions Regulation, affords additional leeway.  Post-Award OA Tr. 21:10–16.

The agency created the Supplying Principles and Practices ("SP&Ps") in May 2006 (revised June 2020) to guide the procurement process in a "business oriented" direction.  UNITED STATES POSTAL SERVICE, SUPPLYING PRINCIPLES AND PRACTICES (2020) ("USPS SP&Ps") at *a*, 3.  According to USPS, the SP&Ps are not "binding regulations" on the USPS, but instead act as a "guide" for "obtaining [the] best value and efficiency."  *Id.* at 3.  Thus, the SP&Ps do not create "rights, substantive or procedural, enforceable against the Postal Service."  *Id.*  Further, "[t]he Postal Service may reject any or all offers if such action is in the best interest of the Postal Service; accept other than the lowest offer, [sic] and waive informalities and minor irregularities in offers received."  *Id.* at 484.

The solicitation's "Instructions and Evaluation Criteria" reiterates USPS's flexibility to "waive minor informalities and irregularities in the proposals it receives."  AR at 214 (Solicitation).  The government proposes font size as an example of "the type of informality that USPS explicitly reserved the right to waive in the Solicitation."  Gov't Post-Award Cross-MJAR at 27.  The solicitation does not define the terms "informality," "minor defect," or "irregularity."  The SP&Ps further do not define these terms, nor do the SP&Ps offer guidance on discretionary acceptance of solicitations.

The government asserts USPS's special treatment status under 39 U.S.C. § 410(a) offers USPS the discretion to approve or deny without oversight.  *See* Gov't Post-Award Cross-MJAR at 20.  Reviewing various USPS procurement cases, the Court notes this is not the first time the government has generally sought special treatment for USPS.  *See, e.g.*, *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1083 (Fed. Cir. 2001) ("[T]he government's position amounts to an argument that no judicial forum is available to review USPS pre-award government contract protests."); *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1357 (Fed. Cir. 2009); *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 21 (2005).  In *Emery*, the Federal Circuit reviewed a bid protest decision in which the USPS argued this court lacked subject matter jurisdiction because USPS is not a "federal agency" for purposes of the Tucker Act.  *Emery Worldwide Airlines*, 264 F.3d at 1075.  The Federal Circuit rejected USPS's argument, holding USPS was a federal agency and thus subject to the government contract procurement protest jurisdiction of this court.  *Id.* at 1081.  In *Banknote*, the Federal Circuit acknowledged the different standards under the Purchasing Manual, a precursor to the SP&Ps, as compared to the Federal Acquisitions Regulation.  *Banknote Corp. of America*, 365 F.3d at 1349 n.1 ("The Purchasing Manual, not the Federal Acquisition Regulations (FAR), applies to USPS procurements.").  Nonetheless, in holding for the government, the Federal Circuit stated, "[t]he USPS Purchasing Manual sets forth the policies and procedures for the USPS's purchasing activities and is incorporated by reference into USPS regulations."  *Id.*  In *Asia Pacific*, USPS argued before this court the Purchasing Manual was unenforceable based on a disclaimer in the manual stating that the manual did not "create any right or benefit, substantive or procedural by a party against the Postal Service or the United States."  *Asia Pac. Airlines*, 68 Fed. Cl. at 28 n.14

(2005) (citing the Purchasing Manual § 1.1.1.b.4). The court rejected USPS's claim, finding the Purchasing Manual was "incorporated by reference in the Code of Federal Regulations," before holding the USPS acted arbitrarily and capriciously in removing an offeror based on ambiguous terms in the solicitation that failed to meet Purchasing Manual criteria. *Id.* at 21, 24.

The Postal Reorganization Act may have made the Postal Service more businesslike, but the Act did not abrogate the Postal Service's purpose: to serve the public interest. *See* 39 U.S.C. § 101(a) ("The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States . . . ."). Fairness in the procurement process is fundamental to serving the public interest. *See Asia Pacific*, 68 Fed. Cl. at 27 ("[I]t is well-established that the public interest is well-served by ensuring that the government procurement process is fair.") (citing *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995)). Government contract disputes are resolved in the Court of Federal Claims "to ensure national uniformity in government contract law." *Texas Health Choice, L.C. v. Off. of Personnel Mgt.*, 400 F.3d 895, 899 (Fed. Cir. 2005); *see also Emery*, 264 F.3d at 1079 ("[T]o prevent forum shopping and to promote uniformity in government procurement award law, Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims.").

In addition to other arguments in this protest, the government attempts to define and apply standards in font size, page length, and late submissions all as minor informalities *post hoc*. As explained *infra, post hoc* definitions of procurement requirements fail to meet the government's duty of providing a rational basis for decisions, particularly when the government acknowledges these "minor informalities" can "conceivably" create unfair advantage. Post-Award OA Tr. 29:4–8; *see PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004) ("[U]neven treatment goes against standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."). The Court notes generally that while USPS is governed by a different procurement process, it is also mandated to have a fair procurement process. *See Asia Pacific Airlines v. United States*, 68 Fed. Cl. 8, 21 (2005). While the Post Office argues the Court must award it special treatment, the purpose of the SP&Ps is to create a "fair, objective" standard for business, and the Postal Office is not exempt from the standard. SP&Ps at 6; *see Emery*, 264 F.3d at 1079, 1083.

## VI.   Parties' Arguments

In its pre-award protest, AMK9 argues USPS arbitrarily combined alarm resolution services and K-9 services into a single solicitation, the combination of services unduly restricted competition, and the government unlawfully crafted the solicitation to favor MSA. *See* AMK9 Pre-Award MJAR at 9, 15–26. The government responds USPS acted within its discretion when the agency combined awards and "rationally determined" a single solicitation would better. *See* Gov't Pre-Award Cross-MJAR at 22–27. Further, the government argues competition was sufficient for the solicitation and the requirements of the solicitation both are rational and do not demonstrate favor for MSA. *See id.* at 27–28.

Regarding post-award protests, both AMK9 and GK9 argue USPS acted arbitrarily and capriciously for accepting MSA's proposal because the proposal allegedly contained text with font size smaller than eleven in violation of the solicitation's requirement. *See* AMK9 Post-Award MJAR at 16–17; GK9 MJAR at 18–20. GK9 argues MSA's failure to comply with the solicitation's font size requirement allowed MSA to condense 27 pages of information down to the required 20 pages, and, had MSA followed the font requirements, MSA would not have been able to respond to every aspect of the Solicitation. *See* GK9 MJAR at 20. The government argues in response the font size requirement was not a material consideration for whether a proposal was acceptable, and USPS has the discretion to "waive minor informalities" in the proposals. Gov't Post-Award Cross-MJAR at 26–27. MSA argues that neither protestor raised this issue at the administrative level, and in the alternative, the font size limitation was not a requirement of the solicitation. *See* MSA Post-Award Cross-MJAR at 44–47. AMK9 initially also argued USPS acted arbitrarily and capriciously by accepting MSA's submission, which AMK9 alleged was submitted four minutes after the deadline. *See* AMK9 Post-Award MJAR at 15. Both the government and MSA argued in response MSA submitted its proposal before the deadline. *See* Gov't Post-Award Cross-MJAR at 25–26, MSA Post-Award Cross-MJAR at 47. AMK9 waived this argument in its reply and at oral argument. *See* Post-Award OA Tr. at 52:13–23.

AMK9 and GK9 also accuse MSA of various organizational conflicts of interest, which plaintiffs allege required USPS to disqualify MSA. *See* AMK9 Post-Award MJAR at 17–25; GK9 MJAR at 12–18. AMK9 and GK9 both claim MSA had unequal access to information through MSA's participation in USPS's pilot program for mail screening and through MSA's exposure to the USPS's mail amendments. *See* AMK9 Post-Award MJAR at 18–20; GK9 MJAR at 16–18. AMK9 and GK9 also claim a biased ground rules organizational conflict of interest existed by way of MSA's participation in the pilot program allegedly "set[ting] the ground rules" of the solicitation. GK9 MJAR at 12; *see also* AMK9 Post-Award MJAR at 24. AMK9 and GK9 argue USPS failed to fully consider the organizational conflicts of interest. *See* AMK9 Post-Award MJAR at 20–23; GK9 MJAR at 16–17. Both the government and MSA contend USPS adequately reinvestigated the OCI and found no evidence. *See* Gov't Post-Award Cross-MJAR at 20–25; MSA Post-Award Cross-MJAR at 36–44. According to the government, MSA had access to a draft of the mail amendment, but the mail amendment "did not contain material information beyond that given in the Solicitation of Work to all bidders." *See* Gov't Post-Award Cross-MJAR at 25.

AMK9 and GK9 argue USPS favored MSA in its treatment of offerors. *See* AMK9 Post-Award MJAR at 31–37; GK9 MJAR at 21–23. AMK9 alleges USPS "treated offerors disparately" by assigning strengths to MSA without acknowledging the same strengths in AMK9's proposal and assigning MSA unwarranted strengths. AMK9 Post-Award MJAR at 31–34. GK9 emphasizes a series of best practices presentations presented by USPS, referenced as a "3PK9 playbook," noted MSA's technology and participation in the pilot program prior to contract solicitation without identifying any other TSA-certified 3PK9 vendors. *See* GK9 MJAR at 21–23. The government responds to AMK9's argument by distinguishing between offerors' proposals to show why it believed the assignment of certain strengths was warranted and responds to GK9's argument by contending USPIS created these presentations, rather than MSA. *See* Gov't Post-Award Cross-MJAR at 23, 28–33. MSA contends USPS planned to implement a

new program and had an obligation, fulfilled through the "playbook," to inform airlines and others of the lessons the agency learned from the pilot program and what USPS "would consider as 'best practices.'" MSA Post-Award MJAR at 36.

AMK9 and GK9 also argue USPS acted arbitrarily and capriciously in evaluating both offerors' proposals. *See* AMK9 Post-Award MJAR at 35; GK9 MJAR at 21. AMK9 argues USPS assigned a weakness to AMK9 based on the offeror's initial proposal. *See* AMK9 Post-Award MJAR at 25–26. AMK9 further argues USPS inaccurately assessed AMK9's proposal, compared to MSA's proposal, when USPS conducted its tradeoff analysis. AMK9 Post-Award MJAR at 34–35. AMK9 and GK9 additionally argue USPS relied on unstated evaluation factors when assigning weaknesses to each offeror's proposal. *See* AMK9 Post-Award MJAR at 26; GK9 MJAR at 20–26. The government contends USPS reasonably evaluated proposals and any errors did not prejudice AMK9 or GK9. *See* Gov't Post-Award Cross-MJAR at 28–37.

## VII.   The Court's Findings Regarding AMK9's Pre-Award Protest Claims

### A. Whether the Government Arbitrarily and Capriciously Combined Alarm Resolution Services and K-9 Services in the Solicitation Rather than Conducting Two Separate Procurements

AMK9 argues "USPS did not require 3PK9 services and alarm resolution services under one procurement," therefore, by including "alarm resolution services into a procurement for 3PK9 services—and including specifications and evaluation methodologies favoring MSA— USPS crafted a Solicitation exceeding its minimum needs in a manner that was overly restrictive and limited competition." AMK9 Pre-Award MJAR at 15. AMK9 asserts "a solicitation must state the agency's 'minimum needs,' and overstating those needs creates a restrictive competition." *Id.* at 17 (citing *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426 (2015); *Chas H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 723 (1999)). AMK9 contends alarm resolution is not a need of USPS and will in fact "run concurrently with the Air Transportation CAIR contract" thereby creating a redundant service. *Id.* at 19. Further, AMK9 argues the government, by combining two services unnecessarily, "prevented offerors from picking and choosing what to apply for." Pre-Award OA Tr. at 44:11–12.

The government contends USPS "properly exercised it [sic] authority" under 39 U.S.C § 401(3) when it "rationally determined that it preferred to have both canine screening (as certified by TSA) and alarm resolution service together in one contract." Gov't Pre-Award Cross-MJAR at 22–23. The government proffers three reasons supporting the bundling of K-9 and alarm services into a single solicitation. First, the government argues USPS concluded a single award would provide "seamless integration of canine explosive detection and alarm resolution services," and therefore support public safety and law enforcement purposes. Gov't Pre-Award Reply at 9. Second, the government argues USPS "rationally concluded that a contract for both canine detection and alarm resolution services would 'allow the Postal Service control over the [mail] screening process.'" Gov't Pre-Award Cross-MJAR at 23 (citing AR 568). Third, the government contends "inconsistencies in the legacy (TSA screening) with alarm resolution service, 'prevented prompt notification of alerts to the USPIS'" and USPS rationally concluded

two interrelated services performed by a single supplier "are far more likely to operate seamlessly." *Id*. at 25 (citing AR at 814 (SDRO Pre-Award Decision)).

The government notes AMK9 cites "no law or regulation that limits the USPS's ability to 'include two interdependent services under one contract.'" *Id*. at 24–25 (citing AR at 814 (SDRO Pre-Award Decision)). MSA adds the combined services would "quickly and efficiently determine if [an] alert is an emergency," in compliance with the ten-minute threat resolution solicitation requirement. MSA Pre-Award Resp. at 16 (citing AR at 727).

Federal agencies conducting procurements have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation." *Tyler Const. Grp. v. United States*, 570 F.3d 1329, 1334 (Fed. Cir. 2009). Agencies determine their own minimum needs for a procurement solicitation. *See XTRA Lease, Inc. v. United States*, 50 Fed. Cl. 612, 625 (2001) ("The determination of an agency's minimum needs is a matter within the broad discretion of agency officials."). The solicitation requirements must only have a rational basis, and the rational basis review is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). At oral argument, AMK9 acknowledged the 3PK9 services and alarm resolution services are "connected." Pre-Award OA Tr. at 67:8–9 (AMK9 counsel "agree[ing] . . . that from a human perspective [3PK9 services and alarm resolution services] are connected"). The two services "replace and expand" upon a screening formerly provided by TSA and together allow USPS to screen U.S. mail for explosives using a "novel process." AR at 627, 629 (CO Resolution of AMK9 Business Disagreement), 169 (Solicitation Amendment 001). The SDRO concluded "two interrelated services are far more likely to operate seamlessly," which "is of the utmost importance" for "a bomb detection system for mail that is loaded onto commercial passenger planes." *Id*. at 814 (Supplier Disagreement Resolution). The government noted a single award would "enable the law enforcement arm [of USPS] to inspect any dangerous mail and to follow up and perhaps apprehend wrongdoers[]" in accordance with "consistent safety standards" defined by USPS. Pre-Award OA Tr. at 45:17–19, 46:2. AMK9 conceded USPS has the authority to resolve alarms in accordance with its own standard. *Id*. at 73:13–20. Based on precedent related to assessing and avoiding risks, the government reasonably concluded a combined services solicitation would better serve public safety and law enforcement priorities. *See CHE Consulting*, 552 F.3d at 1355 ("Indeed [the government agency] has a responsibility to assess risks and avoid them before they become a historical fact."). Examining the USPS solicitation, USPS rationally concluded a single award would provide "continuity and cohesion" in the system through a "single point of contact." AR at 572 (Supply Management Purchase Plan); *CHE Consulting*, 552 F.3d at 1355.

Prior to the solicitation, USPS considered, *inter alia*, increased demand for parcel services, increased need to screen mail on international flights, and a lack of oversight over the previous screening program. AR at 567–68 (Supply Management Purchase Plan). USPS noted the new program would allow "the Postal Service to control the screening process and the subsequent development of a program that will enable the Postal Service to expand the number of sites with screening capabilities." *Id*. at 568. USPS also considered additional potential future costs in ground transportation resulting from global trend shifts and anticipated the proposed solicitation would reduce expenses and fulfill a need "critical to the Postal Service." *Id*. at 567. USPS provided a rational basis for concluding the combined services would "allow the Postal

Service to control the screening process and the subsequent development of a program that will enable the Postal Service to expand. . . ." *Id.* at 568; *see also Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 n.9 (1999) ("[T]his court's role is not to second guess what the [procuring agency] has determined to be its needs.").

The contracting officer and supplier disagreement resolution officer both noted the "pattern of inconsistencies that have resulted under the legacy screening system, particularly with Alarm Resolution services, which have prevented prompt notification of alerts to USPIS." AR at 814 (SDRO Pre-Award Decision).  USPS expected a single supplier would lead to "[e]ffective and efficient interoperability," reducing the errors in the legacy program.  *Id.*  While AMK9 argues the combined services were "unnecessary" for the government's solicitation, the Federal Circuit has clearly stated, "competitors do not dictate an agency's minimum needs, the agency does."  Pre-Award OA Tr. 96:1–4; *Savantage Fin. Serv., Inc.*, 595 F.3d 1282, 1286 (Fed. Cir. 2010).  USPS rationally concluded a single award would avoid the "inefficient and inconsistent" results of the previous screening method.  AR at 628; *see also Savantage Fin. Serv.*, 595 F.3d at 1286–87 (holding an agency's solicitation requirement for an integrated system was rational based on the agency's previous experience and the experience of other agencies and department).

The solicitation sought to implement a "novel process" for mail screenings, conducted exclusively under USPS authority.  AR at 695 (Solicitation Amendment).  In preparing the solicitation, USPS considered its own experience, conducted market research, and implemented a pilot program.  *Id.* at 568–69, 2536–39.  USPS concluded a bundling of the two services would lead to "seamless" operations, greater oversight, and reduced errors.  *Id.* at 628 (Contracting Officer's Resolution of Business Disagreement).  The noted justifications provided by the government independently serve as a rational basis for finding USPS's bundling of services into a single solicitation was not arbitrary and capricious.  *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("[The arbitrary and capricious] standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

## B.  Whether the Government Unduly Restricted Competition by Issuing the Solicitation in a Manner Encouraging a Single Award

AMK9 argues, "USPS set itself up to award a contract to a single entity that could provide both services without ever comparing the value of an offeror proposing just canine services against an offeror proposing both services."  AMK9 Pre-Award MJAR at 20.  AMK9 argues the solicitation "prevented offerors from reasonably competing for 3PK9 services without also proposing to offer alarm resolution services."  AMK9 Pre-Award Resp. at 9.  AMK9 asserts by extending the solicitation "beyond [USPS] requirements" and "combining both services" USPS "unduly restricted competition" in a way "which render[ed] USPS' [sic] actions arbitrary, capricious, an abuse of discretion, and contrary to law."  AMK9 Pre-Award MJAR at 9.  The government contends in response competition under the solicitation's terms was "adequate." Gov't Pre-Award Cross-MJAR at 27.  The government explains AMK9, along with four other offerors, submitted proposals that "qualified for both canine detection and alarm resolution."  *Id.* The government further notes "[USPS] allowed for subcontracting and partnering" and this

"rebut[s] the contention that the solicitation restricted competition." *Id.* at 29–30. MSA emphasizes AMK9 "points to no regulations violated by the USPS" and AMK9 "solely disagrees with how USPS determined—in its reasonable discretion—to award the contract." MSA Pre-Award Resp. at 18.

A plaintiff challenging an unduly restrictive solicitation "bears the burden of showing that the allegedly restrictive solicitation term 'is so plainly unjustified as to lack a rational basis.'" *Cleveland Assets, LLC v. United States*, 132 Fed. Cl. 264 (2017), *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018) (quoting *Savantage Fin. Serv.*, 595 F.3d at 1286–87). Federal agencies conducting procurement have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation." *Tyler Const. Grp.*, 570 F.3d at 1334. Congress authorized the USPS to "determine the character of, and necessity for, its expenditures." 39 U.S.C. § 401(3). The USPS is "exempted from all federal procurement laws not specifically enumerated in 39 U.S.C. §410(a)," which includes an exemption from the Competition in Contracting Act. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 n.7 (Fed. Cir. 2001). In reviewing Agency procurement decisions, the Court must not "substitute its judgment for that of an agency." *Telos Identity Mgmt. Sols., LLC v. United States*, 143 Fed. Cl. 787, 792 (2019).

AMK9's argument the solicitation was unduly restrictive is undermined by the five qualified offers USPS received for both services. AR at 780; *see also American Safety Council*, 122 Fed. Cl. at 436 (stating the presence of multiple proposals "undercut[s] the argument that the terms are unduly restrictive"). The government identified legacy program errors and delays and believed a solicitation combining the two services would reduce these issues. AR at 752. Further, USPS believed sourcing both alarm detection and resolution from a single point of contact would offer greater supervision over the mail screening process. *Id.* The solicitation stated, despite these preferences, the agency would consider offers that did not provide both services, and it is firmly within the agency's discretion to determine the number of contract awards. *Id.* at 719; s*ee Am. Safety Council*, 122 Fed. Cl. at 439 ("[I]t is within the sound discretion of an agency to determine its minimum needs and determine the number of contract awards, consistent with a solicitation's requirements."). The government provided a rational basis for combining the solicitation and therefore did not unduly restrict competition. *See Savantage Fin. Serv.*, 595 F.3d at 1286–87.

### C. Whether the Government Unlawfully Crafted the Solicitation to Favor MSA

AMK9 asserts "USPS drafted evaluation factors in a manner that would ensure MSA received additional credit for the alarm services it previously performed—even though these services were not necessary to satisfy USPS' minimum needs." AMK9 Pre-Award MJAR at 22. AMK9 argues: "USPS stated that holding a SAFETY Act designation for alarm resolution services 'is desirable'"; "offerors were to provide 'historical data of their current processes to provide' alarm resolution services over the last 12 months"; and "the Solicitation included a past performance requirement for '[d]emonstrated support for the execution of this program across the U.S.' and 'Proven [sic] experience in developing national level screening and alarm resolution.'" *Id.* at 22–23 (emphasis omitted). According to AMK9, "the inclusion of alarm services in this Solicitation was unnecessary and allowed MSA to benefit considerably," and

USPS "continually built in evaluation factors that extended beyond its needs in a manner that favored" MSA. *Id.* at 23–24. AMK9 cites USPS's statement it "only 'preferred' to receive these two services in one procurement" as evidence USPS acted improperly in "adding in requirements (or desires) that only MSA could meet and benefit from . . . ." *Id.* at 24. AMK9 alleges neither "bad faith [n]or that USPS intended to favor MSA," but rather "asserts that the solicitation, as drafted, favors one offeror over another, preventing offerors from having a reasonable opportunity for award." AMK9 Pre-Award Resp. at 11 n.8.

The government notes AMK9 "fails to provide any proof that any USPS official intended to favor MSA, much less the clear and convincing proof required to overcome the presumption of good faith on the part of USPS." Gov't Pre-Award Cross-MJAR at 28 (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002) (requiring "clear and convincing evidence" for a Court to conclude a CO did not act in good faith); *Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (requiring "irrefragable proof" for a plaintiff to overcome the presumption of good faith on behalf of the government)). The government argues AMK9 "has pointed to nothing in the record, or otherwise, indicating that USPS had any intent to favor one offeror over another in the crafting of the solicitation, or that it had any intent to injure AMK9." *Id.* at 29. The government further argues its preference for "one prime contractor responsible for both" services is based on "rational explanations," none of which "favored a specific offeror." *Id.* The government also argues USPS's inclusion of an element for prior experience, experience which defendant-intervenor had from the pilot program, "fails to demonstrate . . . that USPS included those elements to favor MSA, rather than the entirely rational preference to have an awardee who was prepared to offer the full range of services requested." *Id.* According to the government, AMK9 "fails to show that the solicitation had either the effect or motivation to exclude offerors other than" defendant-intervenor, since the solicitation allowed for subcontracting, "did not limit experience to the pilot program," and "USPS received five qualified bids for both canine detection and alarm resolution, including" AMK9's. *Id.* at 29–30.

MSA notes the fact it is "simply meeting a preference of USPS's Solicitation [for a SAFETY Act designation in alarm resolution services] does not mean, without any other evidence, that the USPS specifically crafted the solicitation for" MSA. MSA Pre-Award Resp. at 19. Additionally, MSA observes USPS's requirement that offerors provide "historical data of their current processes to provide alarm resolution services over the last 12 months" could not have been intended to unfairly favor MSA because "[t]he evaluation team noted a strength for another offeror, [an offeror not involved in this case], for its 'twelve (12) months of usage history.'" *Id.* at 19–20 (citing AR at 786 (TET Award Recommendation)). MSA characterizes AMK9's objection here as "a mere disagreement that the alarm resolution services were needed by the USPS." *Id.* at 20.

Specifications must be "reasonably related to the agency's minimum needs." *Software Testing Sols., Inc. v. United States*, 58 Fed. Cl. 533, 535 (2003). Determining an agency's minimum needs is broadly within the discretion of agency officials and not for the court to second guess unless the action does not "evince rational reasoning and consideration of relevant factors." *Savantage Financial Services*, 595 F.3d at 1286 (internal quotation marks omitted). The solicitation required offerors either to have or be in the process of obtaining SAFETY Act

certification.  AR at 756.  The SAFETY Act limits liability for claims against companies that create or deploy technology related to countering terrorism, and certification is the process a company goes through to enroll in the SAFETY Act protections.  *Id*. at 582.  To obtain certification, the technology must "perform as intended, conform to the seller's specifications, and [be] safe for use as intended."  *Designation and Certification*, SAFETY Act, https://www.safetyact.gov/help-doc/3561.htm (last visited Jul. 14, 2021).  The government described the SAFETY Act certification as fulfilling a "safety purpose" and as a "limitation on liability" by ensuring offerors were trained in K-9 procedures.  Pre-Award OA Tr. at 104:5–7.  Five of the offerors met the SAFETY Act certification requirement, weakening AMK9's argument the requirement favored MSA.  AR at 784–85 (Supply Management Competitive Award Recommendation).  Further, the government rationally included SAFETY Act certification as a criterion because compliance certifications that support an offeror's ability to adequately perform a required service are reasonably related to the government's needs.  *See, e.g., Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 127 (2016) (holding National Environmental Policy Act compliance requirements reasonable in bid contract).

Several competitors received positive marks for SAFETY Act certification, and MSA was not the only offeror to receive a strength for providing its history of alarm resolution services.  AR at 786.  An offeror not involved in this litigation specifically received strengths for "twelve (12) months of usage history."  *Id*.  Counsel for AMK9 was not able to "speak to" this fact at oral argument but stated AMK9 is "not alleging bad faith or even bad intent."  Pre-Award OA Tr. at 97:19, 98:16–17.  Rather, counsel for AMK9 argued at oral argument the consequences of requiring historical data and past experience sufficiently "favor MSA" for USPS's actions to be arbitrary and capricious.  *Id.* at 98:16–18.  The government's interest in awarding the contract to an offeror with historical data and past performance is rational, and USPS acted rationally when it included the three terms in the solicitation.  *Savantage Fin. Serv.*, 595 F.3d at 1286; s*ee also CGS Administrators, LLC v. United States*, 110 Fed. Cl. 431, 439–40 (2013) (holding an agency acts rationally when it evaluates the past performance of bidders, especially when it evaluates relevant types of past performance).

## VIII.   The Court's Findings Regarding AMK9 & GK9's Post-Award Protests

### A.   Whether USPS Overlooked Alleged Flaws in MSA's Submission

#### 1.   Whether USPS Irrationally Accepted MSA's Submission Without Considering Font Size and Page Length

AMK9 argues "MSA did not comply with the required font size" in the text of several charts and tables labeled as exhibits throughout the proposal.  AMK9 Post-Award MJAR at 16.  Amendment 001 contains a series of questions from offerors and answers from the government.  *See* AR at 161–175 (Solicitation Amendment 001).  Question 34 asked:  "Can USPS specify if there are any font size limitations/restrictions for the written responses and graphics/tables/figures?"  *Id*. at 165.  USPS responded:  "The USPS would like to keep Font Size no smaller 11 [sic]."  *Id*.  Question 68 asked:  "Is there a font size limitation for the Technical Proposal?  Does this limitation apply to any graphics to tables used in the proposal responses?"  *Id*. at 170.  USPS responded:  "Please keep the Font Size no smaller than 11.  This applies to all

graphics, labels, and tables as well." *Id.* According to AMK9, the government erred in "accept[ing] and consider[ing]" MSA's proposal "without considering MSA's failure to conform to the Solicitation's terms" by including fonts smaller than 11. *Id.* at 17. GK9 also argues MSA's failure to comply with the font size requirement allowed MSA to condense a 27-page offer into a 20-page offer to comply with the Solicitation's page limit. GK9 MJAR at 20. According to GK9, this means MSA would not have been able to respond to every aspect of the Solicitation had it fully complied with the font and page requirements. *Id.*

The government argues plaintiffs "fail to demonstrate . . . that this provision was material in light of USPS's request of the 11-point font only in response to a question from offerors and [USPS's] discretion to waive minor irregularities in proposals." Gov't Post-Award Cross-MJAR at 26–27. The government explains, "[t]he alleged improper font size discrepancies contained on the pages of MSA's 20 page proposal . . . are the type of informality that USPS explicitly reserved the right to waive in the Solicitation." *Id.* at 27. MSA argues this issue is not ripe before the Court because plaintiffs must first challenge it through mandatory administrative remedies. MSA Post-Award Cross-MJAR at 44 (citing 39 C.F.R. § 601.108(h) ("The party lodging the disagreement may seek review of the Postal Service's final contract award only after the mandatory administrative remedies provided under § 601.107 and § 601.108 have been exhausted.")). MSA alternatively argues the government did not "intend[] to amend the Solicitation to import this 'requirement'" because the government issued a request, not a mandate, when it responded to questions about font size by saying "[p]lease keep the Font Size no smaller than 11" and "USPS *would like* to keep Font Size no smaller 11 [sic]." *Id.* at 45 (quoting AR at 696 (Email re: Amendment Template Request by 3PK9-C Bidders (Oct. 15, 2020)), AR at 691 (Email re: Amendment Template Request by 3PK9-C Bidders (Oct. 15, 2020))) (emphasis in MSA Post-Award Cross-MJAR). MSA does not dispute its "font size irregularities" and instead explains they were the result of shrinking charts to fit within margin requirements. *Id.* at 45–46. MSA also argues the government did not "inconsistently appl[y] the solicitation requirements" because "other offerors were allowed to submit their proposals with lesser font sizes without disqualification," and therefore the requirement should not be applied only to MSA. *Id.* at 47. Finally, MSA notes the solicitation did not require disqualification for failure to follow font requirements; rather, "USPS noted that an offeror [sic] 'may result in the Offeror being eliminated from the selection process at the Postal Service's discretion.'" *Id.* (quoting AR at 212).

The government agreed at oral argument USPS amended the solicitation to "say please keep font size under 11," a statement which includes the font of "graphics, labels, and tables." Post-Award OA Tr. at 28:16–21; AR at 212 ("Factors requirements are limited to a total of twenty (20) pages, not including any requested or relevant attachments."), 696 ("Please keep the Font Size no smaller than 11. This applies to all graphics, labels, and tables."); *see Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016) ("[A]nswers [to an offeror's questions], when circulated to all [offerors] as an attachment signed by the contracting officer, constitute an amendment of the solicitation.") (quoting *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 689 n.15 (2012)). The government also agreed an offeror would "[c]onceivably" gain an unfair advantage by using a smaller font, because using a smaller font would allow the submission of proposals with " a lot more words." Post-Award OA Tr. at 29:1–7. The solicitation reads: "Failure to provide complete information in the format specified may

result in the Offeror being eliminated from the selection process at the Postal Service's discretion." AR at 212. The solicitation also allows: "USPS may reject any and all proposals and may waive minor informalities and irregularities in the proposals it receives." *Id*. at 214. The solicitation does not appear to state what qualifies as a minor informality or irregularity or how the government should waive such informalities or irregularities. Another judge on this court has found, even when the CICA and FAR do not apply, this court may investigate whether "[a]n agency's failure to follow the terms of its own Solicitation" is conduct that "lacks a rational basis." *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273, *modified*, 63 Fed. Cl. 141 (2004).

Before considering plaintiffs' argument regarding font size on the merits, the Court addresses MSA's argument this issue is not ripe because the issue was not raised in administrative proceedings. MSA Post-Award Cross-MJAR at 44. As GK9 notes, plaintiffs were not on notice of the variety of font sizes in MSA's submission until the government filed the administrative record in this proceeding, by which time the 10-day filing deadline for administrative review with USPS had long passed. GK9 Resp. at 8–9 (citing 39 C.F.R. § 601.107(b)). The regulation states: "The party lodging the disagreement may seek review of the Postal Service's final contract award only after the mandatory administrative remedies provided under § 601.107 and § 601.108 have been exhausted." 39 C.F.R. § 601.108(h). While MSA raises an exhaustion issue, it does not dispute plaintiffs exhausted administrative remedies for review of the Postal Service's final contract award. Plaintiffs had no opportunity to pursue their font size argument through administrative review because the government provided the administrative record containing the issue to plaintiffs after their deadline to file for administrative review. Under MSA's theory the font size argument is unripe as before this Court, plaintiffs would effectively have no recourse for their font size argument, as it would also be untimely for plaintiffs to raise the argument before USPS. 39 C.F.R. § 601.107(b). Plaintiffs were not on notice of the issue regarding the font size of parts of MSA's offer until the offer was part of the administrative record; therefore, plaintiffs have the right to raise this issue at this stage of proceedings, and it is ripe for review. *See The Ravens Grp., Inc. v. United States*, 78 Fed. Cl. 390, 402 (2007) (considering "a new argument in [plaintiff's] opposition brief . . . because these allegations are presumably the result of the Plaintiff's access to the Administrative Record during litigation"). The Court will consider the merits of plaintiffs' argument.

While the government argues the font-size requirement is "the type of informality that USPS explicitly reserved the right to waive in the Solicitation," it does not cite anywhere in the record where USPS identified MSA's failure to comply with the font-size requirement and waived the problem. Gov't Post-Award Cross-MJAR at 27. As counsel for GK9 observed, the government "should have done a compliance analysis." Post-Award OA Tr. at 25:25–26:1. The government also does not cite anywhere in the record where USPS determined its font-size requirement to be a minor issue. On the contrary, at oral argument, counsel for the government agreed it is "the Government's position now that USPS first became aware of the font size discrepancy only at the MJAR briefing." *Id*. at 30:2–5. Counsel for the government also agreed, although there is no "specific requirement in terms of documentation" of the government's steps in recognizing, reviewing, and accepting or rejecting minor informalities, "in general . . . decisions are supposed to be accompanied by the reasoning behind the decision." *Id.* at 42:14–21. The government did not dispute at oral argument counsel for AMK9's observation that "[t]he government did no analysis in the record as to whether or not MSA's proposal was

compliant, and it clearly was not." *Id.* at 18:11–13.  In notable contrast, the government specifically asserted it observed and waived late submissions, viewed by the government as "another minor informality," for several parties.  *See id.* at 54:14–55:3.

MSA argues the solicitation was ambiguous as to whether USPS established a requirement, rather than a preference, that the font size in submissions was to be no smaller than 11; the government at one point in the oral argument agreed with MSA, stating "the answer to the question does create [a] guideline." *Id.* at 21:18–23:2, 28:14–16.  The government appeared to contradict this position, however, by stating "[o]ur understanding is answers to questions are incorporated into the solicitation," meaning the government's answer did "create a requirement as an amendment to the solicitation." *Id.* at 28:3–9.  MSA later agreed, stating, "[i]f you are reading [question] 68 alone, then I would agree that our font size was not consistent with what [question] 68 says." *Id.* at 39:2–4.

Under the Court's APA standard of review, "[c]ourts have found an agency's decision to be arbitrary and capricious when," among other reasons, "the agency 'entirely failed to consider an important aspect of the problem.'" *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In *Emery*, the Federal Circuit held when this Court reviews USPS actions under the APA standard, "the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed. Cir. 2001).  MSA's failure to comply with the government's font requirement was a glaring submission violation the government should have recognized.  Once USPS created a submission rule for font size, it was bound to acknowledge the issue in the proposal and decide whether to enforce or specifically disregard the rule.  The government does not dispute it "entirely failed to consider" MSA's lack of compliance with the font-size requirement. *Alabama Aircraft*, 586 F.3d at 1375; *see also* Post-Award OA Tr. at 30:2–5 (government counsel agreeing it is "the [g]overnment's position now that USPS first became aware of the font size discrepancy only at the MJAR briefing").  The government cannot demonstrate on the record where "a rational basis is articulated and the relevant factors are considered," and the Court finds USPS acted irrationally in failing to consider MSA's violations of USPS's font size requirements. *Emery*, 264 F.3d at 1085.

Counsel for AMK9 argued at oral argument, "[f]ont size is a material requirement that allows offerors to all compete on a level playing field such that each offeror can submit their proposal understanding what the Government is going to evaluate." *Id.* at 39:22–40:1.  "[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)).  This court has found an error to be "material when it (1) violates an express provision of the RFP and (2) that provision serves a substantive purpose.  A substantive purpose is one important to the government's evaluation of the offer, is binding on the offeror, or impacts the price, quantity, or quality of the proposal." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 511 (2019) (citing *Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 335 (2014), *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 108 (2013), *Blackwater Lodge & Training*

*Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 504 (2009)).  When the government does not enforce its own requirements, offerors may exceed the content limitations that page length and font size requirements impose, which in turn directly "impacts the . . . quality of the proposal."  *Id.*  The font size requirement is material because:  (1) it violates an express provision of the solicitation; and (2) it "serves a substantive purpose" by "impact[ing] the . . . quality of the proposal."  *Id.*  While the Court finds the government's action arbitrary and capricious, the Court will further consider *infra* whether the action was prejudicial and what relief is merited.  *See Allied Tech. Grp.*, 649 F.3d at 1329.

### 2.   Whether the Government Improperly Accepted Late Submissions

As the lead argument in its post-award MJAR, AMK9 argues "USPS should have disqualified MSA from the competition because MSA submitted a late proposal after the submission deadline."  AMK9 Post-Award MJAR at 15.  According to AMK9, "MSA submitted its proposal at 1604:33 PM MT, four minutes after the deadline," in violation of USPS's statement it would not accept late proposals.  *Id.* at 15–16.  AMK9 also noted USPS stated it would only accept late proposals if a late proposal were "determined to be in the best interests of the Postal Service," but there is no record of USPS making such a determination.  *Id.* at 16 (citing AR at 84).  Additionally, AMK9 noted in a footnote, "USPS also accepted Global K-9's late proposal submission."  *Id.* at 16 n.4 (citing AR at 987).  The government argues the same email string AMK9 referenced demonstrates MSA made a timely submission, and the government attached the email of the timely submission to its cross-MJAR.  Gov't Post-Award Cross-MJAR at 25; Attachment A, ECF No. 93-1 (MSA Offer Email Submission, received 5 October 2020 at 5:58:38 p.m.).  The government alternatively argues its "right to 'waive minor informalities and irregularities in the proposals it receives" means "AMK9's argument that any deviation from proposal requirements automatically compels disqualification is unfounded."  Gov't Post-Award Cross-MJAR at 26 (citing AR at 85, 126, 213).  MSA offered similar arguments in its cross-MJAR, and also argued "USPS's discretion to accept late proposals is not ripe for review" because "USPS has not inconsistently applied objective solicitation criteria" by denying another late proposal while accepting MSA's.  MSA Post-Award Cross-MJAR at 47–48.

GK9 did not respond in its reply brief to AMK9's argument regarding whether the government improperly accepted late submissions.  *See generally* GK9 Resp.  AMK9 stated in a footnote in its response to the government and MSA's cross-MJARs:  "After the government corrected the record on June 2, 2021, it became clear that MSA submitted a timely proposal.  Therefore, AMK9 withdraws this argument."  AMK9 Post-Award Resp. at 2 n.1.  At oral argument, counsel for AMK9 stated in response to the government, "[w]e have no reason to doubt that the [g]overnment isn't being truthful as to whether or not the proposal was submitted on time.  And therefore, unless somebody else is seeing something that I haven't, we would waive that argument."  Post-Award OA Tr. at 50:2–6.  Counsel for AMK9 additionally stated, however, "We believe GK9's submission was also late.  It came in at 6:01 p.m."  *Id.* at 51:17–18.  GK9 responded, "we understood from [counsel for AMK9] that he was going to withdraw this argument."  *Id.* at 52:4–5.  Counsel for AMK9 replied, "I do withdraw."  *Id.* at 52:7.  Counsel for GK9 also noted, "[g]iven we are not the awardee, I don't think it would be a ripe issue for the Court to decide at this point."  *Id.* at 53:2–4.  The government clarified it believed several offers

were late, but USPS did not reject these offers because "that's another minor informality the Postal Service waived."  *Id.* at 54:24–55:1.

The Court takes notice of AMK9's decision at oral argument to waive its arguments regarding the timing of MSA and GK9's filing of their offers.  *Id*. at 50:2–6.  Additionally, the government sufficiently demonstrated MSA made a timely submission.  Gov't Post-Award Cross-MJAR at 25; Attachment A.  The timing of GK9's submission is not before the Court at this time, and the Court notes GK9's argument that the record is incomplete regarding its time of submission.  *See* Post-Award OA Tr. at 52:13–23.

### 3.  Additional Arguments Regarding MSA's Strengths

#### a.  AMK9's Allegations of Unwarranted Strengths Assigned to MSA

AMK9 additionally argues USPS favored MSA by assigning it unwarranted strengths for its [xxxxxxxxxxxxxxxxxxx], [xxxxxxxxxxxxxxxxxxxxxxxxx], and proposed rollout schedule. AMK9 Post-Award MJAR at 33–34.  The government credited MSA with being "the only offeror that provided a [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx], [xxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxx]," based on an attachment listing [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxx].  AR at 784 (Supply Management Competitive Award Recommendation), 1239–43 (MSA Technical Proposal).  The government demonstrated rational reasoning when it awarded MSA a strength for submitting a proposal that provided a level of detail into MSA's capability that no other offeror provided.  *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); AR at 784.  AMK9 argues, "[t]he administrative record contains no indication that MSA's proposal uses [xxxxxxxxxxxxx]," but AMK9 does not dispute that the government credited MSA's network proposal for "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]" but also providing [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].  AR at 1230 (MSA Technical Proposal); *see* AR at 1354 (AMK9 Technical Proposal), 1712 (Supply Management Competitive Award Recommendation).  The government thus did not act irrationally when it awarded a strength to MSA for its proposal's [xxxxxxxxxxxxxxxxxxxxxxxx]. *See Advanced Data Concepts*, 216 F.3d at 1058.  AMK9 argues MSA's ability to [xxxxxxxxxxxx xxxxxxxxxxxxxxxx] was an unwarranted strength because USPS later stated it "could only work at one airport at a time."  AMK9 Post-Award MJAR at 34.  For support, AMK9 cites the government's declaration in January 2021, months after the award recommendation, that the agency was limited to completing rollouts one airport at a time.  *Id.*  AMK9 provides no justification from the record for its assertion "USPS knew or should have known" of its limited rollout ability when it conducted the award recommendation months earlier.  AMK9 Post-Award Reply at 22.  Further, MSA's ability to "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]" shows flexibility that is relevant to the solicitation's evaluation of offerors on their "ability to meet the required or proposed delivery schedules."  AR at 1204 (MSA Technical Proposal), 1669 (Solicitation).  MSA's offer to not only meet but exceed the government's rollout capabilities supports a finding the government was rational in assigning MSA a strength.  *See Advanced Data Concepts*, 216 F.3d at 1058.

### b. GK9's Allegations of Unwarranted Strengths Assigned to MSA

GK9 argues USPS unfairly assigned MSA strengths for certain aspects of its proposal, namely its [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. *See* GK9 MJAR at 21–26. [xxxxxxxx] is a [xxxxxxxxxxxxxxx] MSA developed to [xxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. MSA's solution "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]" and "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]." GK9 MJAR at 21. GK9 argues the government irrationally gave GK9's technology weaknesses despite its solution being "modern" and irrationally assigned strengths to MSA's "outdated" and "cumbersome" technology. *Id.* at 22. USPS's decision was not arbitrary and capricious because it demonstrated thorough consideration of the strengths and weaknesses of MSA's [xxxxxxxxx] solution. AR at 1494 ("The TET evaluated MSA's Alarm Resolution technology as the highest ranked when compared to that proposed by the other offerors. The TET evaluated MSA's Alarm Resolution technology as excellent in [eleven] areas."); *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

GK9 also argues USPS unfairly assigned MSA strengths for its [xxxxxxxxxxxxxxxxxxxx] because [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. GK9 MJAR at 23. GK9 reasons, "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxx]" and "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxx]." *Id.* GK9 asserts USPS failed to consider associated risk: "While USPS might be able to negotiate exceptions to warranties for the x-ray machines it owns, it lacks any privity to negotiate or manage agreements between airlines and their x-ray machine providers." *Id.* USPS's decision is not arbitrary and capricious because it thoroughly considered the strengths and weaknesses of MSA's [xxxxxxxxxxxxxx] solution. AR at 1494 ("MSA's Alarm Resolution technology requires a [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]; MSA provides [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."); *see Ala. Aircraft Indus.*, 586 F.3d at 1375.

GK9 asserts the government's rating of MSA's rollout plan was irrational because "[xxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]" and, consequently, increases "the risk to MSA of COVID-19." *Id.* at 25. GK9 also argues it was irrational for USPS to deem GK9's roll-out approach to present a COVID-19 risk given the potential for MSA's roll-out solution to present a risk. *Id.* USPS rationally rated MSA's rollout plan because it thoroughly considered the strengths and weaknesses of MSA's rollout information. AR at 1454 ("Offeror provided detailed description of how it would meet the rollout plan"); 1496 ("The TET determined MSA's proposal offered a [xxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."); *see Ala. Aircraft Indus.*, 586 F.3d at 1375.

GK9 also argues USPS arbitrarily "assigned MSA a strength for [xxxxxxxxxxxxxxxxxxxx xxxxxx]" when "MSA's proposal does not discuss this, and the Agency does not cite to anything

in MSA's proposal that addresses it." *Id.* at 25.  MSA described its [xxxxx] capabilities in its proposal:  "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."  AR at 1202.  USPS noted MSA's "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]" and MSA "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."  *Id.* at 1455.  USPS has not "entirely failed to consider an important aspect of" MSA's strength [xxxxxxxxxxxxx] in its proposal.  *Ala. Aircraft Indus.*, 586 F.3d at 1375; AR at 1454–1456 (TET Evaluation).

## B. Review of Post-OCI Remand Investigation

On 8 March 2021, the Court issued a Remand Order regarding OCI and found the following:

> The CO's OCI report did not review Mr. Shelton's TSA exit letter or include any other communication with TSA regarding defendant-intervenor's potential OCI, but instead took the party being investigated at its word that there was no OCI.  The TSA exit letter was in the hands of the government (at least the TSA) and the 16 February 2021 status conference discussion demonstrates the TSA performed something akin to an OCI review in preparing the TSA exit letter for Mr. Shelton. SC Tr. at 13:16–20; 14:2–20.  The CO did not report requesting or receiving any TSA input and instead took defendant-intervenor's conclusory email denying any OCI at face value.  AR at 630.  The Court therefore finds the CO's OCI investigation process, and the SDRO's affirmation of the OCI decision detailing a lack of proper OCI investigation, to lack a rational basis—the OCI investigation was arbitrary and capricious for conducting such a limited OCI review and reaching a premature conclusion of no OCI risk.  *See* AR at 630, 798, 815–16; *Alabama Aircraft Indus.*, 586 F.3d at 1375; U.S. Postal Serv., Supplying Principles and Practices 7-15.2.1, Avoiding Real or Apparent Organizational Conflicts of Interest; *PAI Corp.*, 614 F.3d at 1352; *Turner Const. Co.*, 645 F.3d at 1387.  *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs*., 260 F.3d 1365, 1380 (Fed. Cir. 2001) (finding the agency did not "provide a reasonable explanation for its decision," remanding for further consideration, and "further decid[ing] that the [agency action] will remain in effect during the [remand].").  It further does not appear the CO tracked the process outlined in the SP&P procedures as was required to guide the OCI review process:  insofar as the SP&Ps provide a guidance to follow, the CO's decision not to follow the SP&Ps after identifying a potential OCI—without providing any explanation for the decision to divert from the guidelines—further "lack[s] a rational basis."  *See Domenico Garufi*, 238 F.3d at 1332; OA Tr. at 25:12–26:20 (Government counsel noting the CO decision must withstand rational basis scrutiny insofar as it was to be guided by an SP&P OCI investigation process).

Remand Order at 24–25 (footnote omitted).  The Court ordered a remand investigation, according to the following:

> USPS shall reopen the OCI investigation into defendant-intervenor and Mr. Shelton according to guidelines provided by the SP&Ps and reassess a complete and

documented review of the OCI in light of:  (1) the government's assertions at the 16 February 2021 status conference regarding the possibility of the record being an incomplete representation of the CO's actual 2020 investigation; (2) TSA or defendant-intervenor's production of Mr. Shelton's TSA exit letter; (3) the possibility of investigation or communication within USPS, or between USPS and TSA, related to defendant-intervenor's potential OCI not currently reported in the record; (4) the MSA website detail regarding Mr. Shelton's experience from working with TSA; and (5) any other evidence USPS reflects as necessary to consider regarding defendant-intervenor's potential OCI.

. . . .  The administrative record of remand proceedings shall include, as suggested by the government at the 16 February 2021 status conference:  (1) *in camera* review of the Mail Amendment as agreed by the parties; (2) a copy of Mr. Shelton's TSA exit letter as defendant-intervenor agreed Mr. Shelton would submit; (3) the product of TSA investigation behind Mr. Shelton's exit letter; (4) any communications within USPS or between USPS and TSA related to defendant-intervenor's potential OCI; and (5) summary report of additional review USPS conducts or action USPS decides to take regarding defendant-intervenor's potential OCI, including a complete OCI decision based on all additional information.

*Id.* at 32.

The Post Office's SP&Ps define an OCI as follows:

An organizational conflict of interest exists when the nature of the work to be performed under a contract may give an offeror or supplier an unfair competitive advantage and when an offeror or supplier has other interests that may impair its objectivity or ability to render impartial assistance or advice or to provide objectivity in performing the contract work.

USPS SP&Ss at 7-15.2, Organizational Conflicts of Interest (Suppliers).  The SP&Ps further advise:

As part of purchase planning (see 2-1, Develop Purchase Plan), contracting officers, with the assistance of the purchase/SCM team, must attempt to identify organizational conflicts of interest so that they may be avoided, neutralized or mitigated (when purchases will be made noncompetitively, certain disclosures must be made – see 2-10, Determine Extent of Competition). When a potential organizational conflict is foreseeable, the contracting officer should consult with assigned counsel and obtain the assistance of appropriate technical specialists to consider the potential to avoid, neutralize or mitigate the organizational conflict of interest. Mitigation actions may include, but are not limited to (a) developing a solicitation provision restricting competition to offerors without conflicts of interest, (b) including a contract clause limiting the supplier's eligibility for future contracts and subcontracts, and (c) the adoption of other measures to ensure as fair

a competition as possible. Any limit on future contracts must be for a reasonable period sufficient to avoid unfair competitive advantage or potential bias.

If it becomes apparent when proposals are received that participation by a particular offeror could lead to an organizational conflict of interest and unfair competition, the offeror may be disqualified and its proposal rejected. The contracting officer may take actions necessary and in the interest of the Postal Service and the offerors, to avoid, neutralize or mitigate the potential or apparent conflict of interest.

If the contracting officer decides to neutralize or mitigate a potential or apparent organizational conflict of interest, he or she should include a written analysis of the decision and the chosen course of action in the contract file. The analysis should include a consideration of the potential benefits and detriments to the Postal Service (including consideration of the overall business and competitive interests of the Postal Service and how the appearance of an organizational conflict of interest may affect them) and the offerors, and may consider information provided by offerors in response to the solicitation, or obtained during discussions and negotiations.

SP&P 7-15.2.1, Avoiding Real or Apparent Organizational Conflicts of Interest.

On 5 April 2021, the government filed the administrative record of the CO's remand OCI investigation and analysis.  *See* Index to the Remand Administrative Record at i, ECF No. 57-2. The CO's remand review stated the pre-existing record contained the entirety of the CO's prior OCI investigation and analysis:  "I could not find and do not recall other non-privileged records relating to my OCI analysis."  AR at 1863.  The CO did not dispute the Court's finding that the initial OCI investigation record was insufficient; rather, the CO implicitly agreed with the Court's finding:  "I undertook a renewed OCI review and produced a much more robust record of the facts and my analysis."  *Id.*  The CO explained he:  "prepared a thorough set of questions for both MSA and TSA"; "conducted telephonic interviews of.[sic] Gerald Goss of MSA and Christopher Shelton of MSA"; conducted further written conversations and clarifications with Mr. Goss and Mr. Shelton; and "further asked a couple of follow-up questions of TSA in writing."  *Id.*

The CO determined the TSA and Mr. Shelton "both are essentially in agreement regarding Mr. Shelton's work at TSA, especially with respect to the mail amendment and the USPS/TSA pilot for mail screening," despite some apparent disagreement between the parties. *Id.* at 1864–66.  The CO acknowledged Mr. Shelton was involved in drafting the mail amendment but concluded "[h]e did not have an active role in developing the mail amendment (or any mail screening protocols) or the mail pilot. . . .  [H]is involvement in developing mail screening policies and in the mail pilot was at a minimum."  *Id.* at 1865–66.  In contrast, the TSA explained to the CO that Mr. Shelton contributed to formulating the mail amendment and the pilot program, which led to this procurement.  *See id.* at 1843–45.

The CO also determined, "[w]ith respect to Mr. Shelton's post-employment ethics advice received from TSA, Mr. Shelton and TSA had different recollections."  *Id.* at 1866.  The CO noted that "[i]n contrast" to Mr. Shelton's recollections, "TSA has not located records of specific

advice provided to Mr. Shelton regarding post-employment restrictions." *Id.* The TSA told the CO: "TSA Ethics attorneys have no written records of Mr. Shelton requesting, prior to his departure, any investigations or research into whether the ethics restrictions would restrict his employment with MSA." *Id.* (quoting TSA Response to CO's March 16 Questions, Question 1).[3] The CO did not explore this contradiction further and instead determined, "it does not appear to me that Mr. Shelton engaged in any conduct prohibited by the TSA Exit Clearance Memorandum that he received." *Id.*

The fact "that MSA received an initial version of the mail amendment to be able to perform the pilot program," according to the CO, "did not create an inappropriate unequal access to information or unfair competitive advantage." *Id.* at 1866–67. The CO determined this is because not only will the pilot program performer receive a copy of the mail amendment, but "[e]ach USPS supplier that performs this work will necessarily be issued a mail amendment by TSA." *Id.* at 1867. The CO found that if merely receiving a copy of the mail amendment "created an unequal access to information OCI, the Postal Service would have to solicit only non-incumbents each time it competed the requirement." *Id.* The CO also noted "the information learned from the pilot was included in the SOW that was provided to everyone." *Id.* Additionally, the CO explained, a system in which "those that participated in creating and innovating new methods through a pilot with government agencies were banned from bidding on any contract for the services," the government "would never attract the help we need" for its pilot programs. *Id.*

The CO noted that following the pilot program, MSA participated in "conversations involv[ing] explanations by MSA of the proof of concept that was demonstrated through the pilot program," but "MSA did not participate in drafting the SOW." *Id.* at 1868. The CO also quotes the TSA's explanation of the purpose of the pilot program: "The goals of the pilot were to verify and evaluate the ability of a 3PK9-C to effectively screen U.S. Priority Mail in various configurations, identify any operational issues or other factors impacted by the configurations, and evaluate the alarm resolution processes for mail which contains a potential threat." *Id.* (quoting TSA Responses to CO's March 16 questions at 4). The CO determined the SOW made "key elements" of the mail amendment available to all offerors, so possession of the mail amendment "was not critical to potential offerors in submitting offers." *Id.* Additionally, the CO noted "it did not appear that the mail amendment was used in evaluating the offers in any way." *Id.* at 1869. According to the CO, "the mail amendment could not have created an unfair

[3] The CO also explained: "When I issued follow-up questions to TSA following my review of the MSA responses to my questions, I asked specifically if the two TSA attorneys mentioned by Mr. Shelton (Ms. Fulp and Ms. Flockhart), as having provided advice to him prior to his departure from TSA, had any recollection or record of such conversations, which Mr. Shelton had stated were oral conversations. TSA responded that Ms. Fulp, the ethics counsel mentioned by Mr. Shelton, did not recall providing written advice, but that her e-mail records were being searched (although that process is ongoing at this time). TSA did not specifically comment whether she recalled oral advice, which is what Mr. Shelton alleged occurred. From TSA's response, I further understood that Ms. Flockhart recalled speaking to him before his departure, and she recalled him saying that he had previously received ethics advice relating to post-employment from Ms. Fulp but that Ms. Flockhart did not, herself, provide any such advice. On April 1, 2021, we requested TSA ask Ms. Fulp whether she recalled providing Mr. Shelton any verbal advice. TSA responded the same day as follows: 'She did not recall. However, because she left TSA almost two years ago and the fact that our attorneys also provide informal, general ethics guidance, it is difficult to assert unequivocally that she did not speak with him about the relevant rules.'" AR at 1866 (citing March 31 TSA Responses to CO Follow-up Questions, Question 1; TSA April 1 e-mail) (internal citation omitted).

competitive advantage for MSA if MSA neither used the information in creation of its offer, nor did the USPS evaluation team use it in evaluating offers." *Id.*

The CO concluded the following: (1) MSA's receipt of the mail amendment for the pilot program "did not create an unfair competitive advantage for MSA"; (2) "any knowledge [Mr. Shelton] had would not have informed MSA's proposal"; (3) "[p]ossession of the mail amendment does not create an unfair competitive advantage"; and (4) there is "no evidence that any offerors were prejudiced by not having access to the mail amendment." *Id.* The CO asserts his remand investigation was "a much more thorough review of the potential OCI," apparently accepting the Court's finding that the original OCI investigation was insufficient. *Id.* The fact that at least three of the main conclusions in the CO's "conclusions" section related to the mail amendment demonstrates tunnel vision on the mail amendment during the OCI investigation. *See id.* This demonstrates the remand investigation was itself insufficient and in violation of the remand order, as the order did not mention the mail amendment in its instructions to the CO and only instructed the administrative record of remand proceedings to include discussion of the mail amendment in relation to proposals regarding *in camera* review of the mail amendment. *See* Remand Order at 32.

The SP&Ps direct contracting officers to "attempt to identify organizational conflicts of interest so that they may be avoided, neutralized or mitigated." SP&P at § 7-15.2.1. "An unequal access to information OCI may arise in situations where an offeror, by virtue of [prior] performance on a government contract, obtains access to non-public information that other offerors do not have, which provides it an unfair competitive advantage on a new procurement." *Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 508 (2018) (quoting *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 210 (Fed. Cl. 2011)). "[A]n unequal access OCI requires that a firm have access to non-public information that is competitively useful." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1387 (Fed. Cir. 2011) (citing *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1377 n.1 (Fed. Cir. 2009)). "To prevail on an OCI claim of unequal access to information, it is axiomatic that the government contractor must have access to the kind of specific, sensitive information that would create an OCI." *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 688 (2008) (internal quotation marks omitted), *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009). "Thus, for a bid protester to succeed on an 'unequal access to information' OCI claim, it must demonstrate 'the awardee was in the unique position of [] having access to information to which no other offeror had access.'" *Id.* (internal quotation marks omitted); *see also Johnson Controls World Servs., Inc.*, B–286714.2, 2001 WL 122352, at *5, Feb. 13, 2001 (finding an "unequal access to information" OCI existed when the incumbent had access to a database that provided more detailed information about the procurement than was available in the public domain).

A biased ground rules OCI exists when contractors, "by participating in the process of setting procurement ground rules, have special knowledge of the agency's future requirements that may skew the competition in its favor." *Turner Const.*, 645 F.3d at 1382. A biased ground rules OCI may occur when a firm "has, in some sense set the ground rules for another government contract by, for example, writing the statement of work or the specifications." *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 773 (2006) (quoting *Aetna Gov't Health Plans, Inc., Found. Health Fed. Servs., Inc.*, B-254397 et al., 1995 WL 449806 (Comp. Gen. July 27, 1995)).

A biased ground rules OCI also "may occur in situations where an offeror, as part of [prior] performance of a government contract, has provided input to the statement of work or specifications of a [solicitation] in such a way as to provide the firm a competitive advantage in responding to the [solicitation]." *Jacobs Tech.*, 100 Fed. Cl. at 210 (citing *Turner Const.*, 94 Fed. Cl. at 569). The FAR contains a "development and design" exception to the biased ground rules OCI. FAR 9.505-2(b)(1)(ii); *see AAR Manufacturing v. United States*, 149 Fed. Cl. 514, 526–28 (2020) ("The FAR justifies that exception because [i]n development work, it is normal to select firms that have done the most advanced work in the field.") (internal citations and quotation marks omitted).

"Hard facts" and "concreteness" are necessary to show that a contracting officer's OCI determination lacked a rational basis under the APA's arbitrary and capricious standard— "sufficient alignment of interests," "vague allegations," "mere suspicion and innuendo" are not enough. *Turner Constr.*, 645 F.3d at 1385 (Fed. Cir. 2011) (internal quotation marks omitted). "'Hard facts' do not need to show an actual conflict—a potential conflict can be sufficient." *Id.* at 1387. "An OCI must be established by 'hard facts' that indicate the existence or potential existence of a conflict," but "[t]hese 'hard facts' do not need to show either an actual conflict or a negative impact from a conflict." *Turner Const. Co. v. United States*, 94 Fed. Cl. 561, 573 (2010), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011) (citing *CACI, Inc. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983)). "The 'hard facts' that indicate the existence or potential existence of impropriety stand opposed to inferences based upon 'suspicion and innuendo.'" *Id.* (citing *CACI*, 719 F.2d at 1582). "If 'hard facts' establish the appearance of impropriety, it is not irrational for a reviewing body to" find the agency action arbitrary and capricious. *Id.*

Even "a finding of an appearance of impropriety" is sufficient for a finding of OCI. *NKF Engineering, Inc. v. U.S.*, 805 F.2d 372, 376 (1986). In *NKF Engineering*, Mr. Park, a civilian employee of the Navy who chaired a Contract Award Review Panel applied to work at contractor NFK after it submitted a bid for a contract for which Mr. Park helped prepare the terms of the solicitation. *Id.* at 373-74. Mr. Park told the NFK that Navy legal counsel cleared him to work for the contractor, "[a]lthough he in fact never checked" with the Navy, and nobody at NFK "was aware that Mr. Park had involvement with [the solicitation] beyond having knowledge of its technical requirements as stated in the contract's 'Scope of Work.'" *Id.* at 374. NFK then "submitted the winning bid that included a [significant] price revision." *Id.* at 376. The Federal Circuit held, "[w]hether or not inside information was actually passed from [the government official] to [the awardee], the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify [the awardee]." *Id.* The Federal Circuit also held "an appearance of impropriety" can exist even if the employee moving from the government to an offeror "was not 'substantially' participating in the contract at the time he was negotiating for employment." *Id.* at 376–77.

"Incumbent status by itself is insufficient to create an OCI." *Alabama Aircraft Indus.*, 83 Fed. Cl. at 686; *see also WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998) ("An offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated."). In *Turner*, the Federal Circuit upheld this court's determination the GAO's finding of OCI was flawed because the GAO only established that "employees 'may have had access' to unidentified information," which is a finding merely of

"possible rather than actual access." *Turner Const.*, 645 F.3d at 1387.  This finding of possible access was insufficient because "an unequal access OCI requires that a firm have access to non-public information that is competitively useful." *Id.* (citing *Axiom*, 564 F.3d at 1377 n.1).

### 1.  Whether the CO Sufficiently Investigated the Timing of Mr. Shelton's Job Search in Contrast to the Procurement Timeline

AMK9 argues:  the CO "should have disqualified MSA from the competition based on Mr. Shelton's possession of non-public competitively useful information that he obtained while working with TSA and USPS to develop and implement the 3PK9-C Mail Amendments and Pilot Program.  Instead, [the CO] issued a decision that failed to meaningfully consider whether MSA's employment of Mr. Shelton created an unequal access OCI."  AMK9 Post-Award MJAR at 20.  Specifically, AMK9 alleges, the CO "failed to consider the information that Mr. Shelton could have obtained as an employee of TSA that could have provided MSA with an advantage." *Id.* at 21.  AMK9 observes MSA received several strengths in its proposal that went beyond the requirements of the solicitation, and AMK9 alleges:  "While this may have been a matter of MSA proposing something on its own that exceeded USPS's objectives, it is just as likely a practice that Mr. Shelton established or created while at TSA that did not constitute a requirement." *Id.*  AMK9 argues the CO "did not resolve the factual dispute as to whether Mr. Shelton was told by TSA attorneys that no ethical or conflict of interest restrictions applied to his employment with MSA." *Id.* at 22.  Counsel for GK9 noted at oral argument, "there's a lot that [Mr. Shelton] said that has borne out to be untrue, and the investigation there is incomplete as it relates to the ethics record and these conflict letters he supposedly did or didn't get."  Post-Award OA Tr. at 64:13–16.

The post-remand filings clarify the following facts related to the CO's OCI investigation.  The USPS "Start the Clock Date" on the solicitation was 18 July 2018; USPS issued a request for information on 14 August 2020; USPS issued the solicitation on 21 September 2020; and the proposal due date was 5 October 2020.  AR at 24 (RFI), 776.  On 8 October 2020, the CO wrote an email to MSA stating USPS "recalls that Mr. Shelton was a TSA employee who had a supervisory role at the TSA Canine Training Center and was involved in the USPS canine screening pilot program, both from the perspective of TSA rules and regulations and approvals of USPS processes in the pilot program." *Id.* at 614.  Meanwhile, USPS began the pilot program with MSA on 20 August 2019, and it concluded 15 November 2019. *Id.* at 2538.  Mr. Shelton states TSA attorneys Katherine Fulp and Wendy Flockhart cleared him to work at MSA without restriction. *Id.* at 1777–78.  Ms. Fulp left TSA around 3 May 2019, nearly five months before Mr. Shelton left TSA to become MSA's vice president of air cargo on 2 October 2019. *Id.* at 621, 1855.  If Mr. Shelton discussed joining MSA with Ms. Fulp, as he states he did, this means Mr. Shelton had conversations about joining MSA no later than around 3 May 2019 or earlier; however, Mr. Shelton may have engaged in conversations with MSA and other employers about opportunities even before this time period.  The timeline of the creation and procurement for the pilot program in relation to Mr. Shelton's pursuit of private employment opportunities is unclear, although this information is highly relevant to the CO's OCI investigation.  The CO does not explain why he did not further investigate this information.

During the remand investigation, the TSA informed USPS Mr. Shelton was still at the TSA during the pilot program, participated in that program on the government's behalf, and helped develop the mail mmendments. *Id.* at 1843–45. The TSA stated Mr. Shelton, among other things: assigned a CTC team to work with TSA Policy, Plans, and Engagement; TSA Compliance; and TSA Chief Counsel offices to develop the TSA 3PK9-C program. *Id.* at 1843. Mr. Shelton was consulted as a subject matter expert on canine screening for the mail screening pilot. *Id.* at 1844. The TSA agreed Mr. Shelton had some knowledge of the mail amendment and worked on pilot program plans, as Mr. Shelton was copied on edits to the mail amendment in August 2019, after he apparently spoke with Ms. Fulp about his decision to join MSA as early as May 2019. *See* AR at 1855, 1864–65. The CO did not follow up to investigate the timeline of Mr. Shelton's agreement to join MSA, when he was involved in the process of editing the mail amendment months later and potentially 10 months following the "start the clock date" on the solicitation. *Id.* at 1864 ("According to the information that I received from TSA and Mr. Shelton, they both are essentially in agreement regarding Mr. Shelton's work at TSA, especially with respect to the mail amendment and the USPS/TSA pilot for mail screening, which occurred in late 2019.").

Even MSA recognized Mr. Shelton's move from the TSA to MSA could create an OCI or appearance of OCI because MSA initially "walled off [Mr. Shelton] from participation in the pilot program to avoid any possibility or appearance of a conflict of interest." *Id.* at 1773. While Mr. Shelton was walled off until the end of the pilot program in November 2019, the CO was aware MSA does not assert he was walled off from this procurement. *Id.* at 1866 (quoting Mr. Shelton as stating to the CO: "Once I began employment with MSA, my duties were [xxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. However, in recent months I have begun to work [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."). The CO made a preemptive conclusion without fully resolving whether the risk MSA identified that caused it to wall off Mr. Shelton in October of 2019 also applied to this procurement.

The CO also did not fully resolve whether there was any OCI or appearance of OCI for Mr. Shelton to continue working for TSA if he was applying to industry jobs or may have secured a future work agreement with MSA. *See Turner Const.*, 94 Fed. Cl. at 573. The CO did not ask Mr. Shelton when he first contacted MSA, when he signed for employment, when he was walled off, why he was walled off, or what work he was walled off from and for how long. In light of Mr. Shelton's job search timeline and continued work on issues related to this proposal, the CO preemptively concluded the investigation: (1) answered these questions; and (2) resolved any concerns as to Mr. Shelton not being walled off from the proposal for this procurement. The TSA-work information Mr. Shelton had may have been competitively useful because, through his participation in the pilot and the development of the mail amendment, Mr. Shelton may have helped form and gain understanding of the TSA and USPS's goals in this procurement, giving MSA a competitive advantage. *See* AR at 1843–45 (TSA discussing Mr. Shelton's experience developing the mail amendment and pilot program). The Court therefore finds the CO's investigation into this aspect of MSA's appearance of unequal access OCI to be incomplete and not fully substantiated by the record—the CO did not inquire as to any competitive advantage in this procurement MSA might have obtained through Mr. Shelton's experience or MSA's refusal to wall Mr. Shelton off from this procurement. The remand OCI investigation into the timing of Mr. Shelton's job search still leaves the CO and the Court unable to determine whether MSA has

an OCI.  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("*Chenery I*") ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1327 (Fed. Cir. 2001) (holding remanding the case avoids invading the province of the agency and substituting the court's judgment); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) ("It may be that the agency can provide a reasonable explanation for its decision[,] . . . [b]ut it has not yet done so.").

A biased ground rules OCI occurs when a firm "has, in some sense set the ground rules for another government contract by, for example, writing the statement of work or the specifications."  *Sys. Plus,* 69 Fed. Cl. at 773 (citing *Aetna Gov't Health Plans, Inc., Found. Health Fed. Servs., Inc.*, B-254397 et al., 1995 WL 449806 (Comp. Gen. July 27, 1995)).  Based on the timeline established *supra*, the CO should have also inquired as to whether a biased ground rules OCI existed as a product of Mr. Shelton formulating the mail amendment and pilot program that led to this procurement while under agreement to work at MSA.  *See* 1843–45.  The CO preemptively rejected the possibility of a biased ground rules OCI because "MSA did not help draft the Statement of Work" without fully resolving the timeline of Mr. Shelton's involvement.  AR at 1863.  The CO has not fully investigated how much risk it was for Mr. Shelton to keep working for TSA if he was already job searching and might have had an agreement to work for MSA, since Mr. Shelton could have been contributing to the ground rules of the solicitation with the knowledge he was seeking employment with—or already agreed to work for—an offeror for this procurement.  As the CO did not fully investigate the timing of Mr. Shelton's employment search in comparison with his USPS and TSA contributions, the remand OCI investigation still leaves the CO and the Court unable to determine whether MSA has an OCI.  *Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1327; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

### 2. Whether the CO Resolved Factual Disputes as to Whether Mr. Shelton Sought and Obtained Ethics Clearance from the TSA to Work for a Contractor on this Procurement

AMK9 argues the CO "did not resolve the factual dispute as to whether Mr. Shelton was told by TSA attorneys that no ethical or conflict of interest restrictions applied to his employment with MSA."  Post-Award MJAR at 22 (citing AR at 1866).  GK9's reply also states, "the contracting officer ignored TSA's statement that it did not have an ethics letter for Mr. Shelton."  GK9 Resp. at 5–6 (citing AR at 1843).  At oral argument, counsel for GK9 noted unresolved OCI issues in this case "could have been resolved if there had been an ethics letter which specifically addressed th[em], and there is not and potentially, if the contracting offer had engaged in that discussion with TSA, but he didn't."  Post-Award OA Tr. at 112:9–13.  Also at oral argument, counsel for the government agreed the exit letter was a "generic exit letter" and stated it was "the only one that I believe has been produced by TSA or MSA relating to Mr. Shelton."  *Id.* at 111:5–10.

At the 16 February 2021 status conference, counsel for the government stated Mr. Shelton "received an exit letter when he left TSA with respect to whether there were conflicts," which was the product of "an investigation by or at least a review by TSA officials, including their ethics office."  16 February 2021 SC Tr. at 13:16–20.  The government stated it was not

"aware of" any reason the CO could not have requested this letter from the TSA as part of his initial investigation into Mr. Shelton. *Id.* at 14:21–15:11. Counsel for the government explained, "we know that the Postal Service did reach out to TSA with respect to the request to release the Mail Amendment to bidders, which was denied by TSA. So I'm not aware at this time of whether there was a reason the CO couldn't have reached out to TSA." *Id.* at 15:4–8. The government later stated, "we don't know is what, if any, file there was leading up to the issuance of the letter, the exit letter for Mr. Shelton. So . . . whether there were interviews or documents or things of that nature, we don't know what's in the file since we haven't been shown it." *Id.* at 43:3–8. The Court's Remand Order found "the CO's OCI investigation process, and the SDRO's affirmation of the OCI decision detailing a lack of proper OCI investigation, to lack a rational basis—the OCI investigation was arbitrary and capricious for conducting such a limited OCI review and reaching a premature conclusion of no OCI risk." Remand Order at 24–25.

The CO observed in his discussion of his post-remand investigation, "[w]ith respect to Mr. Shelton's post-employment ethics advice received from TSA, Mr. Shelton and TSA had different recollections." AR at 1866. The CO noted, "TSA has not located records of specific advice provided to Mr. Shelton regarding post-employment restrictions." *Id.* The CO further discussed his follow-up with TSA regarding the two TSA attorneys Mr. Shelton states he received advice from regarding ethics conflicts: "I asked specifically if the two TSA attorneys mentioned by Mr. Shelton (Ms. Fulp and Ms. Flockhart), as having provided advice to him prior to his departure from TSA, had any recollection or record of such conversations, which Mr. Shelton had stated were oral conversations." *Id.* According to the CO, "TSA did not specifically comment whether [Ms. Fulp] recalled oral advice, which is what Mr. Shelton alleged occurred," and "Ms. Flockhart recalled speaking to him before his departure, and she recalled him saying that he had previously received ethics advice relating to post-employment from Ms. Fulp but that Ms. Flockhart did not, herself, provide any such advice." *Id.* The CO also reports Ms. Fulp reported "[s]he did not recall" whether she provided Mr. Shelton with any ethics advice, but "it is difficult to assert unequivocally that she did not speak with him about the relevant rules." *Id.* Mr. Shelton and MSA report he spoke with Ms. Fulp and then Ms. Flockhart "in or about September, 2019." *Id.* at 1777. TSA reports, in contrast, "Ms. Fulp left TSA in early May 2019," while "Ms. Flockhart did not provide Mr. Shelton with any post-employment counseling." *Id.* at 1855. The CO's attempt to resolve this factual conflict is incomplete because it is not fully substantiated by the record; rather, the CO immediately transitioned to asserting, "Mr. Shelton stated that when he joined TSA [sic], he did not focus on any work for the government for a period of one year to avoid any ethics issue." *Id.* at 1866.

The TSA reported to the CO: "TSA Ethics attorneys have no written records of Mr. Shelton requesting, prior to his departure, any investigations or research into whether the ethics restrictions would restrict his employment with MSA. TSA Ethics has no responsive records to this request." *Id.* at 1843. The CO's remand investigation was incomplete and not fully substantiated because the CO failed to conduct any analysis into the conflicting reports from Mr. Shelton and the TSA or any follow-up with the TSA about their records and standard ethics review record-keeping practices; the CO instead preemptively took Mr. Shelton at his word and in conflict with TSA records. *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380 ("It may be that

-42-

the agency can provide a reasonable explanation for its decision[,] . . . [b]ut it has not yet done so.").

The CO determined:  "From the facts before me, it does not appear to me that Mr. Shelton engaged in any conduct prohibited by the TSA Exit Clearance Memorandum that he received."  AR at 1866.  The CO accepted the TSA exit letter as a definitive statement of Mr. Shelton's lack of ethical conflicts without fully investigating its provenance, despite it being a form letter that:  (1) does not provide any substantiation that TSA counsel provided the letter as a product of legal counseling with Mr. Shelton; (2) does not identify Mr. Shelton or his position at TSA; (3) does not discuss Mr. Shelton's future employment; (4) provides no timeline or date of ethics approval; and (5) contains no other facts or legal analysis regarding Mr. Shelton's employment with MSA.  The CO stated, "I had communications with counsel pursuant to the SP&Ps guidance during my initial OCI review," and he also stated he prepared the remand investigation questions for MSA and TSA "with the assistance of counsel."  *Id.* at 1863.  The CO did not provide in the remand record any analysis from a legal or ethics expert in coming to his conclusion of no OCI (or appearance of OCI), and he does not state whether his conclusions were substantiated by legal counsel.  The SP&Ps require:  "When a potential organizational conflict is foreseeable, the contracting officer should consult with assigned counsel and obtain the assistance of appropriate technical specialists to consider the potential to avoid, neutralize or mitigate the organizational conflict of interest."  USPS SP&Ps at 7-15.2.1.  The CO's remand investigation did not fully detail whether the CO consulted with counsel in forming legal conclusions that did not fully resolve contradictory factual reports from the remand investigation into:  (1) the provenance of Mr. Shelton's exit letter; and (2) whether or not Mr. Shelton consulted with agency counsel on post-government-employment OCI issues.  The unresolved factual disputes related to Mr. Shelton's pursuit of ethics clearance still leaves the CO and the Court unable to determine whether MSA has an OCI.  *Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

The CO also did not fully substantiate the timeline or the factual basis for his conclusion that Mr. Shelton sufficiently addressed OCI concerns by being walled off from ethical conflicts within MSA:  "Mr. Shelton stated that when he joined [MSA], he did not focus on any work for the government for a period of one year to avoid any ethics issue."  AR at 1866.  Mr. Shelton instead reported to the CO:  "Once I began employment with MSA, my duties were [xxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]" without mentioning a time period on this walling off, and Mr. Shelton stated, "in recent months I have begun to [xxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."  *Id.* at 1836.  The CO did not provide any reason to believe the federal government contract projects Mr. Shelton began working on in recent months did not include MSA's 5 October 2020 proposal, which [xxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].  AR at 1210.  At oral argument, MSA admitted the veracity of Mr. Shelton's reported walling off is based on "only just MSA's representation."  Post-Award OA Tr. at 106:19.  This demonstrates the CO did not fully substantiate in the record whether OCI concerns were addressed by MSA's walling off procedures or if Mr. Shelton was actually walled off; rather, the CO did not appear to inquire into any further details related to MSA and Mr. Shelton's walling off procedures, nor did he ask the TSA or USPS whether it understood procedures to be sufficient.

Counsel for AMK9 also noted at oral argument the TSA form exit letter "seems to provide no restrictions, and I believe the [g]overnment also finds that there's no restrictions. So to the extent that MSA apparently took this broad step to avoid some sort of ethics concern, it's not supported by the documents we have." Post-Award OA Tr. at 112:19-24. The CO also has not yet investigated why MSA felt the need to take such a broad step to avoid ethical conflicts before then allowing Mr. Shelton to be involved with this procurement; rather, the CO credited Mr. Shelton's form exit letter and MSA's walling off Mr. Shelton from other conflicts as evidence that Mr. Shelton's involvement presented no OCI in this procurement. The CO has not fully explained why MSA walling Mr. Shelton off did not at least lead to investigation by the CO as to what conflicts or potential conflicts MSA identified and sought to avoid and why this procurement was not part of MSA's walling off. The CO noted in a remand investigation question to MSA: "On MSA's website, Mr. Shelton was described as being 'instrumental in the development and implementation of the Certified Cargo Security Program Canine (CCSP-K9), the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments.'" AR at 1774. The CO has not asked why MSA was advertising Mr. Shelton's experience in this way if he was walled off from government contract work; instead, the CO asked MSA for insight into Mr. Shelton's work at the TSA, which is a question he should have instead asked the TSA or Mr. Shelton. The CO's decision to treat MSA's walling off of Mr. Shelton from past procurements as proof there is no OCI in this procurement, from which Mr. Shelton was not walled off, is not fully substantiated by the record. The CO preemptively concluded this walling off and the form ethics letter resolved issues related to unanswered questions in the timeline of Mr. Shelton's conversations with TSA ethics attorneys—a complete OCI investigation must include resolution of these issues in light of MSA's past walling off of Mr. Shelton being insufficient for resolution. *See Alabama Aircraft Indus.*, 586 F.3d at 1375; SP&P 7-15.2.1; *Turner Const.*, 645 F.3d at 1387. The CO's decision to accept MSA's walling off of Mr. Shelton without further investigation still leaves the CO and the Court unable to determine whether MSA has an OCI. *See Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

### 3. Whether the CO Sufficiently Resolved Mr. Shelton's Appearance of OCI Regarding the Mail Amendment and Pilot Program

GK9 notes the "TSA acknowledged that Mr. Shelton 'was consulted as [a] canine subject matter expert (SME)' in connection with the mail amendment." GK9 MJAR at 15 (citing AR at 1844). AMK9 explains its understanding of the CO's error in three steps: (1) in finding "that TSA, MSA, and Mr. Shelton 'are essentially in agreement regarding Mr. Shelton's work at TSA, especially with respect to the mail amendment and the USPS/TSA pilot for mail screening, which occurred in late 2019'"; AMK9 Post-Award MJAR at 20 (quoting AR at 1864); (2) in failing "to consider the information that Mr. Shelton could have obtained as an employee of TSA that could have provided MSA with an advantage"; *id.* at 21; and (3) in "not resolv[ing] the factual dispute as to whether Mr. Shelton was told by TSA attorneys that no ethical or conflict of interest restrictions applied to his employment with MSA." *Id.* at 22 (citing AR at 1866).

The government argues "the CO concluded, based upon review of the evidence collected on remand, that Mr. Shelton did not have access to or a role in drafting the Mail Amendment while at TSA." Gov't Post-Award Cross-MJAR at 24 (citing AR at 1864–65). MSA argues the

CO, following remand, found that while Mr. Shelton was consulted in drafting the mail amendment, he "did not directly participate in the mail screening pilot nor was he instrumental in developing the mail amendment." MSA Post-Award Cross-MJAR at 39 (quoting AR at 1865). According to MSA, this means plaintiffs failed to assert MSA accessed through Mr. Shelton "the kind of specific, sensitive information that would create an [unequal access] OCI." *Id.* (quoting *Alabama Aircraft Indus.*, 83 Fed. Cl. at 688).

The CO's initial investigatory email to MSA dated 8 October 2020 noted, "Mr. Shelton was a TSA employee who had a supervisory role at the TSA Canine Training Center and was involved in the USPS canine screening pilot program, both from the perspective of TSA rules and regulations and approvals of USPS processes in the pilot program." AR at 614. The CO observed in a question to MSA during the remand investigation, "[o]n MSA's website, Mr. Shelton was described as being 'instrumental in the development and implementation of the Certified Cargo Security Program Canine (CCSP-K9), the TSA program regulating the use of third-party canine providers for explosive detection screening in regulated air cargo environments.'" *Id.* at 1774 (MSA Response to CO Inquiries). As part of the pilot program process, the TSA developed and issued the mail amendments for this USPS procurement. *Id.* at 1844. Mr. Shelton, as a leader of the TSA's Canine Training Center, played a role in that process. *Id.* at 1864. Mr. Shelton was an expert on the "capabilities of explosive detecting canines" and the proper "techniques to be used for effective canine explosive detection." *Id.* at 1775.

Regarding Mr. Shelton's experience with the pilot program, the CO noted the TSA reported during the remand investigation: "Mr. Shelton also occasionally liaised with stakeholders and coordinated and/or attended meetings about the mail screening pilot." *Id.* at 1864. The CO noted MSA argued in contrast: "Mr. Shelton had no role or involvement in the 2019 USPS/TSA Phoenix 3PK9 mail screening pilot program." *Id.* at 1865. The CO found Mr. Shelton "assigned a team to participate in the 3PK9 program development to act as subject matter experts, but his involvement in developing mail screening policies and in the mail pilot was at a minimum." *Id.* The CO's finding Mr. Shelton had even a minimal role in the pilot program contradicts MSA's assertion "Mr. Shelton had no role or involvement," similar to how the TSA's report Mr. Shelton had some involvement with the pilot program contradicts MSA's report.

Regarding Mr. Shelton's experience with the mail amendment, the CO observed the TSA reported, "Mr. Shelton was consulted about the language in the draft [mail] amendment templates. Due to his subject matter expertise on canine screening he reviewed amendment language specific to canine screening protocols including mail configurations and alarm resolution." *Id.* at 1864. In contrast, the CO noted MSA reported and Mr. Shelton confirmed, "[a]t no point was Mr. Shelton involved in the development of mail screening protocols." *Id.* The CO found Mr. Shelton "did not have an active role in developing the mail amendment (or any mail screening protocols)," and "[h]e assigned a team to participate in the 3PK9 program development to act as subject matter experts, but his involvement in developing mail screening policies . . . was at a minimum." *Id.*

The CO found the TSA and Mr. Shelton "both are essentially in agreement regarding Mr. Shelton's work at TSA, especially with respect to the mail amendment and the USPS/TSA pilot for mail screening, which occurred in late 2019." *Id.* The CO found, "[a]lthough stated slightly differently, I read the MSA and TSA answers regarding Mr. Shelton's work experience to be very similar. . . . He did not have an active role in developing the mail amendment (or any mail screening protocols) or the mail pilot." *Id.* at 1865. The CO's decision to find the two reports to be "very similar" is not fully substantiated by his analysis or by the record and does not fully resolve the logical conflict between the TSA and MSA's statements regarding Mr. Shelton's experience with the mail amendment and pilot program. The CO preemptively ended his analysis and refrained from investigating the contradictions between accounts. Accordingly, the CO failed to fully resolve issues in the record related to Mr. Shelton's TSA experience, discussed immediately *infra*. The unresolved factual disputes related to Mr. Shelton's involvement with, and access to, the mail amendment and pilot program still leaves the CO and the Court unable to determine whether MSA has an OCI. *See Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

The CO acknowledged the TSA reported Mr. Shelton had access to information regarding the formation of the mail amendments and the pilot program in the following ways: Mr. Shelton "liaised with stakeholders and coordinated and/or attended meetings about the mail screening pilot"; he "was consulted about the language in the draft [mail] amendment templates"; and "[d]ue to his subject matter expertise on canine screening, he reviewed amendment language specific to canine screening protocols including mail configurations and alarm resolution." AR at 1864. The CO did not acknowledge, however, MSA's proposal specifically highlighted Mr. Shelton and his experience with the TSA. AR at 1210 (noting Mr. Shelton was "[r]esponsible for all operations of TSA Canine Training Center in San Antonio for six years"). The TSA stated Mr. Shelton was copied on emails with edits his team made to the mail amendment in August 2019; this is well after Mr. Shelton sought ethics approval from Ms. Fulp regarding work for MSA and thus renders any ethics approval Ms. Fulp provided him moot, absent evidence she provided approval for future activity. *Id.* at 1855. Even if Mr. Shelton did not play an active role in drafting the mail amendment or pilot program separate from the knowledge MSA had as part of the pilot program, the insight he obtained from the steps the agency took in drafting and editing the mail amendment may have included what the agency thought was most important, least important, or potentially key in evaluation. The agency's drafting process and the insight Mr. Shelton obtained into those steps and criteria provided an obligation for the CO to sufficiently investigate and establish a factual record of whether Mr. Shelton's access to information led to MSA being provided with "access to non-public information that is competitively useful." *Turner Const.*, 645 F.3d at 1387 (citing *Axiom,* 564 F.3d at 1377 n.1).

The government argues "the CO concluded, based upon review of the evidence collected on remand, that Mr. Shelton did not have access to or a role in drafting the Mail Amendment while at TSA." Gov't Post-Award Cross-MJAR at 24 (citing AR at 1864–65). Similarly, MSA argues plaintiffs failed to assert MSA accessed through Mr. Shelton "the kind of specific, sensitive information that would create an [unequal access] OCI." MSA Post-Award Cross-MJAR at 39  (quoting *Alabama Aircraft Indus.*, 83 Fed. Cl. at 688). The CO noted that in a response to one of his follow-up questions, the TSA stated:

> Chris Shelton and his team at the Canine Training Center (CTC) were consulted as subject matter experts on canine screening for the mail screening pilot.  On August 1,a[sic] 2019 the American Airlines and MSA amendments were sent to the CTC team, but Mr. Shelton was not on that email.  On August 2, 2019, the CTC team sent back edits via an email where Mr. Shelton was copied.  TSA cannot attribute any of these edits directly to Mr. Shelton.  Mr. Shelton left TSA in September 2019, approximately one month after his team provided feedback.

AR at 1865 (quoting TSA's March 31 response to follow-up questions from the CO at Question 2).  In observing the "release of the mail amendment to all offerors would have been extremely beneficial in eliminating this appearance of a potential unequal access to information OCI," the CO admitted his obligation to fully investigate and resolve in the record the potential for an unequal access OCI.  *Id.* at 1869.  By noting "such option was not available to" him, the CO also recognized the mail amendment had previously been determined to be "sensitive security information."  *Id.*  The CO's investigation is incomplete regarding an unequal access OCI, as the CO made a preemptive conclusion regarding both the mail amendment and the pilot program and failed to resolve conflicting statements in the remand investigation record detailed *supra*.  The CO's failure to resolve these conflicting statements regarding the mail amendment and pilot program still leaves the CO and the Court unable to determine whether MSA has an OCI.  *See Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

GK9 also argues for a biased ground rules OCI:  "MSA hired Mr. Shelton, the former Branch Manager of TSA's Canine Training Center ('CTC'), who was a key developer of the amended security program (*i.e.* the Mail Amendments) to permit 39K9 mail screening and establish screening procedures for the pilot."  GK9 MJAR at 12–13 (citing AR at 1844).  A biased ground rules OCI exists when offerors, "by participating in the process of setting procurement ground rules, have special knowledge of the agency's future requirements that may skew the competition in its favor."  *Turner Const.*, 645 F.3d at 1382.  The CO failed to investigate a biased ground rules OCI regarding Mr. Shelton's timeline of planning to work at MSA as discussed *supra*.  Based on Mr. Shelton's recollection of ethics conversations with Ms. Fulp, he appears to have sought clearance to work for MSA in May 2019 or earlier, and the CO did not fully resolve how the date of Ms. Fulp's departure fit with Mr. Shelton's claim to have sought ethics advice from her in September 2019.  Mr. Shelton's continued exposure to edits to the mail amendment and pilot program as late as August 2019 not only renders out of date any ethics approval Ms. Fulp might have provided in May 2019, but it also demonstrates Mr. Shelton remained exposed to the formation of the mail amendments and pilot program while under agreement to work for MSA.  Additionally, MSA did not wall Mr. Shelton off from this procurement.  Thus, any input Mr. Shelton provided or insight he obtained from observing the editing process could have been performed with his future employment at MSA and this procurement in mind, meaning the CO should have investigated whether Mr. Shelton obtained and shared with MSA "special knowledge of the agency's future requirements that may skew the

competition in its favor."[4]   *Id.*   The CO has not fully resolved this issue by, for example, inquiring into the content of Mr. Shelton's meetings or email threads that crafted the mail amendment and pilot program.   The failure to fully investigate a biased ground rules OCI regarding Mr. Shelton's timing of agreeing to work for MSA leaves the CO and the Court unable to determine whether MSA has an OCI.   *Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

### a.   The CO's Focus on the Mail Amendment

The CO's lack of investigation into various issues related to OCI or appearance of OCI could be explained by what appears to be tunnel vision in resolving whether any OCI issues exist related to the mail amendment.   In the seven-page remand investigation summary, the CO spends nearly a page discussing the mail amendment.   AR at 1868–69.   The CO also discussed the mail amendment extensively in his conclusion, finding without regard to any context or timing in which the mail amendment is accessed, "[p]ossession of the mail amendment does not create an unfair competitive advantage."   *Id.* at 1869.   In focusing specifically on the content of the mail amendment, the CO failed to investigate advantages MSA may have gained through mail amendment access before solicitation release—which provided a short timeframe to craft proposals—and especially insight MSA obtained through Mr. Shelton's access to the process of drafting and editing the pilot program and mail amendment.   Additionally, the CO did not appear to investigate issues related to a biased ground rules OCI, which he was required to do.   SP&P 7-15.2; Remand Order at 32–33 (directing the CO's review to include:   "the possibility of investigation or communication within USPS, or between USPS and TSA, related to defendant-intervenor's potential OCI not currently reported in the record; . . . [and] any other evidence USPS reflects as necessary to consider regarding defendant-intervenor's potential OCI").[5]   The

---

[4] Any speculation at this point regarding insight Mr. Shelton might have gleaned would be "mere suspicion and innuendo."   *Turner Constr.*, 645 F.3d at 1385.   The Court notes, for example, there was a turnaround time of only 13 days between the release of the solicitation and the due date for offers in this procurement—along with MSA's acceptable incumbent advantage handling a short turnaround time to compile a proposal, Mr. Shelton's insights into background preparation of the procurement could have provided MSA advance insight on requirements or timing of the solicitation.   AR at 118 (The solicitation issue date is 22 September 2020, and the offer due date/time is 5 October 2020 at 16:00 MT).   AMK9 also offers the following "suspicion and innuendo":   "MSA—unlike the other offerors—could submit a proposal that was carefully calibrated to satisfy each Mail Amendment requirement"; AMK9 Post-Award MJAR at 18; "AMK9 informed counsel that it could have submitted a stronger technical proposal if it had access to the Mail Amendments"; *id.* at 20; "[i]nformation that could have helped MSA appears in the strengths of MSA's proposal.   For instance, MSA proposed [xxxxxxxxxxxxxxxxxxxxxxxxxxxx], which warranted a strength.   It also proposed [xxxxxxxxxxxxxxxxxxxxxxxxxxxx], also a strength.   While this may have been a matter of MSA proposing something on its own that exceeded USPS's objectives, it is just as likely a practice that Mr. Shelton established or created while at TSA that did not constitute a requirement."   *Id.* at 21 (citing AR at 1454).   These are further details that warrant additional investigation by the CO.

[5] AMK9 argues the CO's "failure to disclose at least SSI redacted Mail Amendments—which would have mitigated MSA's unequal access to competitive information OCI or *appearance of* an unequal access OCI—was arbitrary, capricious, and contrary to law."   AMK9 Post-Award MJAR at 20 (emphasis in original).   While AMK9 believes the CO "had no rational basis for refusing to provide AMK9 and other offerors with pre-award access to the Pilot Program Mail Amendments," *id.*, the CO explains he "concluded that . . . the Postal Service should request that TSA allow for the release of the mail amendment to all offerors.   The Postal Service, through the Postal Inspection Service, who had been working with TSA, asked TSA for permission.   As reflected in the e-mail, which was included as part of the administrative record, that request was ultimately denied by TSA."   AR at 1862–63.   AMK9

remand OCI investigation's narrow focus on the mail amendment still leaves the CO and the Court unable to determine whether MSA has an OCI.  *See Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

### 4.   The Government and MSA's Arguments Against OCI and MSA's Arguments All Advantage Comes from the Pilot Program

With respect to MSA's access to the mail amendment as part of its performance of the pilot program, the CO found "agreement by TSA and MSA that MSA received an initial version of the mail amendment to be able to perform the pilot program."  AR at 1866.  The CO noted, "the participants in the pilot because[sic] needed to receive the mail amendment because it is the legal instrument by which TSA regulates mail screening and security."  *Id.* at 1867.  The CO then concluded:  "Because a mail amendment is legally required to perform the work of canine screening of mail, I find that the fact that MSA was appropriately issued the amendment during its participation in the pilot did not create an inappropriate unequal access to information or unfair competitive advantage."  *Id.*  In other words, according to the CO, "[i]f this created an unequal access to information OCI, the Postal Service would have to solicit only non-incumbents each time it competed the requirement," and there are a "finite number of authorized companies."  *Id.*  The CO noted, "if those that participated in creating and innovating new methods through a pilot with government agencies were banned from bidding on any contract for the services, we would never attract the help we need to meet our legal requirements and innovate."  *Id.*

The CO also found, "the Pilot was necessary to create a method of screening mail," and "MSA's participation in this effort [does not] create[] an unfair competitive advantage because the information learned from the pilot was included in the SOW that was provided to everyone." *Id.*  The CO found, "as confirmed internally by USPS and by MSA, MSA did not participate in drafting the SOW," but the CO does note MSA reported it participated in "conversations involv[ing] explanations by MSA of the proof of concept that was demonstrated through the pilot program."  *Id.* at 1868.  The CO's understanding is that "[t]he pilot provided the necessary proof of concept so that TSA and USPS could finalize regulations and processes and USPS could then draft a robust SOW to compete this requirement."  *Id.*

The government notes, "the SDRO concluded that MSA did not have a role in developing the solicitation's requirements, and that the 'best practices' presentation that GK9 cites was created by USPIS, not MSA," while "[t]he CO also found that MSA did not participate in drafting the Statement of Work."  Gov't Post-Award Cross-MJAR at 23–24 (citing AR at 1868, 1967).  The government argues the CO reasonably concluded MSA's access to an earlier version of the mail amendment through the pilot program "did not confer a competitive advantage to MSA because all offerors received materially similar information from the Statement of Work

---

does not explain by what method or under what legal basis the CO ought to have ignored the TSA's denial of his request.  The Court observes the CO did conduct a complete review of issues related to release of the mail amendment and would have released the mail amendment if the TSA had allowed him to.  AR at 1869.  "[G]overnment officials are presumed to do their duty, and one who contends they have not done so must establish that defect by clear evidence." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1384 (Fed. Cir. 2009).  As plaintiff has not provided such clear evidence, the Court finds the CO did not act irrationally in following the TSA's order not to share the mail amendment with offerors.  *See id.*

for the solicitation." *Id.* (citing AR at 1867–68). The government also notes the SDRO determined "MSA received no nonpublic information different from that any pilot program participant would have received," and the CO concluded GK9 failed to "point to any 'hard facts' showing unequal access to information" related to the nonpublic information MSA accessed during the pilot program. *Id.* (citing AR at 1967). The government also argues the SDRO reasonably rejected concerns related to MSA's alarm technology being "improperly incorporated as a basis for the specifications in the solicitation" because "the SDRO concluded that MSA did not have a role in developing the solicitation's requirements, and . . . the 'best practices' presentation that GK9 cites was created by USPIS, not MSA." *Id.* at 22–23 (citing AR at 1967).

MSA argues it "had no input in drafting the statement of work or specifications" and "simply performed under the Pilot Program." MSA Post-Award Cross-MJAR at 37. MSA also argues its "access to the Mail Amendments did not provide it with *any* non-public information which would have provided MSA with 'an unfair competitive advantage'" because "all information pertinent to the Solicitation that was contained within those Mail Amendments was also present in the Solicitation." *Id.* at 43 (emphasis in original). According to MSA, its "performance under the Pilot Program amounts to nothing more than the natural advantage of incumbency." *Id.*

AMK9 argues "MSA's unequal access to the Pilot Program Mail Amendments gave it an unfair competitive advantage," and the CO erred in not providing "at least SSI redacted Mail Amendments—which would have mitigated MSA's unequal access to competitive information OCI or *appearance of* an unequal access OCI." AMK9 Post-Award MJAR at 18, 20 (emphasis in original). GK9 similarly argues "MSA had unequal access to information that provided it with a competitive advantage" because through the pilot program, "MSA received the Mail Amendments, on or about August 5, 2019," but "no other offerors received a copy of the Mail Amendments." GK9 MJAR at 17–18 (citing AR at 1844). AMK9 also argues MSA had an extensive role in crafting the solicitation's requirements, but the CO "did not analyze MSA's role," and "merely stated as fact that MSA did not draft the SOW." AMK9 Post-Award MJAR at 24. According to GK9, USPS's presentations to airlines about new security measures, using a best practices playbook featuring MSA's participation in the pilot program, means "MSA provided material leading 'directly, predictably, and without delay to' a work statement or specifications." GK9 MJAR at 14 (quoting 48 C.F.R. § 9.505-2(b)(1)).

The CO conducted an extensive investigation into the results of MSA's participation in the pilot program. The CO asked: "Did MSA have any role in creating or drafting any presentations about 3PK9 screening of mail for the Postal Service? If so, please explain." AR at 1776. MSA responded:

Following completion of the pilot program, MSA participated in conversations with other stakeholders including individuals from the TSA, USPS, state and local law enforcement agencies, air carriers and cargo companies. Those conversations involved explanations by MSA of the proof of concept that was demonstrated through the pilot program as well as questions from others as to the results of the pilot program. Later conversations included discussions on how to further develop

and improve the proof of concept.  As part of this process *MSA created several presentations* that showed the conduct of the pilot program and its results.

*Id.* at 1776–77 (emphasis added).  The Court agrees with the CO's determination a finding of OCI through MSA's participation in the pilot program would result in the negative consequence of preventing the government from "attract[ing] the help we need to meet our legal requirements and innovate."  *Id.* at 1867.  Plaintiffs appear to seek to prevent the government from learning technical details from the pilot program in developing a program important to national security; the Court finds an OCI was not automatically present as a result of the government awarding the contract to MSA merely because it participated in the pilot program for the contract.  "Incumbent status by itself is insufficient to create an OCI.  An offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated."  *Alabama Aircraft Indus.*, 83 Fed. Cl. at 688, *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009) (cleaned up).

The government's creation of a best practices playbook—perhaps one of the "presentations" MSA noted in its response—and MSA's access to the mail amendment are foreseeable products of incumbent advantage inherent in participating in the pilot program.[6]  As the government noted at oral argument, "[t]here was no document, no record evidence from the investigation showing that MSA had any input in the presentation of the best practices presentation to airlines or into the solicitation itself."  Post-Award OA Tr. at 72:9–13.  The government also explained the significance of the best practices presentation coming out just before the solicitation is that "the Postal Inspection Service was making [the presentation] to the airlines saying, hey, there's this third party K-9 program; we are going to be rolling it out; here is what we've learned, basically, for best practices from the pilot program, because where else are they going to get that information?"  *Id.* at 72:19–24.  Plaintiffs failed to provide any reason for the Court to find the government has demonstrated an OCI merely by informing airlines of upcoming new national security measures.  "Incumbent status by itself is insufficient to create an OCI.  An offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated."  *Alabama Aircraft*, 83 Fed. Cl. at 688, *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009) (cleaned up).  Although the Court does not find GK9 to have established any concern regarding OCI related to the best practices playbook, the Court notes a full investigation from the CO should include investigation related to the creation and editing of this playbook and the "presentations" MSA noted in its response to the CO, with full detail on who outside the government contributed to the playbook and what role MSA's presentations played in forming the solicitation.[7]  *See Chenery I*, 318 U.S. at 87; *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs.*, 260 F.3d at 1380.

---

[6] One of GK9's primary concerns with the government's best practices playbook is that it provided advertising for competitor MSA to airlines:  "MSA was featured heavily in the Playbook," which "did not identify any other TSA-certified 3PK9-C vendors, even though" GK9 "has provided the same or similar services to all major airlines at all major airports for several years."  GK9 MJAR at 2.  It is beyond the scope of this bid protest to address this concern.
[7] The Court notes GK9 recently filed a motion to supplement the administrative record with depositions.  Mot. to Supp. the Admin. R. with the Depositions of Chris Shelton and Ron Brawner Based on Newly Discovered Evidence and Incorporated Brief, ECF No. 105.  The instant Order includes instructions for a status conference that will incorporate discussion of this motion.  Based on the Court's review of the remand record and briefing on the motion to supplement, it could be there are additional documents that should be included in a supplemental administrative record following a second remand.

### 5.  Remaining Need for Thorough and Complete Second Remand Investigation

At oral argument, counsel for GK9 noted, "the type of injunctive relief [appropriate at this stage] would be different if the Court finds that the overall evaluation was flawed versus if it's some of these OCI grounds that could be potentially addressed with another remand."  Post-Award OA Tr. at 227:5–9.  The Court discussed *supra* several instances in which the CO's remand investigation irrationally drew a premature conclusion of no factual conflict in the remand record.  The CO also failed to fully investigate and resolve issues related to, *inter alia*: the "production of Mr. Shelton's TSA exit letter"; "the MSA website detail regarding Mr. Shelton's experience from working with TSA"; and the possibility of a biased ground rules OCI, either for MSA alone or in conjunction with Mr. Shelton.  Remand Order at 32.  USPS thus failed to follow the Court's instruction in the Remand Order:  "USPS shall reopen the OCI investigation into defendant-intervenor and Mr. Shelton according to guidelines provided by the SP&Ps and reassess a complete and documented review of the OCI."  *Id.*  In light of unresolved factual conflicts in the remand record—and the CO's continued insufficient OCI review pursuant to SP&P guidance—the Court finds now:  (1) "the existing record is insufficient to permit meaningful review consistent with the APA," and (2) the government was unable to confirm USPS is not responsible for "omission of extra-record evidence preclud[ing] effective judicial review."  *Axiom Res. Mgmt.*, 564 F.3d at 1380, 1381.

It may be that USPS can resolve plaintiffs' OCI allegations with another remand investigation.  As in the March Remand Order, the Court observes a remand is a less imposing judicial remedy than a complete equitable remedy overturning award and performance of the contract.  *See* Remand Order at Section VI.  Based on the discussion *supra* and as detailed *infra*, the Court hereby remands this protest to USPS according to RCFC 52.2 to conduct a revised, complete, and documented OCI investigation and analysis of MSA and Mr. Shelton, to be performed by the current contracting officer or potentially a new contracting officer according to guidelines provided by the SP&Ps.  28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.").

### C.  Whether the Government Exercised Bias in Favor of MSA

AMK9 argues the government "treated offerors disparately, favoring MSA," specifically asserting "USPS went out of its way to assign strengths to MSA while ignoring identical strengths for AMK9."  AMK9 Post-Award MJAR at 31.  AMK9 describes various technical ratings for itself and MSA that it alleges to be incorrect.  *Id.* at 31–33.  AMK9 also argues USPS was biased because it "provid[ed] airlines with 'best practices' presentations two months *before* USPS issued a solicitation for these 'novel' services."  *Id.* at 35 (emphasis in original).  AMK9 notes "the presentation indicates that slides discussing MSA constitute the 'USPIS 3PK9 Playbook,' which was prepared in April of 2020—well after the pilot program and well before the issuance of the Solicitation."  *Id.* at 36 (citing AR at 1925–35).

The government provides explanations for why the various ratings AMK9 cites as evidence of bias are instead rational ratings.  Gov't Post-Award Cross-MJAR at 31–33.  MSA

asserts AMK9's argument regarding government bias in favor of MSA "offers nothing in support of this allegation beyond a list of disagreements with the government's discretion in its technical evaluation." MSA Post-Award Cross-MJAR at 22–23. Counsel for GK9 clarified at oral argument GK9 only alleges a biased ground rules OCI, *see supra*, and does not make a general allegation of bias as AMK9 does. Post-Award OA Tr. at 134:4–10 ("I don't want to give the Government the benefit of the heightened standard as it relates to our protest allegation. So we've specifically tailored it to the OCI . . . .").

AMK9 asserts in its reply and response the government failed to respond to, and thus waived defending, an argument in AMK9's MJAR: "The government's MJAR fails to respond to AMK9's bias allegations. This failure concedes the point. Under binding precedent, 'arguments not raised in the opening brief are waived.'" AMK9 Post-Award Resp. at 24 (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)). The government explains in its reply it "discussed in [the government's] opening brief, however, USPS's decisions on these matters were rational and supported by rational evidence. AMK9 also fails to show that USPS showed bias or any intent to favor MSA." Gov't Post-Award Reply at 13. Specifically, the government notes in its reply, "AMK9 argues that the [g]overnment conceded this argument by not responding to it in [the government's] opening brief, but [the government] did respond to AMK9's argument in [its] opening brief." *Id.* at 15 (The government claims it "respond[s] to AMK9's claim that 'USPS favored MSA by considering MSA's alarm resolution technology as part of the best practices presentation in the pilot program' on pages 22 and 23 of its opening brief.).

For plaintiff AMK9 "to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." *Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *Info. Tech. Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003). "'Almost irrefragable proof' amounts to 'clear and convincing evidence.'" *Galen*, 369 F.3d at 1330 (quoting *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002)). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Id.* (quoting *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982)) (internal quotation marks omitted).

While AMK9 cites a variety of complaints regarding its technical ratings, the government provides explanations for those ratings that are facially reasonable and that undermine allegations of bias. *See* Gov't Post-Award Cross-MJAR at 31–33. As the government explains, "the record shows that the presentation in question was prepared by USPS for purposes of informing airlines about the mail screening program, not for preparing the solicitation." Gov't Post-Award Reply at 16 (citing AR at 1906–36, 1947, 1899–1900). The Court will analyze *infra* whether these explanations from the government are sufficient for a finding of rationality regarding USPS's technical ratings; regardless, the government's ability to provide facially reasonable explanations for the technical ratings AMK9 cites as proof of bias undermines AMK9's effort to establish "irrefragable proof" and "evidence of some specific intent to injure the plaintiff." *Galen*, 369 F.3d at 1330.

An August 2019 memorandum of understanding ("MOU") between USPS, the United States Postal Inspection Service ("USPIS"), and the TSA explains the government agencies

"have initiated discussion to develop procedures for the effective screening of certain categories of domestic Priority Mail" and "have agreed to a ninety-day pilot to verify the feasibility of these screening procedures." AR at 2509 (Pilot Program Memorandum of Understanding). The pilot program allowed MSA to screen all domestic Priority Mail traveling on American Airlines passenger flights. *Id.* The MOU stated its purpose includes "the mutual cooperation between the [agencies] in developing procedures to screen 100 percent of U.S. Priority Mail." *Id.* at 2510. There is no evidence MSA was part of this development of procedures.

The pilot program's 12 December 2019 after-action report explains, "[t]he goals of the pilot were to verify and evaluate the ability of a 3PK9-C to effectively screen U.S. Priority Mail in various configurations, identify any operational issues or other factors impacted by the configurations, and evaluate the alarm resolution processes for mail which contains a potential threat." AR at 2538 (Pilot After-Action Report). American Airlines was responsible for alarm resolution, and its "screeners utilized a MSA Security product called [xxxxxxxx]." *Id.* at 2538 n.2. The after-action report's key findings noted, "[a]larm resolution protocols, to include the use of [xxxxxxxxxxxx], worked successfully to evaluate a potential threat." *Id.* at 2539. The fact that the pilot program was meant to further the government's goals to: (1) "verify and evaluate the ability of a 3PK9-C to effectively screen" mail "in various configurations"; (2) to "identify any operational issues or other factors impacted by the configurations"; and (3) to "evaluate the alarm resolution processes," demonstrates how specific of a role MSA's performance played in the government's analysis of whether 3PK9-Cs in general were feasible for the screening of mail. *See id.* at 2538.

AMK9's allegation of bad faith requires a showing of "irrefragable proof," which "has been equated with evidence of some specific intent to injure the plaintiff." *Galen*, 369 F.3d at 1330; *see* Post-Award OA Tr. at 134:4–6 (Counsel for GK9 noted at oral argument it "ha[s] not made a bias allegation" because it "do[es]n't want to give the Government the benefit of the heightened standard."). In its briefing and at oral argument, AMK9 did not show evidence of a "specific intent to injure," and the government's facially reasonable explanations for AMK9's ratings refute AMK9's allegations of "irrefragable proof." *Galen*, 369 F.3d at 1330. The mere fact the government developed "best practices" from MSA's participation in the pilot program similarly fails to show "irrefragable proof" or "evidence of some specific intent to injure" AMK9. *Id.* AMK9 fails to establish "clear and convincing evidence" to "overcome the presumption of good faith [on behalf of the government]." *Id.*

### D.  The Government's Technical Evaluation of AMK9's Proposal

#### 1.  Whether the Government Rationally Assigned a Weakness Based on a Deficiency in AMK9's Initial Proposal

AMK9 argues the TET irrationally assigned it a weakness for its proposal failing to respond to the government's request for a rollout schedule. AMK9 Post-Award MJAR at 25. AMK9 explains USPS "believed AMK9's initial proposal fell short" and submitted follow-up questions, "asking AMK9 if it could detail how it would meet the roll-out schedule." *Id.* (citing AR at 553, 1388). AMK9 argues "AMK9 responded with a revision that USPS deemed worthy

of a strength." *Id.* (citing AR at 1443).  AMK9 argues despite this revision, USPS irrationally assigned a weakness for deficiency in the initial proposal.  *Id.* (citing AR at 1444).

The government argues the solicitation required offerors "to explain how they would meet a three-phase schedule" which included "[o]fferor's demonstrated responsiveness to the attached Roll-out Schedule."  Gov't Post-Award Cross-MJAR at 29 (citing AR at 556, 557).  The government states, "[g]iven these clear instructions from USPS, USPS reasonably concluded that AMK9's failure to explain how it would meet the rollout schedule constituted a weakness in its proposal."  *Id.*  MSA contends USPS had a rational basis for assigning the weakness for "lack of diligence," based on "the award's pertinence to national security."  MSA Cross-MJAR at 18.  MSA further asserts USPS must "be allowed to rationally assign a weakness when a contractor exhibits a lack of diligence" and argues that to hold otherwise would "operate as a chilling effect on agencies' discussions with prospective offerors."  *Id.* at 19.

The solicitation reads, "[t]he offeror must demonstrate its current capability to meet the requirements in the SOW.  The Postal Service will evaluate the offeror's ability to provide canine handler resources adequate to perform the work," including an evaluation of an offeror's "demonstrated responsiveness to the attached Roll-out Schedule."  AR at 158 (Solicitation).  AMK9 failed to provide a rollout schedule in its technical proposal.  *See id.* at 847–86 (AMK9 Technical Proposal).  The TET noted AMK9 "had to be directly asked to provide a schedule of how it would meet the rollout schedules listed in attachments A and B."  *Id.* at 1444 (TET Evaluation).  AMK9 at oral argument stated, "[t]he [g]overnment has opined that because our initial . . . proposal didn't, to its satisfaction, meet the rollout schedule, that we should receive a weakness after discussion.  I'm not aware of any law that allows for that."  Post OA Tr. 193:18–22.  Contrary to AMK9's assertion, the government's position is "AMK9's response to the schedule *even after supplementation* presented weaknesses in its proposal."  Gov't Cross-MJAR at 29 (emphasis added).  USPS observed "[AMK9's] proposal provided incomplete answers and inadequate responses to the SOW."  AR at 1493 (Award Recommendation).  AMK9's rollout schedule explained AMK9 maintained five "ready reserve/contingency teams" and was, at the time, in the process of training and certifying an additional 10 teams to fulfill the USPS Phase 1 requirements.  *Id.* at 1338 (AMK9 Response to Clarification Questions).  In comparison, MSA's rollout schedule included [xxx] SAFETY Act–designated handlers and [xx] CCSP 3PK9–certified handlers available to fulfill USPS's contract.  *Id.* at 1212 (MSA Solicitation), 1492 (Supply Management Competitive Award Recommendation).  Considering the significance of the contract and USPS's concern AMK9 would not adequately respond to agency requests, USPS reasonably concluded AMK9's failure to respond to the government's rollout schedule was a weakness.  *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1357 (Fed. Cir. 2004) (upholding the government's discretionary judgment of offeror's strengths and weaknesses).

### 2.  Whether the Government Rationally Assigned Weaknesses to AMK9 Using Unstated Evaluation Factors

AMK9 contends the government irrationally evaluated its proposal using unstated evaluation factors when USPS assigned weaknesses for:  (1) AMK9's failure to plan staff the entire program "on Day 1"; (2) AMK9's "multiple step[]" alarm resolution process; (3) AMK9's

lack of "automatic redundancy" in alarm resolution; and (4) AMK9's use of a laptop during the live demonstration.  AMK9 Post-Award MJAR at 26–31.  AMK9 asserts USPS's assignment of a weakness for failing to plan to staff the program "on Day 1" is not a requirement in the Solicitation and is inconsistent with the strengths AMK9's proposal received for its rollout schedule and staffing plan.  *Id.* at 27–28.  The government argues, "USPS informed offerors that offerors would need to demonstrate 'ability to meet the required or proposed delivery schedules; provide a management and staffing plan; and the ability to obtain the necessary certifications and security badges required at each location.'"  Gov't Post-Award Cross-MJAR at 29 (quoting AR at 553 (solicitation)).  MSA asserts AMK9's "[d]elays in fulfilling phases of the project has [sic] a rational connection to the ability to meet delivery schedules," and AMK9's "need to recruit and train canine teams . . . necessarily raises the level of risk."  MSA Post-Award Cross-MJAR at 20.

AMK9 also argues USPS irrationally evaluated AMK9's alarm resolution process using unstated factors.  AMK9 Post-Award MJAR at 28.  AMK9 received weaknesses for an alarm resolution process that included "multiple steps" and for a lack of "automatic redundancy" in its alarm resolution procedure.  *Id.* at 28–30.  AMK9 argues the weakness it received for its proposed multistep alarm resolution process "bears no relation to the stated evaluation factors," because "USPS did not request a 'single step' process."  *Id.* at 29.  The government explains AMK9's weakness for alarm resolution "boils down to a practical concern" because "multiple steps would interfere with the ability to 'immediately request remote imaging assistance' from bomb technicians" in accordance with the solicitation.  Gov't Post-Award Cross-MJAR at 30 (quoting AR at 2023) (SDRO Decision).  The government argues USPS's analysis "reasonably addressed efficacy of AMK9's approach."  *Id.*

AMK9 also contends, "the Solicitation contained no requirement for 'automatic redundancy'" and the assignment is "inconsistent with AMK9's proposal," which provided for "an 'automated urgent email notification' to AMK9's operation center, bomb technicians, AMK9 program management, and any government and airline representative required."  AMK9 Post-Award MJAR at 29.  The government argues USPS "reasonably upheld the evaluation based upon the fact that AMK9's bomb technicians were '[xxxxx]' rather than being 'on duty' which raised the 'risk of non-availability.'"  Gov't Post-Award Cross-MJAR at 30 (quoting AR at 1352, 2024).  MSA adds, "USPS assessed a similar weakness to another offeror," meaning CSK9.  MSA Cross-MJAR at 21 (citing AR at 1448) (TET Evaluation).

AMK9 also asserts, "USPS irrationally assigned AMK9 a weakness for using a laptop rather than a desktop during its live demonstration" when AMK9 proposed to use a "[xxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxx] 'or similar' device," because "there is no meaningful distinction between the laptop AMK9 used during its demonstration and the desktop identified in its proposal."  AMK9 Post-Award MJAR at 30–31.  The government argues, "AMK9 did not raise this issue before the CO or SDRO in its administrative appeals so the issue is waived."  Gov't Cross-MJAR at 30.  The government also argues, "USPS accurately found that AMK9 stated in its proposal that it would use a desktop computer but it used a laptop computer for its demonstration."  *Id.* at 31 (citing AR at 1445).  At oral argument, counsel for the government contended, "[the live demonstration] is the only real chance for the Postal Service to see live how AMK9 is going to do its work, and [AMK9] did something different than what it said it was going to do . . . it wasn't treated as disqualifying.  AMK9's bid was technically acceptable, but

nevertheless, it was properly assessed as . . . a risk." Post-Award OA Tr. 198:6–16.  MSA notes, "USPS is particularly situated to determine the level of risk" based on how an offeror's live demonstration differs from the offeror's proposal.  MSA Post-Award Cross-MJAR at 22.

At oral argument discussion of USPS's evaluation of AMK9's ability to staff the entire contract prior to its commencement, counsel for AMK9 stated, "[w]e could perform phase 1 when phase 1 was required.  There's no doubt about that.  We got a strength for being able to recruit personnel to perform phases 2 and 3, which is no different than having a bench."  Post OA Tr. 200:17–20.  The solicitation states each offeror "must demonstrate its current capability to meet the requirements in the SOW" and notes USPS "will evaluate the offeror's ability to provide canine handler resources adequate to perform the work."  AR at 1469 (Supply Management Competitive Purchase Plan).  Amendment 4 of the solicitation adds:  "the number of CCSF certified K9 teams" that are currently "operating in a TSA environment" would be "take[n] . . . into account under Evaluation Factor One."  *Id.* at 2549 (Solicitation Amendment 004).  AMK9's proposal stated it would meet Phase 1 requirements using the teams "we already have on-hand" and acknowledged it would need "additional recruiting" for subsequent phases.  *Id.* at 1338 (AMK9 Response to Clarification Questions).  USPS noted AMK9's recruitment and training plan for the additional staff required to fulfill the contract's three phases "left virtually no room for error."  *Id.* at 1994 (Contracting Officer's Resolution of Post-Award Business Disagreements Lodged by AMK9).  In the evaluation, USPS assessed the *risk* that an offeror would be unable to complete the contract.  AR at 1490 (Supply Management Competitive Award Recommendation) ("[AMK9's] possible delays in fulfillment of Phase 2 and 3 of the project due to its need to recruit and train additional canine team" represented a "Medium to Low Risk.").  Concerned about the possibility of delay, USPS reasonably concluded AMK9's current capability raised the risk AMK9 would be unable to fulfill the contract on time.  *See Banknote*, 365 F.3d at 1357.

Counsel for AMK9 explained its challenge to the government's rating of its multistep alarm resolution process at oral argument by noting, "[t]he government was apparently looking for a single-step solution. . . .  That wasn't what the solicitation called for.  It wasn't what they asked for.  Yet that was the standard that [the government] ultimately used in making the determination."  Post-Award OA Tr. 192:2–8.  The SOW reads:  "[t]he Offeror's technology must provide the screener the ability to immediately request remote imaging assistance from the CCSF-K9 offeror's FBI HAS or NAVSCOLEOD certified bomb technician" and required alarm resolution within ten minutes of detection.  AR at 602–03 (SOW Section 3.3).  AMK9's alarm resolution process requires the user to "manually download the image from the x-ray machine," then "open the TRACK system and find the correct screen," and "upload and transmit the image."  *Id.* at 1993.  The TET observed AMK9's process "was more cumbersome and time-consuming than that offered by MSA."  *Id.* at 1495.  The SOW clearly expressed USPS's desire for quick resolution of alarms, and the Court therefore finds USPS acted reasonably in concluding AMK9's "cumbersome" alarm resolution process was a weakness.  *See Banknote*, 365 F.3d at 1357.

AMK9's proposal for alarm resolution stated an operations manager would manually escalate the analysis request if an "[xxxx]" bomb technician failed to respond to the initial email notification.  AR at 1352 (AMK9 Response to Clarification Questions).  The TET observed this

lack of automatic redundancy "increases the risk that a bomb tech may not be available for the consultation and the offeror could not meet the requirement of having a response within 10 minutes as outlined in Section 3.3 of the SOW." *Id.* at 1445 (TET Evaluation).  USPS was reasonably concerned about AMK9's ability to meet the "critical" ten-minute requirement, and based on this concern USPS reasonably assigned risk to AMK9's proposal.  *Id.* at 1994 (CO Resolution of AMK9 Post-Award Business Disagreement); *see Banknote*, 365 F.3d at 1357).

The government argues AMK9 cannot make a claim regarding the laptop issue because AMK9 did not raise the issue during the administrative process.  Gov't Reply at 14 (citing *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1255 (Fed. Cir. 2015)).  In *Palladian*, an offeror ignored invitation to participate in the administrative appeal process regarding a change in the solicitation.  *See Palladian*, 783 F.3d at 1248.  Following the agency's administrative decision, the offeror attempted to litigate an issue already considered in the previous administrative appeal.  *See id.*  Accordingly,  the Court held "a party's failure to exhaust administrative remedies precludes judicial review of its claim." *Id.* at 1255.  The facts of this case differ from *Palladian*.  Here, AMK9 was not offered the opportunity to appeal this issue during the administrative appeal process, as counsel for AMK9 noted at oral argument:  "the [g]overnment did not identify to AMK9 in its debriefing about this weakness, which prevented us from having the ability to raise it before the USPS administrative appeals.  It was not until we got to the court that we learned of that weakness and we challenged it immediately."  Post OA Tr. 204:1–4.  Thus, the Court will consider USPS's evaluation of AMK9's use of a laptop during the live demonstration on the merits.

At oral argument, AMK9 explained it "proposed a solution that included a specific desktop or similar computer.  The government seems to have ignored the 'or similar.'"  Post-Award OA Tr. 194:11–14.  AMK9's proposal stated AMK9 would provide a "Hewlett Packard (HP) Z2 G4 Desktop Computer *(or similar [device])*" with two monitors.  AR at 857 (AMK9 Technical Proposal) (emphasis in original).  At the live demonstration, AMK9 "showed a laptop connected to the x-ray machine."  AR at 1444 (TET Evaluation).  USPS concluded AMK9's use of a laptop was "particularly concerning" because "[t]ypically, providers of technology have a demo model;" therefore, "[n]ot having the technology listed in the offeror's proposal for the demonstration increases the risk that the offeror will not be able to provide the technology that was stated in the offeror's proposal."  *Id.*  At oral argument, the government elaborated:  "this is the only real chance for the Postal Service to see live how AMK-9 is going to do its work, and [AMK9] did something different than what it said it was going to do in its proposal."  Post-Award OA Tr. 198:5–9.  "[I]t wasn't treated as disqualifying . . . [b]ut rather a risk." *Id.* at 198:13–16.  Plaintiff has not attempted to explain what would be a similar or dissimilar computer, and aside from a conclusory allegation that "[t]he government seems to have ignored the 'or similar,'" plaintiff provides no basis for the Court to overcome its deference to the government's determination that AMK9's choice of computer introduced risk.  The Court thus finds the government reasonably concluded AMK9's use of a laptop was a risk to AMK9's ability to fulfill the contract in accordance with AMK9's proposal.  *See Banknote*, 365 F.3d at 1357.

### E.  The Government's Consideration of AMK9's Final Price

AMK9 argues USPS's tradeoff decision was irrational because the agency incorrectly stated AMK9's price in the narrative section. AMK9 Post-Award MJAR at 34–35. AMK9 explains its proposed final price was [xxxxxxxxxxxxxx] less than MSA's price, rather than the [xxxxxxxx] difference USPS stated in the best-value determination. *Id.* at 35; *see* AR at 1503, 1505. AMK9 further asserts the mistake is material because "[h]ad USPS evaluated MSA's benefits against the actual price difference, it could have reached a different conclusion." AMK9 Post-Award MJAR at 35. The government responds, "although this clerical error was contained in the narrative of the best value analysis trade-off between Technical Ranking and Price Ranking, the clerical error did not change the price rankings that are shown in the chart accompanying the analysis and therefore did not materially affect the price/technical tradeoff." Gov't Post-Award Cross-MJAR at 32. MSA argues, "[e]ven if AMK9 is correct that the USPS used an [xxxxx] million price differential rather than a [xxx] million price differential, this difference is immaterial," since "where the USPS had already decided that MSA's vastly technically superior technical proposal justified a [xxxxx] price premium, that determination would still be valid if the price premium turned out to be [xxxxx]." MSA Post-Award Cross-MJAR at 25.

The Federal Circuit holds, "[c]ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). The solicitation stated, "USPS is more concerned with making an award or awards based on a superior technical proposal than with awarding at the lowest price." AR at 214.

In the best-value determination, USPS observed, "[t]hough both offerors [K2 and AMK9] were rated very competitively in their pricing . . . this does not offset the lower technical ratings and associated technical deficiencies." AR 1505. Since "USPS is more concerned with . . . a superior technical proposal than with awarding at the lowest price" and the government found AMK9's competitive price "was not enough to outweigh the significant difference in technical ranking, each of which was a full three (3) adjectival ratings below MSA's technical ranking," AMK9 carries a burden to explain how USPS's misquotation materially affected its conclusion. AR at 214, 1505. AMK9's technical ranking was fourth, and it was second in pricing under either price the government noted. AR 1503, 1505.

Additionally, while USPS's best value analysis tradeoff narrative quoted AMK9 as being only "[xxxxxx] less than MSA," the summary of price negotiations two pages earlier acknowledged, "AMK9 further updated its pricing per Amendment 0006" to [xxxxxxxx], which it understood to be a "[xxxxx]" change. AR at 1503, 1505. As MSA noted, AMK9's "claim that there is a [xxxx] difference in the price premiums is somewhat misleading. There is a [xxxx] difference between the [xxxxx] million price premium that the USPS thought it was paying an[d] the [xxx] million price premium it may actually be paying. But there is only a 2.1% difference between the actual prices that the government is paying." MSA Post-Award Cross-MJAR at 25 n.2. The government thus appears to have understood AMK9's final offered price, and AMK9 provides no basis for the Court to believe a [xxxxx] difference in price would overcome AMK9's

fourth place technical ranking below three offerors who all had lower price rankings.  In fact, the government's final ranking of the offerors perfectly matched the offerors' technical evaluation rankings—regardless of their final price ranking—in line with the government's statement it was more concerned with a "superior technical proposal."  AR at 214, 1504.

Despite asserting the government "could have reached a different conclusion," AMK9 does not attempt to explain how a [xxxx] change in its quoted price would have improved its ranking, and the Court does not find such a misquote could have materially affected the government's best-value tradeoff that ranked AMK9 fourth.  AR at 1504.  The Court finds USPS did not "entirely fail[] to consider an important aspect of the [pricing] problem" because its analysis also included plaintiff's correct price and was ultimately based on a balancing of technical rating and price that would not have changed with a slightly lower price.  *Ala. Aircraft Indus., Inc.-Birmingham*, 586 F.3d at 1375; AR at 214 ("USPS is more concerned with making an award or awards based on a superior technical proposal than with awarding at the lowest price.").

### F.  The Government's Technical Evaluation of GK9's Proposal

GK9 argues the government "unreasonably evaluated GK9's proposal by arbitrarily assigning weaknesses, risks, and deficiencies and failing to recognize its inherent strengths and in assigning strengths or failing to assign weaknesses for similar features in MSA's proposal."  GK9 MJAR at 23.  GK9 specifically alleges USPS's ratings related to x-ray image technology, global command center, [xxxxxxxxxx], prior rollouts, and Wi-Fi were irrational.  *Id.* at 23–26.  Counsel for GK9 emphasized at oral argument it was struck by "the complete lack of curiosity the [g]overnment had about the . . . potential problems associated with MSA's technical solution."  Post-Award OA Tr. at 206:21–24.

#### 1.  X-ray Image Distortion

GK9 argues USPS's assessment of a weakness in its proposed x-ray technology was irrational because [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx] under USPS's alarm resolution criteria.  GK9 MJAR at 23–24.  Potential image distortion does not negatively impact such an approach.  *Id.* at 23.  At oral argument, counsel for GK9 stressed its concern over the lack of official recording of the offerors' presentations of their proposals:  "So we don't know exactly what happened [at the presentation].  All we do know is . . . the [g]overnment said there was an x-ray problem and our client said that [xxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxx]."  Post-Award OA Tr. at 208:6–10.  FAR 15.102(e) requires agencies to maintain a record of oral presentations:  "The contracting officer shall maintain a record of oral presentations to document what the Government relied upon in making the source selection decision.  The method and level of detail of the record (e.g., videotaping, audio tape recording, written record, Government notes, copies of offeror briefing slides or presentation notes) shall be at the discretion of the source selection authority."  FAR 15.102(e).  While the FAR is not binding on USPS, this provision demonstrates an established best practice for contracting officers when conducting offeror presentations.  The government asserts GK9 fails to establish why its concern regarding image distortion was irrational because GK9's x-ray technology involves "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].”  Gov't Post-Award Cross-MJAR at 33.  As such, the "lighting, quality of internet connection, imaging device, and the skill of the picture-taker" all could impact the quality of the x-ray image.  *Id.* (citing AR at 1453, 1947–48, 1970–71).  At oral argument, counsel for the government explained, "the technical evaluation team looked at [GK9's proposal] and found that there was a weakness based on [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxx].”  Post-Award OA Tr. at 208:21–209:3.  The government further noted GK9 cannot claim it does not know what happened at its own presentation.  *Id.* at 217:15–21 ("So if [the contractors] are saying that they don't know when they are the ones who would have reason to know, that would call into question whether there is any error in what the USPS said.").

The solicitation states:

The offeror is required to provide technology that is compatible with existing airline or Postal Service owned x-ray machines at locations outlined in Attachments A & B to facilitate use of offeror's technology.  The offeror shall provide technology and services which includes live 24/7/365 response capabilities with FBI HDS or NAVSCOLEOD certified bomb technicians that facilitates remote viewing of x-ray images.

AR at 102–103 (SOW).  The solicitation further provides, "the service and technology must include the offeror's ability to provide high-definition x-ray images to the USPS in real time." *Id.* at 103.  In response to a question regarding x-ray image quality, USPS stated in the solicitation:  "We want the best image available to capture image and colors on the x-ray machine.  Minimum 1920 x 720 is desirable."  AR at 162–163 (solicitation).  USPS gave GK9 a weakness for its x-ray technology, explaining "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].”  *Id.* at 1453 (TET Evaluation).  USPS further noted, "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx] . . [sic] (live demonstration).”  *Id.*  GK9 argues USPS' conclusion regarding its x-ray technology was arbitrary and capricious because USPS did not find quality of image "to be an issue during the live presentation."  GK9 MJAR at 24.

GK9's proposal noted its "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].”  *Id.* at 1055 (GK9 proposal).  GK9 also noted its alarm resolution technology "[xxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxx].  *Id.* at 1053.  The agency understood the capacities of GK9's x-ray technology, discussing both its strengths and weaknesses.  *Id.* at 1452–53.  In terms of weaknesses, USPS explains:

[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxx]

*Id.* at 1453 (TET Evaluation).  Nothing in the solicitation required USPS to do more than consider the offeror's technical proposal's strengths and weaknesses.  USPS thoroughly explained why it has concerns over GK9's x-ray image quality.  The Court acknowledges, however, if the government is to rely on an oral presentation for its argument, it should keep a detailed record of that presentation.  GK9 does not outright reject the potential for poor x-ray image quality and, rather, stresses the overall reliability of its alarm resolution system.  GK9 MJAR at 23–24.  USPS evaluated GK9's x-ray technology in accordance with the solicitation and SOW and determined its x-ray image quality did not meet the standards of the solicitation.  AR at 1453 (TET Evaluation).  The Court will not second-guess the judgment of the agency in instances such as this.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

## 2.  Command Center

The solicitation required "an alternate continuity of operations plan capable of accommodating catastrophic incidents."  AR at 63, 103.  USPS gave GK9 a weakness for its command centers, explaining GK9 "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxx]" and, as a result, "does not meet the requirements of the SOW."  *Id.* at 1453.  GK9 asserts USPS's assignment of a weakness was irrational because such a "weakness does not align with any stated evaluation criterion" and GK9 offered [xxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxx].  GK9 MJAR at 24.  The government argues GK9's "[xxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."  Gov't Post-Award Cross-MJAR at 33–34.  At oral argument, the government stressed, "[xxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."  Post-Award OA Tr. at 211:8–11.  The government further reasoned, "[xxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxx]."  *Id.* at 211: 4–6.

The solicitation states:

> The supplier shall provide DHS SAFETY Act designated software/technology and services which includes live 24/7/365 communication capabilities and an active emergency operations command center (command center) staffed with FBI Hazardous Device School (HDS) certified bomb technicians that facilitates remote viewing of x-ray images.  In addition, a secondary command center shall be operational as an alternative backup and to provide additional remote command center capabilities to accommodate catastrophic incidents.

AR at 38.  GK9's proposal explains its "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]"; rather,

GK9's [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. *Id.* at 1054.  GK9 further notes, "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxx]." *Id.*  GK9 states "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]."  GK9 MJAR at 24.

USPS understood GK9's proposal to offer [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].  AR at 1453 (TET Evaluation).  As the agency notes, "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx], and the TET found that a continuity of operations plan was not explained thoroughly enough." *Id.* at 1948 (CO Resolution of GK9 Post-Award Business Disagreement).  USPS performed the analysis the solicitation required in determining whether GK9 complied with the requirement to offer at least two command centers. *Id.*; *see also id.* at 38 (Solicitation).  USPS reasons GK9's [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxx]. *Id.* at 1948.  GK9 explained [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx], in response to a clarification question:  "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]." *Id.* (citing Clarification Question Responses, dated October 25, 2020 at Question 7).  USPS reasoned based on this clarification, "[xxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxx]." *Id.*  USPS also noted that "there was no plan if a bomb technician could not be reached." *Id.* at 787 (supply management competitive award recommendation).  Not only was the agency's decision rational because it followed the terms of the solicitation in making its decision, but it also provided a detailed explanation of why GK9's proposal deserved a weakness. *Id.* at 1948.  The Court will not second-guess the judgment of the agency in instances such as this. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency").

### 3.  Use of [xxxxxxxxxxxxxx]

GK9 argues USPS' assignment of weaknesses for its proposed use of [xxxxxxxxxxx] was irrational because "they have nothing . . . to do with the Solicitation or SOW" and "conflict with several of the strengths GK9 received for its [xxxxxxx] solution."  GK9 MJAR at 25 (citing AR at 1452).  The government responds it "rationally concluded that GK9's solution had weaknesses, including that [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]." Gov't Post-Award Cross-MJAR at 34.  USPS also argued, "GK9 did not raise this argument to the CO or SDRO and therefore waived it." *Id.*

The solicitation states:  "In making trade-off judgements, the Purchase/SCM Team will consider the most optimal value in overall performance, economy, and efficiency."  AR at 12. Additionally, the solicitation also notes, "[f]or this purchase, best value means that the Postal Service will perform a technical/price trade-off analysis such that businesses judgement will be exercised in selecting the most advantageous offer to the Postal Service, considering both the technical merit and the evaluated total price of the proposals." *Id.*

GK9 explains its "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]." AR at 1054 (GK9's proposal). GK9 further notes, "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]." *Id.* (original emphasis omitted). The TET gave GK9 a weakness for its [xxxxxxxxxxx], explaining GK9's "[xxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx] (offeror's presentation)." *Id.* at 1453 (TET Evaluation). The government contends "operational efficiency of GK9's solution is a relevant consideration." Gov't Post-Award Cross-MJAR at 34. USPS understood what GK9's proposal offered in terms of its technological approach: [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. *Id.* The agency explains efficiency is an important consideration in its overall evaluation of technical factors, and GK9's [xxxxxxxxxxxx] failed to meet the solicitation's efficiency standard due to the potential for [xxxxxxxxxxxxxxxxxxxxx]. AR at 1453. Nothing in the solicitation required USPS to do more than consider GK9's technical approach. USPS thoroughly explained its concerns that GK9's [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]. *Id.* The Court will not second-guess the judgment of the agency in instances such as this. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

## 4. Information on Prior Rollouts

GK9 asserts USPS irrationally assigned GK9's proposal a weakness for its "inadequate" past rollout information because "GK9 provided robust detail on its past rollouts in its proposal and in response to USPS's questions," demonstrating "it had sufficient staff to meet the Solicitation's requirements." GK9 MJAR at 25 (citing AR at 1313, 1378–80, 1042, 1043). The government argues the SDRO, after review, found GK9's additional information it provided in response to government's questions to be inadequate. Gov't Post-Award Cross-MJAR at 34 (citing AR at 1380, 1971–72).

The solicitation states the "offeror's demonstrated responsiveness to the attached Roll-out Schedule" is part of "Evaluation Factor One – Capability" and is to be weighted during the agency's evaluation. AR at 12–13 (solicitation). GK9 provided information on its past rollouts in its proposal in addition to providing a list of current clients: "[xxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxx]." *Id.* at 1043 (original emphasis omitted). In response to an agency's question surrounding GK9's past rollouts over a 12-month period, GK9 provided the following description:

[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].

*Id.* at 1380 (GK9 Response to Questions).  GK9 also stated it would add additional teams during the different phases of the rollout process.  *Id.* at 1046–49.

USPS assigned GK9 a weakness for the information it provided on its past rollouts, explaining GK9 "did not adequately demonstrate history of past national roll-outs."  *Id.* at 1533 (GK9 Debrief).  USPS further reasoned GK9 "does not currently have enough teams to meet the demands of the roll-out schedule and will need to recruit additional teams to meet the schedule."  *Id.*  USPS explained, "to meet each phase of the roll-out schedule, it will need to recruit an additional eleven (11) teams for the domestic roll-out and seven (7) teams for the international roll out."  AR at 784 (supply management competitive award recommendation).  Such "recruitment deficiencies raise the risk of delay in meeting the roll-out schedule."  *Id.*  The agency understood the GK9 rollout schedule to be inadequate after it considered the information GK9 provided:  "GK9PG did not provide a history of past nationwide roll-outs, and it did not provide an explanation of its past national alarm resolution technology roll-outs."  AR at 788 (Supply Management Award Recommendation).  Further, the agency viewed GK9's proposal as a risk due to recruitment deficiency delays, despite a [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxx].  *Id.* at 784 ([xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]).  Nothing in the solicitation required USPS to do more than consider GK9's technical proposal.  USPS thoroughly explained its concerns that GK9's rollout schedule did not provide adequate information to the agency.  *Id.* at 1948 (CO Resolution of GK9 Post-Award Business Disagreement).  The Court will not second-guess the judgment of the agency in instances such as this.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

### 5.  Reliance on USPS Wi-Fi

USPS assigned GK9 a weakness for "requir[ing] USPS to provide wifi" at the live demonstration.  AR at 1453.  GK9 argues this rating was irrational because its proposal states "it would [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].'"  GK9 MJAR at 26 (citing AR at 1054).  GK9 also argues USPS was irrational in assigning MSA a strength for providing a [xx xxxxxxxxx] but not adequately addressing why MSA received this strength.  *Id.* (citing AR at 1455).  The government responds, "GK9's argument fails because its proposal stated that its [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx], but USPS found that GK9 required USPS wifi at its live demonstration."  Gov't Post-Award Cross-MJAR at 34.  The government further argued, "GK9 did not raise this challenge to the CO or SDRO and it is therefore waived."  *Id.*

The solicitation states: "the connection must be made via a minimum of a 256 bit encrypted connection by either cellular, Wi-Fi, or LAN, independent of the Postal Service/USPIS network unless expressly requested or authorized." AR at 39. While GK9 claims [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]," USPS found otherwise when [xxxx xxxxx] were dependent upon the Postal Service/USPIS network for connection at demonstration. *Id.* at 1453. Nothing in the solicitation required USPS to do more than consider the offeror's technical approach in accordance with the solicitation. The agency thoroughly explained why [xxxxxxxxxx] do not meet the solicitation requirements in relying upon Postal Service/USPIS network for connection when the SOW stated its connection must be independent of the network unless expressly authorized. *Id.* at 1948 (CO Resolution of GK9 Post-Award Business Disagreement). The Court will not second-guess the judgment of the agency in instances such as this. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

### G. The Overall Deficit in Plaintiffs' Technical Ratings

At oral argument, counsel for MSA stressed, "the protestors have failed to show how even if they are correct that the Government was wrong in assigning strengths and weaknesses, how it would overcome the large deficit in the technical ratings." Post-Award OA Tr. at 205:6–10. MSA added, "AMK-9 has not explained how it would overcome the fact that it was two adjectival ratings below the awardee, MSA, with the small number of strengths and weaknesses that they have identified as potentially improper or irrational." *Id.* at 205:13–17. MSA further noted, "even if all of the technical issues that GK9 alleges are correct, they still don't overcome the fact that they have a vastly lower technical rating and a higher price." *Id.* at 220:1–10. Counsel for AMK9 responded, "[b]ut for the flaws in the evaluation . . . AMK9 offers a lower price than MSA. The government didn't do the evaluation or the tradeoff based on the evaluation as it should have been done rationally." *Id.* at 205:22–24. Counsel for GK9 acknowledged, "We don't dispute that some of those weaknesses may have been rational." *Id.* at 212:9–10.

AMK9 received several additional weaknesses that negatively affected its technical evaluation score. AR at 1443–44 (TET Evaluation). AMK9 failed to provide USPS with the TSA External Control Audits despite being asked twice. *Id.* at 1443. The TET found AMK9's proposal "increases the risk that the offeror may not be able to properly maintain records that are required for purposes of this contract." *Id.* USPS contacted TSA directly to obtain AMK9's score, which at [xxx] was the lowest TSA external audit score of the technically acceptable offerors. *Id.* The TET found "the offeror's unwillingness to provide this information increases the risk" because "the offeror may not be forthcoming with information that is important to the contract, but does not reflect positively on the offeror." *Id.* Concerning AMK9's report of its alarm resolution history, the evaluation team noted, "[t]he offeror is willfully misrepresenting its past capabilities." *Id.* at 1445. The Court agrees with the government that these issues "go[] right to the core of the safety function," and the Court finds the government provides a rational basis for its analysis of AMK9's proposal. Post-Award OA Tr. 199:4–5; AR at 780 (Technical Proposal Evaluation); *see Banknote*, 365 F.3d at 1357.

GK9 also received several weaknesses it does not challenge. The government at oral argument noted, "[GK9] only had [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxx]" instead of the "[xxxxxxxxxxxxxxxxxxx]" the solicitation requested. Post OA Tr. 209:16–17, 22. Further, GMK9's TSA audit score was described as "not optimal" by the technical evaluation team. AR at 1452 (TET Evaluation). Additionally, the evaluation team observed, "[xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxx]." AR at 1453 (TET Evaluation). All of these weaknesses support a finding the government rationally analyzed GK9's proposal. AR at 780 (Technical Proposal Evaluation); *see Banknote*, 365 F.3d at 1357.

In contrast, MSA "was the only offeror that exceeded the criteria requested in this evaluation factor" by including a list of benefits, one of which is "[s]coring the highest of those tested on the TSA External Audits." AR at 784. Further, "MSA was the only offeror that provided [xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx]." *Id.* The TET rated MSA substantially better: regarding K-9 services, which comprised 60% of the evaluation, "the TET did not identify any significant weaknesses or deficiencies in its proposal." *Id.* With respect to alarm resolution, which made up 30% of the evaluation, the TET "did not identify any weaknesses with MSA's Alarm Resolution technology or plan." *Id.* at 786. Accordingly, even if AMK9's and GK9's disputed evaluation factors were decided in plaintiffs' favor, these items do not outweigh the quantity and quality of the other weaknesses plaintiffs received in the evaluation, nor do they detract from MSA's "Excellent" rating. *Id.* at 780.

## IX. Prejudice

### A. Whether MSA's Font Size Prejudiced Plaintiffs

AMK9 argues, "[h]ad MSA complied with the font requirement, its proposal may have left out information in order to comply with the page limitations." AMK9 Post-Award Reply at 3. At oral argument, counsel for AMK9 explained MSA's font size discrepancy would "at the very least, . . . make a difference as to whether or not MSA warranted a weakness." Post-Award OA Tr. at 41:5–7. GK9 argues MSA's smaller font size allowed it to submit additional information beyond what other competitors who complied with the font size requirements were able to submit.[8] According to counsel for GK9, MSA's ability to fit more content into its 20-page proposal "goes to an issue of fundamental fairness." *Id.* at 24:19–20. Both plaintiffs contend MSA's violation of the font size requirement should have disqualified MSA's proposal from consideration. AMK9 Post-Award MJAR at 16–17; GK9 MJAR at 18. The government objects to plaintiffs' argument MSA should have been disqualified, arguing the government "reserved the right to waive" the font size discrepancy. Gov't Post-Award Cross-MJAR at 27. The government notes AMK9 and GK9 both benefitted from improving and expanding their submissions in response to clarifying follow-up questions USPS sent to them, contending that overall, plaintiffs "benefitted from the flexibility accorded by USPS rather than being prejudiced by it." *Id.* At oral argument, the government presented an alternative argument, stating, "the instruction to offerors in the solicitation says 20 pages, but it also says it's 20 pages not including

---

[8] The Court: "And just to confirm . . . the prejudice issue is . . . that there was additional documentation able to be submitted in MSA's proposal as compared to others?" Counsel for GK9: "Yes, your Honor." Post-Award OA Tr. at 45:23–46:2.

any necessary or relevant attachments," and any information in MSA's proposal could have been attached.  Post-Award OA Tr. 20:15–17; 32:1–7.

"The disappointed bidder must show a 'clear and prejudicial violation of applicable statutes or regulations.'"  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001).  "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."  *Data Gen. Corp. v. Johnson* 78 F.3d 1556, 1562 (Fed. Cir. 1996).  For post-award protests, "[t]o establish prejudice [plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors in the bid process."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005).  The solicitation states:  "Proposal responses to Statement of Work combined with the responses to the Evaluation Factors requirements are limited to a total twenty (20) pages, not including any requested or relevant attachments."  AR at 212 (Solicitation).

The government at oral argument stated, "[t]here's no hypothetical on what it would have been if [MSA] had made a table an[] attachment as opposed to part of the 20-page document."  Post-Award OA Tr. at 20:24–21:2.  At oral argument, counsel for GK9 conceded, "I don't dispute that relevant attachments could be outside the page limitation" but added GK9 did not consider information "directly responsive to all of Section 3 or past performance" as "appropriate" attachments.  Post-Award OA Tr. at 34:13–15; 34:20–21; 35:11.  Counsel for GK9's understanding of the solicitation is incorrect, as the solicitation also stated in an answer to a question incorporated by amendment, "[o]fferors can determine what constitutes a relevant attachment."  AR at 167 (Solicitation Amendment 001).  The fact that MSA, in accordance with the solicitation, could have supplemented its proposals with anything it considered relevant undermines plaintiffs' reliance on USPS's 20-page submission limit.  *See id.*  Further, the government reserved the right to issue clarification proposals to offerors, and in response to clarification questions issued to plaintiffs, AMK9 and GK9 provided detailed 22-page and 17-page discussion responses, respectively.  *Id.* at 1335–57 (AMK9 discussion responses), 1372–89 (GK9 discussion responses).  All parties had ample opportunity to fully detail and explain technical proposals, and the government fairly and fully considered each proposal; AMK9 and GK9 thus fail to demonstrate that "but for the [government's] errors in the bid process," either plaintiff had a "substantial chance" of receiving the contract; there is accordingly no prejudice.  *Bannum*, 404 F.3d at 1358.

## X.    Relief

As fully discussed in the previous Remand Order, this Court has broad authority under the Tucker Act to remand bid protests without vacating the contract award.  *See* Remand Order at Section VI.; 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.").  "[O]nce jurisdiction attaches, the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy."  *Turner Const. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011).  If the limited record before the court precludes a determination as to whether "the procurement official's decision lacked a rational basis . . . or . . . the procurement procedure involved a violation of regulation or procedure," a

court's decision to remand the matter to the agency appropriately avoids invading the province of the agency and substituting the court's judgment for that of the agency.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The Federal Circuit holds, "[t]he focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  The Court finds, as discussed in detail *supra* at Section VIII.B.:  (1) "the existing record is insufficient to permit meaningful review consistent with the APA," and (2) the government was unable to confirm USPS is not responsible for "omission of extra-record evidence preclud[ing] effective judicial review."  *See supra* at Section VIII.B., VIII.B.4. n.7; *Axiom*, 564 F.3d at 1379–81.

The Court's finding the USPS CO's investigation to be arbitrary and capricious for failing to consider all information related to the potential OCI in this case, *supra* at Section VIII.B., means the CO, the SDRO, and the Court are not in a position to determine whether MSA has an OCI.  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Domenico Garufi*, 238 F.3d at 1332; *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) ("It may be that the agency can provide a reasonable explanation for its decision[,] . . . [b]ut it has not yet done so.").  The Court hereby orders this case to be remanded to USPS for the CO to provide a complete account of the OCI investigation consistent with the guidance in USPS's SP&Ps.  28 U.S.C. § 1491(b)(1); RCFC 52.2(a); *Turner*, 645 F.3d at 1388; *see Tikigaq Constr., LLC v. United States*, No. 16-708C, 2016 WL 6080803, at *8 (Fed. Cl. Oct. 6, 2016) ("[T]he administrative record in this matter clearly demonstrates that the [agency's action] in this case is not supported, or even explained, by the current record evidence.  Given this, the Court cannot ascertain a rational basis for the agency's . . . action.  And so, a remand of this matter to the [agency] is warranted.").  At a minimum, as discussed *supra*, USPS should conduct a complete OCI remand investigation review with full resolution of factual contradictions from the previous remand investigation and resolution of all biased ground rules OCI issues.

According to the Tucker Act, "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  28 U.S.C. § 1491(b)(3).  The Court appreciates the national security and public safety concerns the government discussed in its HSD filings and at the 16 February 2021 status conference, and the Court notes AMK9's counsel agreed at the 16 February status conference with the validity of these concerns.  16 February 2021 SC Tr. at 60:11–15.  For all these reasons, the Court remands without vacatur, stays further consideration of plaintiffs' MJAR OCI arguments, and orders a status conference for further discussion of the remand and relief in light of HSD considerations.

### A.  Details Regarding Remand of Case to USPS

For the foregoing reasons, the Court **REMANDS** this case to USPS.  As agreed by counsel, the Court will hold a sealed, in-person status conference on **12 August 2021 at 10:30 a.m. EDT**.  The Court notes GK9 filed a motion to supplement the administrative record with depositions on 30 July 2021; the Court will also hold discussion of this motion at the status

conference.  *See* Mot. to Supp. the Admin. R. with the Depositions of Chris Shelton and Ron Brawner Based on Newly Discovered Evidence and Incorporated Brief, ECF No. 105.

Pursuant to RCFC 52.2(b), the Court provides the following instructions for remand:

(1) The remand period shall terminate on Wednesday, 1 September 2021.  If USPS does not respond on or before Wednesday, 1 September 2021, the parties shall follow the procedures set forth in RCFC 52.2(c).

(2) USPS shall reopen the OCI investigation into MSA and Mr. Shelton according to guidelines provided by the SP&Ps and reassess a complete and documented review of the OCI in light of the Court's OCI findings discussed *supra*.

(3) The administrative record of remand proceedings shall fully address the Court's OCI findings discussed *supra* and comply with the guidelines provided by the SP&Ps.

(4) When proceedings before USPS conclude, the government shall file with the Clerk's office, pursuant to RCFC 52.2(d):  (1) any additional review USPS conducts regarding MSA's potential OCI; and (2) two copies of USPS's administrative record of remand proceedings and any action taken, including a complete OCI decision based on all additional information.  On or before 7 September 2021 at 5:00 p.m. EDT, the parties shall file a joint status report proposing future proceedings, pursuant to RCFC 52.2(e)(1).

Pursuant to the protective order in this case, government counsel is directed to serve a copy of this opinion and order on USPS CO Jeremiah D. Baker.

## XI.     Conclusion

For the reasons discussed *supra*, the Court **DENIES IN PART AND STAYS IN PART** AMK9's pre-award and post-award MJARs, **DENIES IN PART AND STAYS IN PART**, GK9'S MJAR, **GRANTS IN PART AND STAYS IN PART** the government's pre-award and post-award cross-MJARs and **GRANTS IN PART AND STAYS IN PART** MSA's cross-MJAR, and **REMANDS** this case to USPS for complete investigation.

As agreed by counsel, the Court will hold a sealed, in-person status conference on **12 August 2021 at 10:30 a.m. EDT**.  The government and MSA shall respond to GK9's motion to supplement the administrative record on or before **6 August 2021**; GK9 shall reply on or before **10 August 2021 at 12:00 p.m. EDT**.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge